Slip Op. 20-167

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS,<br><br>      Plaintiff,<br><br>  and<br><br>FONTAINE INC., ET AL.,<br><br>      Consolidated Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>  and<br><br>FONTAINE INC., ET AL.,<br><br>      Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Consol. Court No. 19-00122 |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final results in the countervailing duty expedited review of certain softwood lumber products from Canada for reconsideration of the statutory basis upon which Commerce promulgated 19 C.F.R. § 351.214(k).]

Dated: November 19, 2020

Sophia J.C. Lin, Picard Kentz & Rowe LLP, of Washington, DC, argued for Plaintiff Committee Overseeing Action for Lumber International Trade Investigations or Negotiations.  With her on the brief were Lisa W. Wang, Andrew W. Kentz, David A. Yocis, Nathanial M. Rickard, Whitney M. Rolig, Heather N. Doherty, and Zachary J. Walker.

Consol. Court No. 19-00122                                           Page 2

Alan G. Kashdan, McDermott Will & Emery LLP, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Government of Canada.  With him on the brief were Joanne E. Osendarp, Lynn G. Kamarck, Dean A. Pinkert, Daniel M. Witkowski, Julia K. Eppard, and Stephen R. Halpin, III, Hughes Hubbard & Reed LLP, of Washington, DC.

Nancy A. Noonan, Arent Fox LLP, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Government of Québec.  With her on the brief were Matthew J. Clark and Aman Kakar.

Elliot J. Feldman and Mark B. Lehnardt, Baker Hostetler, LLP, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Fontaine Inc.

John R. Magnus, TradeWins LLC, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Mobilier Rustique (Beauce) Inc.

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Nikki Kalbing, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Stephan E. Becker, Aaron R. Hutman, and Moushami P. Joshi, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, for Defendant-Intervenor Government of New Brunswick.

Yohai Baisburd, Jonathan M. Zielinski, and James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor Scierie Alexandre Lemay & Fils Inc.

Edward M. Lebow, Haynes and Boone, LLP, of Washington, DC, for Defendant-Intervenors Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc.

Richard L.A. Weiner, Rajib Pal, and Alex L. Young, Sidley Austin LLP, of Washington, DC, for Defendant-Intervenors North American Forest Products Ltd, Parent-Violette Gestion Ltée, and Le Groupe Parent Ltée.


    Barnett, Judge:  In this case, the court considers whether the U.S. Department of

Commerce ("Commerce" or "the agency") was authorized to create an expedited review

process to determine individual countervailing duty ("CVD") rates for exporters not

individually examined in an investigation.[1]  This process is distinct from annual reviews,

new shipper reviews, and sunset reviews that readers may often encounter and that are

expressly provided for by statute.  Here, Commerce established the expedited review

process by regulation and the court must determine whether the statutory authority

identified by Commerce provides a legal basis for that regulation.  As discussed herein,

the court concludes that the answer is no and remands the determination for Commerce

to either identify an alternative basis for the regulation or take other action in conformity

with this opinion.

　　　This consolidated case is before the court on a motion for judgment on the

agency record pursuant to U.S. Court of International Trade ("USCIT") Rule 56.2 filed by

Plaintiff Committee Overseeing Action for Lumber International Trade Investigations or

Negotiations ("Plaintiff" or "the Coalition").  Confidential Pl.'s Rule 56.2 Mot. for J. on the

Agency R. and accompanying Confidential Mem. in Supp. of Pl.'s Rule 56.2 Mot. for J.

on the Agency R. ("Coalition Br."), ECF No. 101.  Plaintiff, an association of domestic

manufacturers, producers, and wholesalers of softwood lumber products, Compl. ¶ 9,

ECF No. 2, challenges Commerce's final results in the CVD expedited review of certain

softwood lumber products from Canada, *see Certain Softwood Lumber Products From*

*Canada*, 84 Fed. Reg. 32,121 (Dep't Commerce July 5, 2019) (final results of CVD

expedited review) ("*Final Results of Expedited Review*"), ECF No. 99-5, and

accompanying Issues and Decision Mem. ("I&D Mem."), C-122-858 (June 28, 2019),

---

[1] For ease of reference, the court characterizes the type of proceeding at issue in this case as a "CVD expedited review."

Consol. Court No. 19-00122                                                    Page 4

ECF No. 99-6.[2]  Plaintiff argues, *inter alia*, that Commerce exceeded the congressional

grant of rulemaking authority set forth in section 103(a) of the Uruguay Round

Agreements Act ("URAA" or "the Act"), Pub. L. No. 103-465, 108 Stat. 4809 (1994),

when the agency promulgated the regulation governing CVD expedited reviews, 19

C.F.R. § 351.214(k), pursuant to that statutory provision.  Coalition Br. at 14–32; *see*

*also* Pl. [Coalition's] Reply Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R.

("Coalition Reply") at 2–12, ECF No. 127.

     For the reasons discussed herein, the court agrees that Commerce exceeded its

relied-upon authority and remands the matter to the agency for Commerce to reconsider

the statutory basis for its regulation.[3]

---

[2] The administrative record is divided into a Public Administrative Record, ECF
No. 99-2, and a Confidential Administrative Record, ECF Nos. 99-3, 99-4.  Parties
submitted joint appendices containing record documents cited in their briefs. *See* Public
J.A., ECF No. 148; Confidential J.A., ECF No. 149.

[3] Because the validity of the regulation underlying Commerce's *Final Results of
Expedited Review* remains open to question, the court declines to resolve Plaintiff's
additional argument that the cash deposit and liquidation instructions that Commerce
issued following the *Final Results of Expedited Review* violated 19 C.F.R.
§ 351.214(k)(iii).  *See* Coalition Br. at 32–33.  The court also declines to resolve the
various challenges to Commerce's calculation of individual cash deposit rates raised by
Plaintiff in its motion and by Consolidated Plaintiffs in their respective motions.  *See id.*
at 33–47; Mot. for J. Upon the Agency R. Under Rule 56.2 of Consol. Pl. Mobilier
Rustique (Beauce) Inc., ECF No. 100, and accompanying Pl.'s Mem. in Supp. of Mot.
for J. on the Agency R., ECF No. 100-1; Rule 56.2 Mot. of Fontaine[] Inc[.] for J. on the
Agency R., ECF No. 103, and accompanying Confidential Corrected Mem. in Supp. of
Rule 56.2 Mot. of Fontaine[] Inc[.] for J. on the Agency R., ECF No. 150; Consol. Pl.
Gov't of Can.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 105, and
accompanying Consol. Pl. Gov't of Can.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the
Agency R., ECF No. 156; Consol. Pl. Gov't of Que.'s Rule 56.2 Mot. for J. on the
Agency R., ECF No. 106, and accompanying Consol. Pl.'s Mem. in Supp. of Mot. for J.
on the Agency R., ECF No. 145.

**BACKGROUND**

**I.    The Uruguay Round Agreements Act**

Congress enacted the URAA on December 8, 1994.  Pub. L. No. 103-465, 108 Stat. 4809 (1994).  The Act, which became effective on January 1, 1995, amended the domestic antidumping ("AD") and CVD laws in connection with several international trade agreements referred to as the Uruguay Round Agreements.  *See* 19 U.S.C. §§ 3511(a)(1), (d), & 3501(7).  Relevant here, one such agreement is the Agreement on Subsidies and Countervailing Measures ("SCM Agreement").  *Id.* § 3511(d)(12); *see generally* Agreement Establishing the World Trade Organization, Apr. 15, 1994, 1869 U.N.T.S. 14, Annex 1A, SCM Agreement.  Pursuant to Article 19.3 of the SCM Agreement:

> When a countervailing duty is imposed in respect of any product, such countervailing duty shall be levied, in the appropriate amounts in each case, on a non-discriminatory basis on imports of such product from all sources found to be subsidized and causing injury, except as to imports from those sources which have renounced any subsidies in question or from which undertakings under the terms of this Agreement have been accepted.  *Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter*.

SCM Agreement, art. 19.3 (emphasis added).

The Statement of Administrative Action ("SAA") accompanying the URAA discussed the statutory amendments to Title VII of the Tariff Act of 1930 considered necessary to implement Article 19.3.  *See* URAA, SAA, H.R. Doc. No. 103–316, vol.1, at 941–42 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4250–51.  Prefacing those

changes, the SAA explained that, under pre-URAA law, "Commerce normally calculate[d] a country-wide [CVD] rate applicable to all exporters unless there [was] a significant differential in CVD rates between companies or if a state-owned company [was] involved." *Id.* at 941, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4250.  The SAA further explained that, pursuant to Article 19.3 of the SCM Agreement, an "exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter." *Id.*  The SAA then discussed several changes to U.S. trade laws effected by sections 264, 265, and 269[4] of the URAA.  *Id.* at 941–42, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4251.  Those changes included Commerce's calculation of individual CVD rates for exporters and producers that were individually investigated in an investigation or administrative review, an all-others rate for those that were not individually examined, and, in certain circumstances, a country-wide CVD rate.  *See id.*  The SAA did not, however, discuss any implementation of CVD expedited reviews.[5]

---

[4] The SAA misattributes changes made by URAA § 269 to URAA § 265.  *See* SAA at 941–42, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4251; URAA § 269(a) (amending 19 U.S.C. § 1677f-1 to add new subsection (e)).

[5] The portion of the SAA dedicated to discussing the statutory changes necessary to implement the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (otherwise referred to as "the Antidumping Agreement") contains a section regarding "new shipper reviews."  SAA at 875–76, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4203.  "New shippers are defined as exported and producers . . . that . . . : (1) did not export the merchandise to the United States . . . during the original period of investigation; and (2) are not affiliated with any exporter or producer who did . . . . , including those not examined during the investigation."  SAA at 875, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4203.  During the Uruguay Round negotiations, "[t]he United

Congress expressly approved the SAA in the URAA.  *See* 19 U.S.C.

§ 3511(a)(2).  Further, the SAA "shall be regarded as an authoritative expression by the

United States concerning the interpretation and application of the Uruguay Round

Agreements and this Act [i.e., the URAA] in any judicial proceeding in which a question

arises concerning such interpretation or application."  *Id.* § 3512(d).

## II.    Implementing Regulations

Section 103 of the URAA delegated authority to Commerce, among others, to

promulgate interim and final regulations implementing the provisions of the Act.  19

U.S.C. § 3513.  This section provides:

(a) Implementing actions

After December 8, 1994—

(1) the President may proclaim such actions, and
(2) other appropriate officers of the United States Government may issue such regulations,

as may be necessary to ensure that *any provision of this Act, or amendment made by this Act*, that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States *is appropriately implemented on such date*.  Such proclamation or regulation may not have an effective date earlier than the date of entry into force with respect to the United States of the agreement to which the proclamation or regulation relates.

---

States agreed . . . to provide new shippers with an expedited review" in order to "establish individual dumping margins for such firms on the basis of their own sales."  *Id.* Expedited reviews for new shippers apply to determinations of both AD and CVD duties. *See* 19 U.S.C. § 1675(a)(2)(B).  However, such new shipper reviews are distinct from the CVD expedited review at issue here.  *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* ("*Lumber II*"), 43 CIT ___, ___, 413 F. Supp. 3d 1334, 1343–45 (2019) (discussing the differences).

(b) Regulations—

> Any interim regulation necessary or appropriate to carry out any action proposed in the statement of administrative action approved under section 3511(a) of this title to implement an agreement described in section 3511(d)(7), (12), or (13) of this title shall be issued not later than 1 year after the date on which the agreement enters into force with respect to the United States.

*Id.* (emphasis added).[6]

On May 11, 1995, Commerce issued interim regulations.  *See Antidumping and Countervailing Duties*, 60 Fed. Reg. 25,130 (Dep't Commerce May 11, 1995) (interim regulations; request for cmts.).  Commerce did not address CVD expedited reviews in those interim regulations.  *See id.* at 25,130–33 (discussing the regulations).

On May 19, 1997, Commerce published its final agency regulations concerning the implementation of the URAA.  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*").  These regulations finalized new provisions governing new shipper reviews.  *Id.* at 27,318–22 (discussing 19 C.F.R. § 351.214).  Subsection (k) of the new shipper regulation further provided for Commerce's implementation of CVD expedited reviews.  *See* 19 C.F.R. § 351.214(k) (1998); *Preamble*, 62 Fed. Reg. at 27,321.

---

[6] With respect to implementing regulations, the SAA states:
> In practice, the Administration will endeavor to amend or issue the regulations required to implement U.S. obligations under the Uruguay Round [A]greements as soon as practicable after the time the obligations take effect.  Section 103(a) of the [the URAA] provides the authority for such new or amended regulations to be issued, and for the President to proclaim actions implementing the provisions of the Uruguay Round [A]greements, on the date they enter into force for the United States.

SAA at 677, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4055–56.

Subsection (k) of the new shipper regulation permits a respondent that was not

selected "for individual examination" or accepted "as a voluntary respondent" in a CVD

investigation in which Commerce "limited the number of exporters or producers to be

individually examined" to "request a review . . . within 30 days of the date of publication

in the Federal Register of the [CVD] order."  19 C.F.R. § 351.214(k)(1).  A company

requesting a CVD expedited review must certify that:

> (i) The requester exported the subject merchandise to the United States
> during the period of investigation;
> (ii) The requester is not affiliated with an exporter or producer that the [agency]
> individually examined in the investigation; and
> (iii) The requester has informed the government of the exporting country that the
> government will be required to provide a full response to the [agency's]
> questionnaire.

*Id.* § 351.214(k)(1)(i)–(iii).  If requested, an expedited review will be initiated "in the

month following the month in which a request for review is due."  *Id.* § 351.214(k)(2)(i).

Additionally, the expedited review will be conducted "in accordance with the provisions

of this section applicable to new shipper reviews," subject to certain exceptions.  *Id.*

§ 351.214(k)(3).[7]

---

[7] Those exceptions are:
> (i) The period of review will be the period of investigation used by the
> [agency] in the investigation that resulted in the publication of the
> countervailing duty order;
> (ii) The [agency] will not permit the posting of a bond or security in lieu of a
> cash deposit under paragraph (e) of this section;
> (iii) The final results of a review under this paragraph (k) will not be the
> basis for the assessment of countervailing duties; and
> (iv) The [agency] may exclude from the countervailing duty order in
> question any exporter for which the [agency] determines an individual net
> countervailing subsidy rate of zero or de minimis . . . , provided that the
> [agency] has verified the information on which the exclusion is based.

19 C.F.R. § 351.214(k)(3) (citation omitted).

### III.    The CVD Order and Expedited Review of the Order

On January 3, 2018, following affirmative determinations of countervailable subsidization and material injury, Commerce published the CVD order on certain softwood lumber products from Canada.  *See Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 347 (Dep't Commerce Jan. 3, 2018) (am. final aff. [CVD] determination and [CVD] order) ("*CVD Order*").  On March 8, 2018, in response to requests filed by certain Canadian producers, Commerce initiated an expedited review of the *CVD Order*.  *See Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 9,833 (Dep't Commerce March 8, 2018) (initiation of expedited review of the [*CVD Order*]) ("*Initiation Notice*").  The companies subject to the expedited review (and their affiliates) are companies that were not selected for individual examination during the investigation and that had been assigned the "all-others" rate of 14.19 percent.  *CVD Order*, 83 Fed. Reg. at 348–49.  The "period of review" for the CVD expedited review was January 1, 2015, through December 31, 2015 (the same as the period of investigation in the original investigation).  *Initiation Notice*, 83 Fed. Reg. at 9,833.

On July 5, 2019, Commerce issued the *Final Results of Expedited Review*, pursuant to which the agency calculated reduced or *de minimis* rates for the eight companies as follows: (1) Les Produits Forestiers D&G Ltée and its cross-owned affiliates ("D&G"): 0.21 percent; (2) Marcel Lauzon Inc. and its cross-owned affiliates ("Lauzon"): 0.42 percent; (3) North American Forest Products Ltd. and its cross-owned affiliates ("NAFP"): 0.17 percent; (4) Roland Boulanger & Cie Ltée and its cross-owned affiliates ("Roland"): 0.31 percent; (5) Scierie Alexandre Lemay & Fils Inc. and its cross-

owned affiliates ("Lemay"): 0.05 percent; (6) Fontaine Inc. and its cross-owned affiliates

("Fontaine"): 1.26 percent; (7) Mobilier Rustique (Beauce) Inc. and its cross-owned

affiliates ("Rustique"): 1.99 percent; and (8) Produits Matra Inc. and Sechoirs de Beauce

Inc. and their cross-owned affiliate ("Matra"): 5.80 percent.  84 Fed. Reg. at 32,122.

 The rates calculated for D&G, Lauzon, NAFP, Roland, and Lemay are

considered *de minimis*; therefore, Commerce stated it would instruct CBP "to

discontinue the suspension of liquidation and the collection of cash deposits of

estimated countervailing duties on all shipments of softwood lumber produced and

exported by" those companies that were entered on or after July 5, 2019; "liquidate,

without regard to countervailing duties, all suspended entries of shipments of softwood

lumber produced and exported by" those companies; and "refund all cash deposits of

estimated countervailing duties collected on all such shipments."  *Id.*  As to the

companies receiving a lower—but not *de minimis*—rate (Fontaine, Rustique, and

Matra), Commerce stated it would instruct CBP "to collect cash deposits of estimated

countervailing duties" at the lower rates calculated in the *Final Results of Expedited

Review*.  *Id.*

 In the Issues and Decision Memorandum accompanying the *Final Results of

Expedited Review*, Commerce explained that section 103(a) of the URAA authorized

the agency to promulgate 19 C.F.R. § 351.214(k) and conduct CVD expedited reviews.

I&D Mem. at 18–20.  According to Commerce, section 103(a) affords Commerce "the

authority to promulgate regulations to ensure that remaining obligations under the

URAA which were not set forth in particular statutory provisions were set forth in the

Code of Federal Regulations." *Id.* at 19; *see also id*. at 20 (explaining that the

regulation "ensures that United States law is consistent with [international] obligations").

### IV.   Procedural History of This Case

Plaintiff commenced this action on July 15, 2019.  Summons, ECF No. 1.

Plaintiff alleged jurisdiction pursuant to 28 U.S.C. § 1581(i)(4) (2018)[8] or, alternatively,

28 U.S.C. § 1581(c).[9]  Compl. ¶¶ 3–6.

On July 26, 2019, the court vacated a temporary restraining order requested by

the Coalition barring U.S. Customs and Border Protection ("CBP") from liquidating

unliquidated entries of softwood lumber produced or exported by certain Canadian

companies that received reduced or *de minimis* rates in the *Final Results of Expedited*

*Review*.  *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v.*

*United States*, 43 CIT ___, 393 F. Supp. 3d 1271 (2019).  The court also denied

Plaintiff's motion for a preliminary injunction seeking the same relief.  *See id.*

On November 4, 2019, the court denied the Government's motion to dismiss

pursuant to USCIT Rule 12(b)(1) for lack of subject matter jurisdiction.  *Lumber II*, 413

F. Supp. 3d at 1347.  While exercising jurisdiction pursuant to 28 U.S.C. § 1581(i)(4),

---

[8] Pursuant to 28 U.S.C. § 1581(i)(4):

> [T]he Court of International Trade shall have exclusive jurisdiction of any
> civil action commenced against the United States, its agencies, or its
> officers, that arises out of any law of the United States providing for ...
> administration and enforcement with respect to the matters referred to in
> paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this
> section.

[9] Pursuant to 28 U.S.C. § 1581(c), "[t]he Court of International Trade shall have
exclusive jurisdiction of any civil action commenced under section 516A or 517 of the
Tariff Act of 1930," i.e., 19 U.S.C. §§ 1516a, 1517.

the court entered an order instructing, *inter alia*, that "the disposition of these cases shall follow the procedures set forth in Rule 56.2" of the rules of this court.  Order (Nov. 4, 2019), ECF No. 92.[10]

On November 12, 2019, the court consolidated Court Nos. 19-00122, 19-00154, 19-00164, 19-00168, and 19-00170 under this lead action and set a scheduling order. Order (Nov. 12, 2019), ECF No. 93 (consolidation); Order (Nov. 12, 2019), ECF No. 94 (scheduling); *see also* Order (Apr. 6, 2020), ECF No. 113 (amending the scheduling order).  Plaintiff subsequently filed the instant motion on December 19, 2019.  *See* Coalition Br.  Thereafter, Defendant United States ("Defendant" or "the Government") and Defendant-Intervenors filed their respective responses to the Coalition's arguments. Confidential Def.'s Resp. [to] Pls.' Mots. For J. on the Agency R. ("Gov't Resp."), ECF No. 110; Joint Br. of Def.-Ints. Gov't of Can. and Gov't of Que. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("CGP Resp."), ECF No. 120;[11] *see also* [Resp.] of Def.-Ints. Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("D&G/Lauzon Resp."), ECF No. 117;[12] Resp. of Def.-Int. Scierie Alexandre Lemay & Fils Inc. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Lemay

---

[10] Relatedly, the court waived the requirement for the Government to file an Answer in this case.  Docket Entry (Nov. 19, 2019), ECF No. 98; *see also* USCIT Rule 7(a)(2) (requiring an "answer to a complaint" to be filed in any action other than one "described in 28 U.S.C. § 1581(c)").

[11] CGP stands for "Canadian Governmental Parties."  The Canadian Governmental Parties consist of Defendant-Intervenors Government of Canada and Government of Québec.  *See* CGP Resp. at 1.

[12] D&G and Lauzon support the arguments made by the CGP regarding Commerce's authority to promulgate 19 C.F.R. § 351.214(k) and offered no additional arguments on that issue.  D&G/Lauzon Resp. at 1–2.

Resp."), ECF No. 119;[13] Def.-Int. [NAFP's] Resp. to Pl.'s Rule 56.2 Mot. for J. on the

Agency R., ECF No. 125;[14] Resp. of Def.-Int. Gov't of N.B. in Opp'n to Pl.'s Mot. for J.

on the Agency R., ECF No. 141.[15]  The Coalition has filed a reply.  *See* Coalition Reply.

On September 16, 2020, the court heard oral argument on Commerce's authority

to promulgate 19 C.F.R. § 351.214(k).  *See* Docket Entries, ECF Nos. 166, 168.

### JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(i)(4).  The court

reviews an action commenced pursuant to 28 U.S.C. § 1581(i)(4) in accordance with

the standard of review set forth in the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 706, as amended.  *See* 28 U.S.C. § 2640(e).  Section 706 directs the court, *inter alia*,

to "hold unlawful and set aside agency action, findings, and conclusions found to be . . .

in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5

U.S.C. § 706(2)(C).

### DISCUSSION

Section 103(a) of the URAA delegates authority to "appropriate officers of the

United States Government [to] issue such regulations, as may be necessary to ensure

that any provision of this Act, or amendment made by this Act, . . . is appropriately

implemented."  19 U.S.C. § 3513(a)(2).  At issue in this case is the scope of rulemaking

authority granted by section 103(a).  Statutory interpretation requires the court to

---

[13] Lemay adopted by reference the arguments made by other parties and raised no
additional arguments.  Lemay Resp. at 2.
[14] The NAFP did not comment on the issue addressed herein.
[15] The Government of New Brunswick did not comment on the issue addressed herein.

"carefully investigate the matter to determine whether Congress's purpose and intent on

the question at issue is judicially ascertainable."  *Timex V.I., Inc. v. United States*, 157

F.3d 879, 881 (Fed. Cir. 1998).  That inquiry involves an examination of "the statute's

text, structure, and legislative history," applying, if necessary, "the relevant canons of

interpretation."  *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino*

*v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)).  When, as here, the court concludes

that Congress's intent is clear, "that is the end of the matter," and the court "must give

effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v.*

*Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).[16]

## I.   Parties' Contentions

The Coalition contends that Commerce's authority pursuant to section 103(a) is

limited to enacted provisions and, because there is no statutory provision authorizing

Commerce to establish CVD expedited reviews, Commerce exceeded its rulemaking

---

[16] Because the court finds that Congress's intent respecting the scope of rulemaking authority set forth in URAA § 103(a) is unambiguous, the court does not resolve what level of deference, if any, would apply to Commerce's interpretation of section 103(a) if congressional intent were ambiguous.  Commerce does not administer the statutory provision and shares rulemaking authority with other "appropriate officers of the United States Government," all of whom may construe section 103(a) differently.  19 U.S.C. § 3513(a)(2) (codified in Title 19, Chapter 22 (Uruguay Round Trade Agreements), Subchapter 1); 19 U.S.C. § 1677(1) (defining Commerce as the "administering authority" for the domestic trade laws contained in Title 19, Chapter 4 (Tariff Act of 1930), Subtitle IV); *cf. City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 301 (2013) (holding that *Chevron* applies to an agency's "construction of a[n ambiguous] jurisdictional provision *of a statute it administers*") (citation omitted) (emphasis added); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority.").  For the same reason, the court does not address Parties' arguments implicating deference under *Chevron* prong two.  *See, e.g.*, Gov't Resp. at 6, 12–14; CGP Resp. at 4–5, 7–10.

authority when it promulgated 19 C.F.R. § 351.214(k).  Coalition Br. at 14–19.   The

Coalition further argues that Commerce's interpretation of section 103(a) nullifies

sections 123 and 129 of the URAA, which govern U.S. implementation efforts in

response to adverse findings by a dispute settlement panel of the World Trade

Organization ("WTO") or the WTO Appellate Body regarding the United States'

compliance with the provisions of the Uruguay Round Agreements.  *Id*. at 20.  With

respect to the legislative history, Plaintiff contends that "[t]he SAA summarized the

changes Congress felt necessary to conform U.S. law to Article 19.3 of the SCM

Agreement," *id.* at 22, and, thus, demonstrates that Congress considered the issue and

decided against the establishment of CVD expedited reviews, *id.* at 22–23.

     The Government concedes that the URAA does not contain an explicit provision

for the administration of CVD expedited reviews.  *See* Gov't Resp. at 7.  Nevertheless,

the Government contends that section 103(a) authorized Commerce to promulgate

regulations implementing both the URAA and the international trade agreements the Act

approved.  *Id*. at 7–8.  The Government rejects the Coalition's arguments implicating the

procedural requirements of sections 123 and 129 as inapposite to an understanding of

Commerce's authority under section 103(a).  *Id*. at 9.  The Government also disagrees

with Plaintiff as to the significance of the relevant language in the SAA.  According to

the Government, the SAA represents evidence that Congress, through section 103(a),

intended for Commerce to promulgate regulations implementing Article 19.3 of the SCM

Agreement.  *See id.* at 7–8.

The Canadian Governmental Parties advance substantially similar arguments to those of Defendant.  CGP Resp. at 5–6, 10–12, 19.  The Canadian Governmental Parties further assert that the text of section 103(b) authorizing interim regulations supports Commerce's interpretation of section 103(a).  *Id*. at 12–13.  The Canadian Governmental Parties also contend that Congress has acquiesced to Commerce's interpretation of section 103(a) as authorizing Commerce to conduct CVD expedited reviews.  *Id*. at 18 n.11.

## II.   Analysis

Examination of the statutory text, structure, and legislative history compel the court to conclude that Commerce exceeded its authority to the extent that it promulgated 19 C.F.R. § 351.214(k) pursuant to URAA § 103(a).  The court further finds that Congress has not acquiesced to Commerce's interpretation of section 103(a).

### A.  Statutory Text

The plain language of section 103(a)—specifically, the statutory reference to "this Act, or amendment made by this Act"—refers to the URAA.  *See* URAA § 1 ("This Act may be cited as the 'Uruguay Round Agreements Act.'").[17]  The text therefore grants Commerce regulatory authority with respect to enacted provisions, but extends no further to encompass perceived international obligations that Congress did not

---

[17] Notwithstanding the Government's and the Canadian Governmental Parties' respective arguments in support of Commerce's regulation, this interpretation of the text is not contested.  The Canadian Governmental Parties explicitly concede that "this Act" refers to the URAA.  *See* CGP Resp. at 6 ("[T]he language refers to 'any' provision of the URAA or 'any' amendment made by the URAA.").

implement through the URAA.[18]  In matters of statutory interpretation, "courts must

presume that a legislature says in a statute what it means and means in a statute what

it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).  Otherwise,

"[t]o permit an agency to expand its power in the face of a congressional limitation on its

jurisdiction would be to grant to the agency power to override Congress," which the

court cannot do.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374–75 (1986).

Louisiana Public Service Commission addressed the lawfulness of the Federal

Communication Commission's ("FCC") ruling that section 220 of the Communications

Act of 1934 permitted the FCC to prescribe depreciation practices that served to pre-

empt inconsistent state regulations.  476 U.S. at 362, 369.  The Court held that a

separate provision, section 152(b) of the Communications Act of 1934, constrained the

FCC from displacing state law in that regard.  *Id.* at 369–76.  While that case involved "a

congressional denial of power," the broader principle that "an agency literally has no

power to act . . . unless and until Congress confers power upon it," *id.* at 374 (emphasis

omitted), is applicable here.  The opinion of the U.S. Court of Appeals for the Federal

---

[18] The Canadian Governmental Parties attempt to convert the court's analysis of the
statutory language into one pursuant to *Chevron* prong two through the observation that
"section 103(a) of the URAA is silent or ambiguous regarding how Congress intended
for Commerce and other relevant administrative agencies to implement the general
provisions of the URAA."  CGP Resp. at 6.  The court must not, however, be too quick
to "throw up [its] hands and declare that Congress's intent is unclear."  *Timex*, 157 F.3d
at 882 (citation omitted).  In this case, the focal point for the court's inquiry is whether
Commerce had the authority to develop a methodology for conducting CVD expedited
reviews in the first instance, not the reasonableness of Commerce's chosen method of
conducting the reviews.  Thus, the Canadian Governmental Parties' argument lacks
merit.

Circuit ("Federal Circuit") in *FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002) is instructive in this regard.

*FAG Italia* addressed Commerce's position that the agency had the authority to conduct a duty absorption inquiry[19] with respect to an antidumping duty order issued before January 1, 1995[20] in years other than the second or fourth year after publication of the transition order at issue.  *Id.* at 808.  As authority for its position, Commerce relied on the absence of an explicit statutory prohibition and corresponding silence in the legislative history "as to whether Commerce can conduct duty absorption inquiries in years other than years [two] and [four]."  *Id.* at 815.

The Federal Circuit squarely rejected this view of agency authority.  The appellate court explained that Congress only provided for duty absorption inquiries during an administrative review "initiated [two] years or [four] years after the publication of an antidumping duty order," *id.* at 814 (quoting 19 U.S.C. § 1675(a)(4) (2000)), and Commerce could not convert congressional silence regarding the administration of duty

---

[19] Duty absorption inquiries are governed by 19 U.S.C. § 1675(a)(4), which provides:
> During any review under this subsection initiated 2 years or 4 years after the publication of an antidumping duty order under section 1673e(a) of this title, [Commerce], if requested, shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter. . . .

[20] Orders entered before January 1, 1995 are referred to as "transition orders."  19 U.S.C. § 1675(c)(6)(C).  Commerce issued the order in question on May 15, 1989 and conducted the duty absorption review as part of its seventh administrative review, the results of which were published in 1997.  *FAG Italia*, 291 F.3d at 812.

absorption reviews in other years into an authority to do so, *id.* at 815.  The Federal

Circuit reasoned that

> no case of which we are aware holds that an administrative agency has
> authority to fill gaps in a statute that exist because of the absence of
> statutory authority.  To the contrary, the Supreme Court has noted that "an
> agency literally has no power to act . . . unless and until Congress confers
> power upon it," *La. Pub. Serv. Comm'n*[, 476 U.S. at 374 (1986)], and has
> cautioned that "[t]o supply omissions [within a statute] transcends the
> judicial function[,]" *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101
> (1991) (quoting *Iselin v. United States*, 270 U.S. 245, 250–51 (1926)).

*Id.* at 816 (first, third, and fourth alterations original); *see also id.* at 818 n.18 (stating

that Commerce "lack[ed] general authority to act" in its chosen manner).[21]

The appellate court has since reaffirmed the principle that Commerce may not

rely on statutory silence as a source of authority.  *See Agro Dutch Indus. v. United*

*States*, 508 F.3d 1024, 1033 (Fed. Cir. 2007) (addressing 19 U.S.C. § 1675(a)(4) and

stating that, "while Congress may not have affirmatively intended to bar Commerce from

conducting a duty absorption inquiry under the facts presented here, *Congress also did*

*not authorize Commerce to do so, and under settled principles of statutory construction,*

*the effect is the same*, as 'an agency literally has no power to act . . . unless and until

Congress confers power upon it'") (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374)

(emphasis added).  Applying the foregoing principle to the issue at hand compels the

court to conclude that section 103(a), which limits Commerce's rulemaking authority to

---

[21] The Government attempts to distinguish *FAG Italia* on the basis that, in that case, both the statute and legislative history were silent as to whether Congress intended for Commerce to conduct duty absorption reviews on transition orders.  Gov't Resp. at 11. Although the Federal Circuit noted, in passing, the absence of pertinent legislative history, the appellate court reached its ruling based primarily, if not entirely, on the absence of statutory authority.  *See FAG Italia*, 291 F.3d at 814–17.

the URAA, does not provide a basis upon which Commerce may issue a regulation that fills a perceived gap between the United States' international obligations and domestic legislation.

Indeed, contrary to the Government's argument, *see* Gov't Resp. at 8, the notion of gap-filling refers to explicit and implicit legislative delegations of authority to an agency for the purpose of clarifying ambiguous—yet extant—statutory provisions, *see Chevron*, 467 U.S. at 843–44. Effectuating international obligations that Congress has not enacted into domestic law is not a permissible use of Commerce's gap-filling authority. *See id.* Accepting Commerce's interpretation of section 103(a) would significantly enlarge Commerce's authority beyond what the provision supports and turn *Chevron* on its head.[22]

---

[22] At oral argument, the Government of Canada argued that interpreting *FAG Italia* to preclude agency action not expressly authorized by Congress contravenes the requirement for *Chevron* deference in the face of statutory silence. Oral Arg. 44:16–45:16 (reflecting the time stamp from the recording), https://www.cit.uscourts.gov/audio-recordings-select-public-court-proceedings. The court disagrees. *Chevron* deference may apply when "*the statute* is silent or ambiguous with respect to *the specific issue*." 467 U.S. at 843 (emphasis added). Thus, for example, the court may accord deference when a statute is silent or ambiguous as to the methodologies Commerce must employ in calculating the duties contemplated by that statute. *See, e.g.*, *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1360–61 (Fed. Cir. 2010). Statutory silence regarding a specific issue is not, however, the same as the absence of statutory authority for an agency activity, in this case, CVD expedited reviews. *See Marine Harvest (Chile) S.A. v. United States*, 26 CIT 1295, 1309, 244 F. Supp. 2d 1364, 1379 (2002) (characterizing *FAG Italia* as drawing "a distinction between ambiguous statutory language that creates a 'gap' in the statute that an agency could reasonably fill and a silence in the statute from which an agency cannot create authority"). Accordingly, *FAG Italia*, and the court's interpretation thereof, is not inconsistent with *Chevron*.

The court's conclusion is, moreover, consistent with the non-self-executing nature of the Uruguay Round Agreements.[23]  *See* 19 U.S.C. § 2903(a)(1) (providing the conditions pursuant to which certain trade agreements, including the Uruguay Round Agreements, "shall enter into force with respect to the United States");[24] S. Rep. 103–412, at 13 (1994) (explaining that the Uruguay Round Agreements "are not self-executing and thus their legal effect in the United States is governed by implementing legislation").  Thus, absent legislation implementing Commerce's interpretation of the requirements of Article 19.3, section 103(a) does not authorize Commerce to effectuate that interpretation.  *See, e.g.*, *La. Pub. Serv. Comm'n*, 476 U.S. at 357 ("As we so often admonish, only Congress can rewrite this statute.").[25]

---

[23] The Government agrees that the Uruguay Round Agreements are not self-executing. Oral Arg. 30:20–30:26.

[24] The URAA was enacted in accordance with 19 U.S.C. § 2903.  *See* 19 U.S.C. § 3511(a).  Pursuant to section 2903, certain trade agreements "shall enter into force with respect to the United States if (and only if)" enumerated conditions are met.  *Id.* § 2903(a)(1).  Those conditions consist of the following:

> (A) the President, at least 90 calendar days before the day on which he enters into the trade agreement, notifies the House of Representatives and the Senate of his intention to enter into the agreement, and promptly thereafter publishes notice of such intention in the Federal Register;
> (B) after entering into the agreement, the President submits a document to the House of Representatives and to the Senate containing a copy of the final legal text of the agreement, together with--
> > (i) a draft of an implementing bill,
> > (ii) a statement of any administrative action proposed to implement the trade agreement, and
> > (iii) the supporting information described in paragraph (2); and
> (C) the implementing bill is enacted into law.

*Id.*

[25] The Canadian Governmental Parties argue that if "the provisions of the URAA had been intended to spell out everything that was required by international agreements, there would have been no need for the SAA," discussed *infra*, "to speak to both the

The judicial canon of statutory construction referred to as the *Charming Betsy* doctrine does not compel a different outcome.  *See generally Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804).  *But see* CGP Resp. at 27–28. *Charming Betsy* instructs, *inter alia*, that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  6 U.S. at 118.  Section 103(a) does not, however, directly implement the United States' international obligations.  Instead, the provision authorizes actions otherwise provided for in the URAA.  Thus, *Charming Betsy* is inapposite to the court's interpretation of section 103(a).

In sum, section 103(a) provides limited rulemaking authority to Commerce which does not encompass CVD expedited reviews.  Further examination of the statutory structure and legislative history do not demonstrate a contrary intent.

### B.  Statutory Structure

The statutory scheme does not demonstrate congressional intent either to establish CVD expedited reviews specifically or, more broadly, to permit Commerce to promulgate regulations untethered to the URAA.  Parties' arguments in this regard focus on sections 103(b), 123, and 129 of the URAA.

As noted, section 103(b) authorized the issuance of "[a]ny interim regulation necessary or appropriate to carry out any action proposed in the [SAA] . . . to implement

---

interpretation and application of those provisions."  CGP Resp. at 11–12.  The court disagrees.  The completion of the SAA was a statutory requirement in accordance with the legislative mechanism utilized for congressional enactment of the Uruguay Round Agreements.  *See* 19 U.S.C. § 2903(a)(1).  Thus, the existence of the SAA cannot justify or excuse the absence of statutory implementing legislation.

an agreement described in section 3511(d)(7), (12), or (13) of [Title 19]."  19 U.S.C.

§ 3513(b).  The Canadian Governmental Parties argue that the reference to expedited

reviews pursuant to Article 19.3 in the SAA constitutes a "proposed action"

implementing the SCM Agreement which is identified in 19 U.S.C. § 3511(d)(12).  CGP

Resp. at 12.  The Canadian Governmental Parties argue that it is therefore "reasonable

to interpret the specific authorization to issue interim regulations as authorizing such

final regulations."  *Id*. at 12–13.  The premise of the Canadian Governmental Parties'

argument fails, however, because the SAA does not propose any action to implement

CVD expedited reviews.  While the SAA provides that "[s]everal changes must be made

to the Act to implement the requirements of Article 19.3 of the [SCM Agreement]," the

subsequent discussion does not propose any actions to implement expedited reviews.

*See* SAA at 941–42, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4251.

Sections 123 and 129 of the URAA govern the implementation of adverse

findings by a WTO dispute settlement panel or the WTO Appellate Body regarding the

United States' compliance with the provisions of the Uruguay Round Agreements.  *See*

19 U.S.C. §§ 3533(f)–(g), 3538(b).  Generally, sections 123 and 129 prohibit Commerce

from implementing such an adverse decision until, among other things, specified

consultations with congressional committees, and others, have taken place.  *See Corus*

*Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1349 (Fed. Cir. 2005).  Both sections

123(g) and 129(b), in particular, prescribe several steps that must precede the

publication of any final rule or modification to agency practice or determination of

Commerce to render a prior action not inconsistent with WTO obligations.  19 U.S.C.

§§ 3533(g)(1), 3538(b).  In each case, Commerce and other trade officials are required to consult with relevant congressional committees prior to taking action in response to such an adverse WTO dispute settlement report.  *See id.*

As the Government correctly notes, in this case, there is no adverse WTO dispute settlement report that would trigger the consultation and other requirements in sections 123 and 129.  *See* Gov't Resp. at 9.  Nevertheless, while Commerce's interpretation of section 103 as authorizing implementation of WTO obligations not otherwise provided for in the URAA might not nullify sections 123 and 129 of the URAA (particularly when such a WTO report occurs), the consultation requirements of those sections are consistent with the broader statutory scheme of preserving Congress's role in the implementation of WTO obligations.  Section 102 of the URAA provides both that "[n]o provision of any of the Uruguay Round Agreements . . . that is inconsistent with any law of the United States shall have effect," 19 U.S.C. § 3512(a)(1), and the converse, that "[n]othing in this Act shall be construed . . . to amend or modify any law of the United States . . . unless specifically provided for in this Act," *id.* § 3512(a)(2).  Thus, while the respective arguments are not outcome determinative either way, the court does find limited merit in the Coalition's argument that sections 123 and 129 of the URAA counsel against the Government's expansive interpretation of section 103 of the URAA.

### C.  Legislative History

Parties' disagreements respecting the legislative history focus on the significance of the SAA's reference to the second sentence of Article 19.3 entitling a non-

investigated exporter to "an expedited review to establish an individual CVD rate for

[that] exporter."  SAA at 941, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4250.[26]  As noted,

the Government and Canadian Governmental Parties point to that reference as

evidence that Congress intended for Commerce to conduct CVD expedited reviews.

Gov't Resp. at 7–8; CGP Resp. at 10–11.  The Coalition argues that the SAA

demonstrates congressional awareness of the requirements of Article 19.3 and a

rejection of the notion that CVD expedited reviews were needed to fulfill U.S.

obligations.  Coalition Br. at 23–24.

 This dispute is tangential, however, to the court's inquiry, which is to discern

congressional intent respecting the scope of section 103(a).  On that point, the SAA

speaks to the timing of the implementing regulations promulgated pursuant to section

103(a), noting that the provision provides the authority for regulations to be issued on

the date the provisions of the Uruguay Round Agreements enter into force for the

United States.  SAA at 677, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4055–56.  Nothing

in the relevant portion of the SAA suggests that section 103(a) is intended to authorize

regulatory action beyond the substantive provisions otherwise included in the URAA.

 Moreover, accepting the Government's position would require the court to accept

the proposition that Article 19.3 requires CVD expedited reviews.  During oral argument,

---

[26] The SAA was prepared by the Executive Branch, *see* SAA at 656, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4040, and approved by Congress "as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act," *see* 19 U.S.C. § 3512(d).  The court may therefore consult the SAA for indications of congressional intent.

however, Parties agreed that interpreting the text and requirements of Article 19.3 is beyond the scope of this litigation.  Oral Arg. 52:50–54:48.  For that reason, congressional intent is best discerned from the SAA's discussion of the actual statutory changes considered relevant to implementing the requirements of Article 19.3.  As previously noted, that discussion is devoid of any provision explicitly providing for CVD expedited reviews.  This omission—both in the statute and the SAA—is consistent with other legislative history indicating that, regardless of any unarticulated congressional view as to whether Article 19.3 required additional procedures, Congress did not include any such procedures in the implementing legislation.  *See* S. Rep. 103-412, at *98 (1994) (explaining that URAA § 264, which requires Commerce "to determine an estimated countervailable subsidy rate for each exporter and producer individually investigated, and an estimated 'all-others' rate for those not individually investigated and for new exporters and producers, . . . implement[s] the requirements of Article 19.3 of the [SCM] Agreement").

Accordingly, on balance, the legislative history supports Plaintiff's interpretation of the text of section 103(a).  To the extent the legislative history is ambiguous as to Congress's views on the administration of CVD expedited reviews, that ambiguity cannot override Congress's clear statutory limitation on Commerce's rulemaking authority.  *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) (stating that while "clear evidence of congressional intent" in the legislative history "may illuminate ambiguous [statutory] text," the court cannot "allow[] ambiguous legislative history to muddy clear statutory language").

### D. Congressional Acquiescence

The Canadian Governmental Parties argue that congressional acquiescence to Commerce's interpretation provides evidence that Congress intended Commerce to conduct CVD expedited reviews.  CGP Resp. at 18 n.11.  The Canadian Governmental Parties assert that Commerce has conducted CVD expedited reviews since 2003, and Congress did not prohibit CVD expedited reviews in recent amendments to the Tariff Act of 1930.  *Id.* (discussing the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114–125, § 421, 130 Stat. 122, 161 (2016)).  At oral argument, the Government likewise pressed the court to sustain Commerce's regulation in light of congressional acquiescence.  Oral Arg. 26:50–28:45.

Assuming, *arguendo*, that subsequent congressional acquiescence is relevant to discerning prior congressional intent, *see Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (stating that circumstances in which "Congress has frequently amended or reenacted the relevant provisions without change" in response to an agency's interpretation "provide further evidence . . . that Congress intended [that agency's] interpretation, or at least understood the interpretation as statutorily permissible"),[27] "the Supreme Court has repeatedly made clear that an important foundation of acquiescence is that

---

[27] The U.S. Supreme Court has also stated that "the doctrine of legislative acquiescence is at best only an auxiliary tool for use in interpreting *ambiguous* statutory provisions." *Jones v. Liberty Glass Co.*, 332 U.S. 524, 533–534 (1947) (emphasis added); *see also Helvering v. Reynolds*, 313 U.S. 428, 431–32 (1941) (stating that the doctrine of congressional acquiescence to an agency's construction of a statutory term "is no more than an aid in statutory construction" and, "[w]hile it is useful at times in resolving statutory *ambiguities*, it does not mean that the prior [agency] construction has become so embedded in the law that only Congress can effect a change") (emphasis added).

Congress as a whole was made aware of the administrative construction or

interpretation and did not act on contrary legislation despite having this knowledge,"

*Schism v. United States*, 316 F.3d 1259, 1297 (Fed. Cir. 2002) (en banc) (discussing

cases); *see also, e.g.*, *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1311–12 &

n.10 (Fed. Cir. 2001).  "Past practice does not, by itself, create power, but 'long-

continued practice, known to and acquiesced in by Congress, would raise a

presumption that the [action] had been [taken] in pursuance of its consent.'"  *Dames &*

*Moore v. Regan*, 453 U.S. 654, 686 (1981) (quoting *United States v. Midwest Oil Co.*,

236 U.S. 459, 474 (1915)) (alterations original).

  Here, there is no indication that Commerce's administration of CVD expedited

reviews *or* Commerce's interpretation of URAA § 103(a) as permitting the agency to

regulate matters outside the URAA has been brought to Congress's attention.

Nevertheless, at oral argument, the Government pointed to two U.S. Supreme Court

cases as taking a purportedly different view and further argued that the existence of 19

C.F.R. § 351.214(k) gives rise to a presumption of congressional awareness regarding

Commerce's administration of CVD expedited reviews.  Oral Arg. 26:42–28:03, 28:30–

28:51 (mentioning *Haig v. Agee*, 453 U.S. 280 (1981), and *Norwegian Nitrogen Prods.*

*v. United States*, 288 U.S. 294, 304 (1933)).  The referenced cases do not compel a

different outcome.

  *Haig* concerned the Secretary of State's authority to promulgate rules in relation

to the granting, issuance, and verification of passports pursuant to the Passport Act of

1926, 22 U.S.C. § 211a ("the 1926 Act").  453 U.S. at 289–90.  The Secretary of State

had issued a regulation authorizing the revocation of passports on grounds related to

national security and foreign policy, and the recipient of a revocation notice challenged

the regulation as statutorily unauthorized.  *Id.* at 286–87.  The Court relied on the "broad

rule-making authority granted in the [1926] Act," *id.* at 291 (citation omitted) (alteration

original), to support the proposition that "a consistent administrative construction of that

statute must be followed by the courts unless there are compelling indications that it is

wrong," *id.* (citation omitted).  In finding that the construction was not wrong, the Court

pointed to the Secretary's consistent application of the challenged regulation when

circumstances called for revocation and relevant legislative action, which included an

amendment to the Passport Act of 1926 that omitted any changes to the scope of the

statute's rule-making authority.  *Id.* at 300–03.

        *Norwegian Nitrogen* addressed whether language contained in the Tariff Act of

1922 requiring the United States Tariff Commission ("Tariff Commission"), *inter alia*, to

"give reasonable public notice of its hearings" and a "reasonable opportunity to parties

interested to be present, to produce evidence, and to be heard" before changing duty

rates required the Tariff Commission to disclose business confidential information to an

affected importer.  288 U.S. at 302–03.  The Court found that neither the text of the

statute, which afforded the Tariff Commission discretion in this regard, nor the

legislative history of the statute, required such extensive disclosure.  *Id.* at 304–08.  The

Court further pointed to administrative practice pre- and post-enactment in 1922 and

congressional attention directed towards the role and function of the Tariff Commission

to find that Congress had acquiesced to the challenged practice.  *Id.* at 311–15.

*Haig* and *Norwegian Nitrogen* are readily distinguished.  First, both cases

addressed administrative practice closely connected to the authorizing statute the

respective entities administered and pursuant to which they each exercised substantial

discretion.  *Haig*, 453 U.S. at 289–91; *Norwegian Nitrogen*, 288 U.S. at 302–03.  Here,

Commerce does not rely on any statute it administers as authority for CVD expedited

reviews; rather, as noted, it relies on the general grant of rulemaking afforded U.S.

government agencies in connection with the URAA.  I&D Mem. at 19 & n.123 (citing 19

U.S.C. § 3513(a)).

More importantly, while the Government and the Canadian Governmental Parties

urge the court to find that Congress has acquiesced to the administration of CVD

expedited reviews specifically, that argument loses sight of the inquiry before the

court—discerning congressional intent with respect to the scope of section 103(a).  In

other words, the court must consider whether Congress has acquiesced to the agency's

construction of section 103(a) as permitting Commerce to conduct CVD expedited

reviews.  Although Commerce has been conducting CVD expedited reviews since at

least 2003, *see Certain Softwood Lumber Products from Canada*, 68 Fed. Reg. 24,436

(Dep't Commerce May 7, 2003) (final results of [CVD] expedited reviews), Commerce

only recently announced its reliance on section 103(a) as authority for the regulation

governing such reviews, *see Irving Paper Ltd., et al. v. United States, et al.*, Court No.

17-cv-00128 (Jan. 30, 2018), ECF No. 53 (the United States' response to the court's

questions concerning the court's jurisdiction to entertain an action challenging the

results of a CVD expedited review and Commerce's authority to promulgate 19 C.F.R.

§ 351.214(k)).[28]  Thus, in contrast to *Haig* and *Norwegian Nitrogen*, there has been little

time or opportunity for Congress to acquiesce to Commerce's interpretation of section

103(a) particularly when, as here, that interpretation was only announced after the most

recent set of amendments to the Tariff Act of 1930.

Lastly, and perhaps most importantly, the court cannot find congressional

acquiescence to an agency's construction of a statute when "there are compelling

indications that [the construction] is wrong."  *Haig*, 453 U.S. at 291.  "True indeed it is

that administrative practice does not avail to overcome a statute so plain in its

commands as to leave nothing for construction."  *Norwegian Nitrogen*, 288 U.S. at 315;

*see also Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("A regulation's age [alone] is no

antidote to clear inconsistency with a statute . . . .").  Here, as discussed, section 103(a)

plainly limits Commerce's rulemaking authority to the implementation of the relevant

provisions of the URAA.  Under these circumstances, any argument for a more

expansive interpretation of section 103(a) that is grounded in congressional

acquiescence lacks merit.

In view of the foregoing, the court finds that Congress unambiguously

constrained the scope of rulemaking authority conferred by section 103(a) to the

enacted provisions of the URAA.  Commerce therefore exceeded its statutory authority

pursuant to section 103(a) when it promulgated 19 C.F.R. § 351.214(k).  *See* 5 U.S.C.

§ 706(2)(C).

---

[28] Plaintiffs dismissed *Irving Paper* prior to the court's resolution of the matters raised in
the court's questions to the parties.  *See Irving Paper Ltd., et al. v. United States, et al.*,
Court No. 17-cv-00128 (July 31, 2018), ECF No. 76 (Order of Dismissal).

### E. The *Final Results of Expedited Review* are Remanded for Reconsideration

In briefing and during oral argument, the Government and Canadian Governmental Parties offered various *post hoc* justifications for Commerce's regulation and the agency's administration of CVD expedited reviews.  *See, e.g.*, Gov't Resp. at 9–10 (arguing that 19 C.F.R. § 351.214(k) may properly be characterized as an "interim regulation[]" issued pursuant to URAA § 103(b)); Gov't Resp. at 12–13 (pointing to Commerce's inherent authority "to reconsider previously closed proceedings"); CGP Resp. at 7–10 (arguing that section 103(a) authorized Commerce to issue 19 C.F.R. § 351.214(k) in order to ensure that URAA § 101, which reflects congressional approval of the Uruguay Round Agreements and their entry into force, is appropriately implemented); CGP Resp. at 15–18, 22–27 (discussing 19 U.S.C. §§ 1671d, 1675, and 1677f-1 as alternate statutory authorities for CVD expedited reviews).

At oral argument, the Government requested a remand to the agency for consideration of these alternative bases in the event the court concludes that section 103(a) did not authorize Commerce to promulgate 19 C.F.R. § 351.214(k).  Oral Arg. 1:44:40–1:46:14 (requesting the court to afford Commerce one further attempt to articulate a lawful basis for the regulation before invalidating the regulation).  The court agrees that a remand to the agency for consideration of these alternative bases for the regulation is more appropriate than judicial review of *post hoc* justifications.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that when the court cannot sustain an agency action, "the proper course, except in rare circumstances, is to

remand to the agency for additional investigation or explanation").[29]  Further, in certain

circumstances, the court may remand a regulation for further consideration while

allowing the regulation to remain in effect.  *See Nat'l Org. of Veterans' Advocates, Inc.*

*v. Sec'y of Veterans Affairs* ("*NOVA*"), 260 F.3d 1365, 1367–68, 1379–81 (Fed. Cir.

2001).[30]  Accordingly, the court remands the *Final Results of Expedited Review* to

Commerce for reconsideration of the statutory basis authorizing the agency's

promulgation of 19 C.F.R. § 351.214(k).  The court declines to invalidate Commerce's

regulation pending Commerce's remand redetermination.

---

[29] The U.S. Supreme Court in *Florida Power & Light* made this statement in the course of evaluating whether initial review of a decision by the Nuclear Regulatory Commission to deny, without holding a hearing, a petition requesting a proceeding to suspend an operating license should be located in the appropriate district court or court of appeals. 470 U.S. at 731.  In locating initial review in the court of appeals, the Court explained that the factfinding capacity of the district court was unnecessary because in the event the record did not support the agency action, the "proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 744.  Although the Court was not conducting APA review of the challenged action, its comments are nevertheless instructive.

[30] In *NOVA*, the Federal Circuit adopted the standard first set forth by the U.S. Court of Appeals for the D.C. Circuit as to whether a regulation should remain in effect when the regulation is remanded for further consideration.  260 F.3d at 1380 ("[A]n inadequately supported rule . . . need not necessarily be vacated.") (second alteration original) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)).  In deciding whether to vacate, the court considers "the seriousness of the [regulation's] deficiencies . . . and the disruptive consequences of an interim change that may itself be changed."  *Id.* (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995)); *see also Allied-Signal*, 988 F.2d at 150–51.  Parties have not briefed this issue.  Nevertheless, while the court has serious questions about the validity of the regulation, the disruptive consequences of invalidation appear likely to be significant, particularly when the possibility remains, however slight, that the regulation may ultimately be upheld.  Thus, the court declines to vacate the regulation at this time.

### CONCLUSION & ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results of Expedited Review* are remanded to the agency for reconsideration consistent with this opinion; it is further

**ORDERED** that Commerce shall file its remand results on or before February 17, 2021; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.


                                                         /s/      Mark A. Barnett
                                                         Mark A. Barnett, Judge


Dated: November 19, 2020
          New York, New York