Slip Op. 24-50

## UNITED STATES COURT OF INTERNATIONAL TRADE

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,

                Plaintiff,

     and

FONTAINE INC., ET AL.,

                Consolidated Plaintiffs,

     v.

UNITED STATES,

                Defendant,

     and

FONTAINE INC., ET AL.,

                Defendant-Intervenors.

Before: Mark A. Barnett, Chief Judge
Consol. Court No. 19-00122

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the countervailing duty expedited review of certain softwood lumber products from Canada.]

Dated: April 22, 2024

[1]<u>Sophia J.C. Lin</u> and <u>Jessica M. Link</u>, Picard Kentz & Rowe LLP, of Washington, DC, argued for Plaintiff Committee Overseeing Action for Lumber International Trade

---

[1] The briefs relevant to the issues addressed herein were filed in 2019 and 2020. With the passage of time, certain attorneys listed on those briefs are no longer with the firm involved or the firm itself is no longer involved in the action. Certain government attorneys have left government service or now occupy new positions. For the sake of

Investigations or Negotiations.  On the brief were <u>Lisa W. Wang</u>, <u>Andrew W. Kentz</u>, <u>David A. Yocis</u>, <u>Nathanial M. Rickard</u>, <u>Whitney M. Rolig</u>, <u>Heather N. Doherty</u>, and <u>Zachary J. Walker</u>.

<u>Alan G. Kashdan</u>, Blank Rome, LLP, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Government of Canada.  On the brief were <u>Joanne E. Osendarp</u>, <u>Dean A. Pinkert</u>, <u>Lynn G. Kamarck</u>, <u>Daniel M. Witkowski</u>, <u>Julia K. Eppard</u>, and <u>Stephen R. Halpin III</u>, Hughes Hubbard & Reed LLP, of Washington, DC.

<u>Nancy A. Noonan</u>, ArentFox Schiff LLP, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Government of Québec.  On the brief were <u>Matthew J. Clark</u> and <u>Aman Kakar</u>.

<u>Mark B. Lehnardt</u>, Law Offices of David L. Simon, PLLC, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Fontaine Inc.  On the brief was <u>Elliot J. Feldman</u>, Baker Hostetler, LLP, of Washington, DC.

<u>John R. Magnus</u>, TradeWins LLC, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Mobilier Rustique (Beauce) Inc.

<u>Elizabeth A. Speck</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. On the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, and Stephen C. Tosini, Senior Trial Counsel.  Of counsel at the hearing was <u>Jesus N. Saenz</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Aaron R. Hutman</u>, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, argued for Defendant-Intervenor Government of New Brunswick.  On the brief were <u>Stephan E. Becker</u> and <u>Moushami P. Joshi</u>.

<u>Edward M. Lebow</u>, Haynes and Boone, LLP, of Washington, DC, argued for Defendant-Intervenors Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc.

<u>Rajib Pal</u>, <u>Richard L.A. Weiner</u>, and <u>Alex L. Young</u>, Sidley Austin LLP, of Washington, DC, for Defendant-Intervenors North American Forest Products Ltd, Parent-Violette Gestion Ltée, and Le Groupe Parent Ltée.

---

accuracy, the court lists the attorneys included on the last merits brief filed and their respective firms or positions as of the time of filing.

Yohai Baisburd, Jonathan M. Zielinski, and James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor Scierie Alexandre Lemay & Fils Inc.

  Barnett, Chief Judge:  In 2019, the U.S. Department of Commerce ("Commerce" or "the agency") issued its final results in the countervailing duty ("CVD") expedited review of certain softwood lumber products from Canada.  *See Certain Softwood Lumber Prods. From Can.*, 84 Fed. Reg. 32,121 (Dep't Commerce July 5, 2019) (final results of CVD expedited review) ("*Final Results*"), ECF No. 99-5, and accompanying Issues and Decision Mem., C-122-858 (June 28, 2019) ("I&D Mem."), ECF No. 99-6.  In *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States* (*Coalition IV*), 45 CIT __, 535 F. Supp. 3d 1336 (2021), this court vacated prospectively Commerce's *Final Results*, finding an absence of statutory authority for Commerce to conduct CVD expedited reviews.  The matter returns to the court for resolution of the parties' substantive claims following the U.S. Court of Appeals for the Federal Circuit's ("Federal Circuit") reversal, holding that Commerce has statutory authority to conduct CVD expedited reviews.  *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* (*Coalition V*), 66 F.4th 968, 979 (Fed. Cir. 2023).  For the reasons discussed herein, Commerce's *Final Results* will be remanded in part and sustained in part.[2]

---

[2] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 99-2, and a Confidential Administrative Record ("CR"), ECF Nos. 99-3, 99-4. Parties submitted joint appendices containing record documents cited in their briefs and requested by the court.  Public J.A. ("PJA"), ECF No. 148; Confid. J.A. ("CJA"), ECF No. 149; [Public] Correction to J.A. ("Rev. PJA"), ECF No. 230 (correct version of PJA Tab

## BACKGROUND

### I.    Commerce's Authority to Conduct CVD Expedited Reviews

CVD expedited reviews are principally a creature of Commerce's regulations, specifically provided for in 19 C.F.R. § 351.214(k)(2020).[3]  In the decision memorandum accompanying the *Final Results*, Commerce relied on section 103(a) of the Uruguay Round Agreements Act ("URAA" or "the Act"), 19 U.S.C. § 3513(a), as authority for the promulgation of 19 C.F.R. § 351.214(k).  I&D Mem. at 19.  Commerce stated that 19 C.F.R. § 351.214(k) is intended "[t]o implement Article 19.3 of the [Subsidies and Countervailing Measures ("SCM")] Agreement" in CVD investigations in which Commerce limits the number of individually examined respondents pursuant to 19 U.S.C. § 1677f-1(e)(2)(A).  I&D Mem. at 19–20 & n.124 (first alteration in original)

---

66); Rev. and Add. to [PJA], ECF Nos. 239, 239-1, 239-2; Rev. and Add. to [CJA] ("1st Suppl. CJA"), ECF Nos. 240, 240-1, 240-2 (complete versions of Tabs 47 and 50, and new Tabs 67 and 68); Submission of Admin. R. Doc. Referenced at the Feb. 14, 2024 Hr'g, ECF No. 243; Submission of R. Doc. Following Oral Arg., ECF Nos. 244 (confid.), 245 (public).  The court references the confidential version of record documents when available unless otherwise specified.

[3] The court cites to the 2020 edition of the Code of Federal Regulations unless otherwise specified.  On October 20, 2021, subsection (k) was redesignated as subsection (*l*) without material change.  *See Regulations to Improve Admin. and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,371, 52,373–74 (Dep't Commerce Sept. 20, 2021).  For consistency with prior proceedings in this case, the court refers to 19 C.F.R. § 351.214(k).  Broadly speaking, 19 C.F.R. § 351.214 governs new shipper reviews.  However, subsection (k) of the regulation provides for an administrative procedure referred to as a CVD expedited review.  Subsection (k) permits a respondent that was not "select[ed] for individual examination" or "accept[ed] as a voluntary respondent" in a CVD investigation in which Commerce "limited the number of exporters or producers to be individually examined" to "request a review . . . within 30 days of the date of publication in the Federal Register of the [CVD] order."  19 C.F.R. § 351.214(k)(1).

(quoting *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,318 (Dep't Commerce Feb. 27, 1996) (notice of proposed rulemaking and request for public comments)).  Commerce asserted that section 103(a) of the URAA afforded the agency "the authority to promulgate regulations to ensure that remaining obligations under the URAA which were not set forth in particular statutory provisions were set forth in the Code of Federal Regulations."  *Id.* at 19.

In this lead case, Plaintiff, Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("Plaintiff" or "the Coalition"), challenged Commerce's authority to promulgate 19 C.F.R. § 351.214(k) pursuant to section 103(a) of the URAA.  *See* Compl. ¶¶ 15–16, ECF No. 2.[4]  The Act, which became effective on January 1, 1995, amended the domestic antidumping and countervailing duty laws in connection with the Uruguay Round Agreements, which included the SCM Agreement.  *See* 19 U.S.C. §§ 3511(a)(1), (d), & 3501(7).[5]  Section 103(a) of the URAA delegated

---

[4] The Coalition is an association of domestic manufacturers, producers, and wholesalers of softwood lumber products.  Compl. ¶ 9.

[5] Article 19.3 of the SCM Agreement states, *inter alia*:

> When a countervailing duty is imposed in respect of any product, such countervailing duty shall be levied, in the appropriate amounts in each case, on a non-discriminatory basis on imports of such product from all sources found to be subsidized and causing injury, except as to imports from those sources which have renounced any subsidies in question or from which undertakings under the terms of this Agreement have been accepted.  Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter.

authority to "appropriate officers" to promulgate regulations "necessary to ensure that any provision of this Act, or amendment made by this Act, . . . is appropriately implemented."  19 U.S.C. § 3513(a)(2).

In reviewing Plaintiff's claim, this court held "that Commerce exceeded its authority to the extent that it promulgated 19 C.F.R. § 351.214(k) pursuant to URAA § 103(a)."  *Coalition III*, 483 F. Supp. 3d at 1263–64.  The court grounded its holding primarily in the plain language of section 103(a), which only grants Commerce authority to issue regulations necessary to implement enacted provisions of the URAA.  *Id.* at 1264.

Before the court, Defendant United States ("the U.S. Government" or "the United States") and certain Canadian parties appearing as Defendant-Intervenors with respect to this issue "offered various *post hoc* justifications for Commerce's regulation and the agency's administration of CVD expedited reviews."  *Id.* at 1271–72.  Those justifications included Commerce's authority to issue interim regulations regarding the URAA, Commerce's authority to reconsider prior decisions, and various other statutory provisions in which the Canadian parties had identified gaps for Commerce to fill using

---

SCM Agreement, Annex 1A, art. 19.3, Marrakesh Agreement Establishing the World Trade Org., Apr. 15, 1994, 1869 U.N.T.S. 14.  The court did not find it necessary or appropriate to construe the intent of this provision because it is not self-executing and has legal force only insofar as there is implementing legislation.  *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* (*Coalition III*), 44 CIT __, __, 483 F. Supp. 3d 1253, 1266 (2020).

the CVD expedited review procedure.  *See id.*[6]  In light of these *post hoc* justifications, the court remanded the matter for the agency to address the alternatives and provide the explanation necessary for judicial review.  *See id.* at 1272–73.

On remand, Commerce reviewed the statutory provisions, including 19 U.S.C. §§ 1671d, 1675(a),(b), and 1677f-1,[7] and found that none of them explicitly or implicitly authorized Commerce to conduct CVD expedited reviews.  Final Results of Redetermination Pursuant to Ct. Remand ("Remand Results") at 10–12, 19–21, ECF No. 173-1.  Additionally, after considering the court's prior holdings on alternative justifications, Commerce concluded that it "lack[ed] the statutory authority" to promulgate 19 C.F.R. § 351.214(k) or conduct CVD expedited reviews.  *Id.* at 12.[8] Finding that Commerce had discharged its duty to consider the alternatives and upon agreeing with the agency's interpretation of the provisions not to confer authority for the

---

[6] No parties argued, nor did the court find, that these statutory provisions were plain in this regard.  Rather, the parties argued as to whether Congress left gaps for Commerce to fill, and whether Commerce's CVD expedited review procedure reflected a permissible method of doing so.  *See, e.g.*, Joint Br. of Def.-Ints. Gov't of Can. and Gov't of Que. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 15–18, 22–27, ECF No. 120.

[7] Section 1671d governs Commerce's final determinations following a CVD investigation.  Section 1675(a) and (b) governs administrative reviews and changed circumstances reviews, respectively.  Section 1677f-1, as will be discussed herein, sets forth the procedures for Commerce's use of sampling and averaging to determine antidumping or countervailing duties.

[8] In the Remand Results, Commerce relied on *Coalition III* to "presume" that URAA section 103(a) did not authorize the regulation, Remand Results at 10, but did not state that the agency considered the alternative theories under protest, *see id.*; *Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (a decision adopted by Commerce "under protest" and subsequently sustained places the U.S. Government in the position of the non-prevailing party for purposes of preserving its right to appeal).

regulation, the court sustained Commerce's Remand Results.  *Coalition IV*, 535 F.

Supp. 3d at 1349–50, 1364.[9]  The court vacated 19 C.F.R. § 351.214(k) and vacated

prospectively Commerce's *Final Results*.  *Id.* at 1352–64.

Certain Canadian parties appealed the court's decision to the Federal Circuit.

*See Coalition V*, 66 F.4th at 976–77.  The United States did not participate in the

Canadian parties' appeal until, following oral argument, the Federal Circuit ordered the

U.S. Government to file an amicus brief.  *See id.*  In that brief, the U.S. Government, for

the first time, adopted the argument that 19 U.S.C. § 1677f-1(e) authorized CVD

expedited reviews.  *Id.* at 976–77.

Section 1677f-1(e) sets forth a general rule that when Commerce is "determining

countervailable subsidy rates under section 1671b(d), 1671d(c), or 1675(a) of this title,

the [agency] shall determine an individual countervailable subsidy rate for each known

exporter or producer of the subject merchandise."  19 U.S.C. § 1677f-1(e)(1).  The

statute also provides certain exceptions, such that if Commerce "determines that it is

not practicable to determine individual countervailable subsidy rates under paragraph

(1) because of the large number of exporters or producers involved in the investigation

or review," Commerce may instead "determine individual countervailable subsidy rates

for a reasonable number of exporters or producers by limiting its examination to . . . a

---

[9] Insofar as Commerce disclaimed authority to conduct CVD expedited reviews pursuant to the considered provisions, Remand Results at 11–12, 19–21, there was no agency decision that interpreted those sections to provide such authority and as to which Commerce could have sought judicial deference for its interpretation of statutory ambiguities.

sample of exporters or producers" or the "exporters and producers accounting for the

largest volume of the subject merchandise from the exporting country that [Commerce]

determines can be reasonably examined." *Id.* § 1677f-1(e)(2)(A).[10]  Section 1677f-1(e)

thus operates in service of agency determinations issued pursuant to the specified

statutory provisions.

        In considering this issue, the Federal Circuit stated that "the question of whether

there is statutory authority for [section] 351.214(k) . . . presents an issue of law, decided

*de novo*, requiring no exercise of discretion that belongs to the agency under [the

*Chenery* line of cases]."[11]  *Coalition V*, 66 F.4th at 976.  With the *Chenery* reference

indicating that the appellate court found the statute plain and providing no discretion to

---

[10] Commerce may also determine a single country-wide subsidy rate to be applied to all exporters and producers.  19 U.S.C. § 1677f-1(e)(2)(B).

[11] Those cases consist of *Securities and Exchange Commission v. Chenery Corp.* (*Chenery I*), 318 U.S. 80 (1943), and *Securities and Exchange Commission v. Chenery Corp.* (*Chenery II*), 332 U.S. 194 (1947).  *Chenery II* states the general rule that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."  332 U.S. at 196.  When, however, "the sole issue is one of statutory construction," the court does not intrude on the agency's discretion insofar as "the plain language of the statute compels [a particular] conclusion."  *Koyo Seiko Co. v. United States*, 95 F.3d 1094, 1101 (Fed. Cir. 1996).  Nevertheless, *Chenery II* precludes a court from "affirm[ing] on a basis containing any element of discretion—including discretion to find facts and interpret statutory ambiguities—that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court."  *Id.* (citation omitted); *see also Women Involved in Farm Econs. v. U.S. Dept. of Agric.*, 876 F.2d 994, 998 (DC Cir. 1989) (noting that *Chenery I* "ordinarily prevents agency counsel from proffering alternative theories—not explicitly embraced by a department or agency head—to support a challenged regulation" because to do so "risks *judicial* 'intru[sion]' upon the domain which Congress has exclusively entrusted to an administrative agency'" (quoting *Chenery I*, 318 U.S. at 88) (alterations in original)).

Commerce, the Federal Circuit located "statutory authority for the expedited-review process . . . in the URAA's enactment of [section] 1677f-1(e) to favor individual-company determinations and the URAA's grant of regulatory-implementation power to Commerce in [section] 3513(a)." *Id.* at 977.[12]

While Commerce, thus, may conduct CVD expedited reviews pursuant to section 1677f-1(e), that provision is not among the determinations listed in 19 U.S.C. § 1516a(a)(1) that are judicially reviewable pursuant to 28 U.S.C. § 1581(c). Accordingly, Commerce's CVD expedited review determinations are reviewable pursuant to 28 U.S.C. § 1581(i).[13]  *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* (*Coalition II*), 43 CIT __, 413 F. Supp.

---

[12] The Federal Circuit based its conclusion on language in the Statement of Administrative Action accompanying the URAA and set forth various reasons why CVD expedited reviews may be necessary to the implementation of "the individualized-determination preference of § 1677f-1(e)."  *Coalition V*, 66 F.4th at 977–78.  The appellate court also found support in 19 U.S.C. § 1677m, which permits Commerce to select voluntary respondents in investigations or administrative reviews that timely submit the necessary information.  *Id.* at 978.  Lastly, the appellate court acknowledged that CVD expedited reviews "do not occur during a CVD investigation, but only *after* publication of a CVD order," but did not find the timing material to its construction of the statute.  *See id.* at 978–79.

[13] In 2020, section 1581(i)(4) was redesignated as section 1581(i)(1)(D) without material change.  *See* 28 U.S.C. § 1581(i)(1)(D) (2018 & Supp. II 2020).  Section 1581(i)(1)(D) provides the court with exclusive jurisdiction over a civil action commenced against the United States "that arises out of any law . . . providing for" the "administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of [paragraph (1)] and subsections (a)-(h) of this section."  28 U.S.C. § 1581(i)(1)(D).  Subsection (i) cannot confer jurisdiction over an antidumping or countervailing determination that is judicially reviewable pursuant to 19 U.S.C. § 1516a (2018) (which does not include CVD expedited reviews).  28 U.S.C. § 1581(i)(2)(A).  Judicial review of those determinations is reserved to 28 U.S.C. § 1581(c).

3d 1334 (2019) (finding jurisdiction pursuant to 28 U.S.C. § 1581(i)(4)(2018)); *Coalition V*, 66 F.4th at 976 n.4 (finding "no reversible error" in this exercise of jurisdiction).[14]

## II.    Commerce's *Final Results* and Procedural Posture[15]

With the statutory authority addressed, the court reviews the parties' substantive challenges to the *Final Results*.  In that determination, issued on July 5, 2019, Commerce announced the results of expedited reviews requested by eight Canadian producers and their affiliates that were not selected for individual examination during the investigation and had been assigned the "all-others" rate of 14.19 percent.  *See generally Certain Softwood Lumber Prods. From Can.*, 83 Fed. Reg. 347, 348–49 (Dep't Commerce Jan. 3, 2018) (am. final affirmative CVD determination and CVD order) ("*CVD Order*"); *Certain Softwood Lumber Prods. From Can.*, 83 Fed. Reg. 9,833, 9,833 (Dep't Commerce March 8, 2018) (initiation of expedited review of the [*CVD Order*]) ("*Initiation Notice*").[16]  For those companies, Commerce determined reduced or *de minimis* rates as follows: (1) Les Produits Forestiers D&G Ltée and its cross-owned affiliates ("D&G"): 0.21 percent; (2) Marcel Lauzon Inc. and its cross-owned affiliates

---

[14] Prior to resolving the court's jurisdiction, this court issued an opinion vacating a temporary restraining order requested by Plaintiff barring U.S. Customs and Border Protection ("CBP") from liquidating unliquidated entries of softwood lumber produced or exported by Canadian companies that received reduced or *de minimis* rates in the *Final Results* and denying the Coalition's corresponding request for a preliminary injunction. *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* (*Coalition I*), 43 CIT __, 393 F. Supp. 3d 1271 (2019).

[15] When necessary, additional background specific to each claim accompanies the court's analysis of the claim.

[16] The period of review ("POR") for the CVD expedited review was January 1, 2015, through December 31, 2015, the same as the period of investigation for the investigation.  *Initiation Notice*, 83 Fed. Reg. at 9,833.

("MLI"): 0.42 percent; (3) North American Forest Products Ltd. and its cross-owned affiliates ("NAFP"): 0.17 percent; (4) Roland Boulanger & Cie Ltée and its cross-owned affiliates ("Roland"): 0.31 percent; (5) Scierie Alexandre Lemay & Fils Inc. and its cross-owned affiliates ("Lemay"): 0.05 percent; (6) Fontaine Inc. and its cross-owned affiliates ("Fontaine"): 1.26 percent; (7) Mobilier Rustique (Beauce) Inc. and its cross-owned affiliates ("Rustique"): 1.99 percent; and (8) Produits Matra Inc. and Sechoirs de Beauce Inc. and their cross-owned affiliate ("Matra"): 5.80 percent.  *Final Results*, 84 Fed. Reg. at 32,122.

The rates calculated for D&G, MLI, NAFP, Roland, and Lemay are considered *de minimis*;[17] therefore, Commerce stated it would instruct CBP "to discontinue the suspension of liquidation and the collection of cash deposits of estimated countervailing duties on all shipments of softwood lumber produced and exported by" those companies that were entered on or after July 5, 2019; "liquidate, without regard to countervailing duties, all suspended entries of shipments of softwood lumber produced and exported by" those companies; and "refund all cash deposits of estimated countervailing duties collected on all such shipments."  *Id.*  As to the companies receiving a lower—but not *de minimis*—rate (Fontaine, Rustique, and Matra), Commerce stated it would instruct CBP

---

[17] For ease of reference, the court refers to D&G, MLI, NAFP, Roland, and Lemay collectively as the *de minimis* companies.

"to collect cash deposits of estimated countervailing duties" at the lower rates calculated in the *Final Results*.  *Id.*[18]

Plaintiff commenced this action on July 15, 2019.  Summons, ECF No. 1.  After ruling on jurisdiction, *Coalition II*, 413 F. Supp. 3d 1334, the court consolidated Court Nos. 19-00154, 19-00164, 19-00168, and 19-00170 under this lead action.  Order (Nov. 12, 2019), ECF No. 93.[19]  The court heard oral argument on the merits claims on February 14, 2024.  Docket Entry, ECF No. 241.

The following table lists the filings before the court pertinent to the remaining claims:

---

[18] In *Coalition IV*, the court ordered Commerce to reinstate the *de minimis* companies in the *CVD Order* prospectively and, for the remaining companies, to "impose a cash deposit requirement based on the all-others rate from the investigation or the company-specific rate determined in the most recently completed administrative review in which the company was reviewed."  535 F. Supp. 3d at 1363.  Following *Coalition V*, the court granted the *de minimis* companies' motion (with the exception of Roland, which did not participate in the litigation) to reinstate their exclusion from the *CVD Order*.  *See generally Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* (*Coalition VI*), 47 CIT __, __, 665 F. Supp. 3d 1347, 1355 (2023).
[19] The consolidated actions were filed by Fontaine, Rustique, the Government of Québec ("GOQ"), and the Government of Canada ("GOC").  Various Canadian parties intervened on the plaintiff or defendant side of the respective actions; their filings are reflected in the table of briefs.

| Plaintiff's Claims |
|---|
| **Moving Brief** |
| Confid. Pl.'s Rule 56.2 Mot. for J. on the Agency R. and accompanying Confid. Mem. in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("**Coal. Mem.**"), ECF No. 101. |
| **Response Briefs** |
| Confid. Def.'s Resp. [to] Pls.' Mots. for J. on the Agency R. ("**U.S. Resp.**"), ECF No. 110. |
| Joint Br. of Def.-Ints. [GOC]. and [GOQ] in Opp'n to Pl.'s Mot. for J. on the Agency R. ("**CGP Resp.**"), ECF No. 120.[20] |
| Br. of Def.-Ints. [D&G] and [MLI] in Opp'n to Pl.'s Mot. for J. on the Agency R. ("**D&G/MLI Resp.**"), ECF No. 117. |
| Resp. of Def.-Int. [Lemay] in Opp'n to Pl.'s Mot. for J. on the Agency R. ("**Lemay Resp.**"), ECF No. 119.[21] |
| Def.-Int. NAFP's Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("**NAFP Resp.**"), ECF No. 125. |
| Resp. of Def.-Int. Gov't of N.B. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("**N.B. Resp**."), ECF No. 141. |
| **Reply Brief** |
| Pl. [Coal.'s] Reply Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("**Coal. Reply**"), ECF No. 127. |
| **Claims by Consolidated Plaintiffs** |
| **Moving Briefs** |
| Mot. for J. Upon the Agency R. under Rule 56.2 of Consol. Pl. [Rustique], ECF No. 100, and accompanying Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 100-1 ("**Rustique Mem.**"). |
| Rule 56.2 Mot. of [Fontaine] for J. on the Agency R., ECF No. 103, and accompanying Confid. Corrected Mem. in Supp. of Rule 56.2 Mot. of [Fontaine] for J. on the Agency R., ECF No. 150 ("**Fontaine Mem.**"). |

---

[20] CGP stands for "Canadian Governmental Parties," and consists of the GOC and GOQ.

[21] Lemay adopted by reference the arguments made by other parties and raised no additional arguments. Lemay's Resp. at 2.

Consol. Pl. [GOC's] Rule 56.2 Mot. for J. on the Agency R., ECF No. 105, and accompanying Confid. Consol. Pl. [GOC's] Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 156 ("**GOC Mem.**").

Consol. Pl. [GOQ's] Rule 56.2 Mot. for J. on the Agency R., ECF No. 106, and accompanying Consol. Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 145 ("**GOQ Mem.**").

Consol. Pl.-Int.'s [GOC's] Mem. in Supp. of Rule 56.2 Mots. for J. on the Agency R. Submitted by [Fontaine], [Rustique], and the [GOQ] ("**GOC Int. Mem.**"), ECF No. 108.

### Response Briefs

Confid. Def.-Int. [Coal.'s] Resp. to Rule 56.2 Mots. for J. on the Agency R. Submitted by [Fontaine], [Rustique], the [GOC], and the [GOQ] ("**Coal. Resp.**"), ECF No. 114.

**U.S. Resp.**

### Reply Briefs

Consol. Pl. [Rustique's] Reply Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("**Rustique Reply**"), ECF No. 126.

Confid. Corrected Reply Br. of [Fontaine] in Supp. of its Rule [56.2] Mot. for J. on the Agency R. ("**Fontaine Reply**"), ECF No. 152.

Consol. Pl. [GOC's] Reply Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("**GOC Reply**"), ECF No. 132.

Confid. Revised Consol. Pl. [GOQ's] Reply to Resp. of Def. United States and Def.-Int. [Coal.] to Rule 56.2 Mots. for J. on the Agency R. Submitted by [Fontaine], [Rustique], the [GOC], and the [GOQ] ("**GOQ Reply**"), ECF No. 146.

Consol. Pl.-Int. [GOC's] Reply Mem. in Supp. of Rule 56.2 Mots. for J. on the Agency R. Submitted by [Fontaine], [Rustique], and the [GOQ] ("**GOC Int. Reply**"), ECF No. 136.[22]

---

[22] In its capacity as consolidated plaintiff-intervenor, the GOQ filed letters in lieu of briefs supporting the arguments made by consolidated plaintiffs.  Consol. Pl.-Int. [GOQ's] Letter in Lieu of Mot. for J. on the Agency R., ECF No. 107; Consol. Pl.-Int. [GOQ's] Letter in Lieu of Reply Br., ECF No. 135.

## JURISDICTION AND STANDARD OF REVIEW

As noted, the court exercises jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(D).

The court reviews an action commenced pursuant to 28 U.S.C. § 1581(i) in accordance

with the standard of review set forth in the Administrative Procedure Act ("APA"), 5

U.S.C. § 706, as amended.  *See* 28 U.S.C. § 2640(e).  Section 706 directs the court,

*inter alia*, to "hold unlawful and set aside agency action, findings, and conclusions found

to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law."  5 U.S.C. § 706(2)(A).  "An abuse of discretion occurs where the decision is

based on an erroneous interpretation of the law, on factual findings that are not

supported by substantial evidence, or represents an unreasonable judgment in weighing

relevant factors."  *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir.

2005).

## DISCUSSION

### I.    The Coalition's Claims

The Coalition challenges three aspects of the *Final Results*: Commerce's

treatment of the *de minimis* companies, Commerce's decision not to attribute supplier

subsidies to the CVD expedited review respondents, and Commerce's adjustment to the

benchmark used to calculate the benefit from the Government of New Brunswick's

property tax program.  Coal. Mem. at 32–47; Coal. Reply at 12–24.  The U.S.

Government and several Defendant-Intervenors responded in support of Commerce's

determinations.  U.S. Resp. at 14–31; CGP Resp. at 31–44; D&G/MLI Resp. at 2–5;
NAFP Resp. at 14–23; GNB Resp. at 9–14.

The court will sustain Commerce's treatment of the *de minimis* companies and
benchmark adjustment but will remand Commerce's decision not to attribute subsidies
received by suppliers to the respondents.

### A.    Commerce's Treatment of the *De Minimis* Companies

The Coalition contends that Commerce violated 19 C.F.R. § 351.214(k)(3)(iii)
when it instructed CBP to liquidate entries from the *de minimis* companies "without
regard to countervailing duties" and to refund cash deposits paid on those entries.
Coal. Mem. at 32–33.  That regulation states that a determination pursuant to
subsection (k) "will not be the basis for the assessment of countervailing duties."  19
C.F.R. § 351.214(k)(3)(iii).  The Coalition points out language in the liquidation and cash
deposit instructions regarding "the assessment of countervailing duties," which it claims
is inconsistent with the regulation.  Coal. Mem. at 33 (citing CBP Message No. 9234309
(Aug. 22, 2019) ("Liquidation Instructions"), PR 776, CJA Tab 65; CBP Message No.
9288315 (Oct. 15, 2019) ("Cash Deposit Instructions"), PR 784, Rev. PJA Tab 66); *see
also* Coal. Reply at 13.

Regulations, like statutes, must be "read as a whole."  *Apex Frozen Foods
Private Ltd. v. United States*, 862 F.3d 1322, 1336 (Fed. Cir. 2017).  The regulation here
goes on to state that, subject to verification requirements, Commerce "may exclude
from the countervailing duty order in question any exporter for which the [agency]
determines an individual net countervailable subsidy rate of zero or *de minimis*."  19

C.F.R. § 351.214(k)(3)(iv).  In directing CBP to exclude the *de minimis* companies from

the *CVD Order*, Commerce adhered to the plain language of the regulation and

Commerce's prior interpretation of the provisions.  As Commerce explained in the

preamble accompanying the regulation:

> The objective [of a CVD expedited review] is to provide a noninvestigated
> exporter with its *own cash deposit rate* prior to the arrival of the first
> anniversary month of the order, at which point the exporter may request
> an administrative review.  In this regard, in paragraph (k)(3)(iii) we have
> clarified that the final results of a paragraph (k) review will *not be the basis
> for the assessment of countervailing duties*, except, of course, under the
> automatic assessment provisions of § 351.212(c).

> Finally, because the [agency] will be reviewing the original period of
> investigation, we have provided in paragraph (k)(3)(iv) for the *exclusion
> from a CVD order* of a firm for which the [agency] determines an individual
> countervailable subsidy rate of zero or *de minimis*.

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,321 (Dep't

Commerce May 19, 1997) (final rule) ("*Preamble*") (emphases added).

     "Assessment," for these purposes, refers to the "'retrospective' assessment

system" used in the United States "under which final liability for antidumping and

countervailing duties is determined after merchandise is imported."  19 C.F.R.

§ 351.212(a).  Pursuant to this retrospective system, "[g]enerally, the amount of duties

to be assessed is determined in a review of the order covering a discrete period of

time," *id.*; in CVD cases, those reviews consist of administrative reviews and new

shipper reviews, *see id.* § 351.212(b)(2).  Thus, 19 C.F.R. § 351.214(k)(3)(iii) confirms

that the final results of a CVD expedited review do not trigger the assessment provision

in 19 C.F.R. § 351.212(b)(2).[23]  Read together, 19 C.F.R. § 351.214(k)(iii) and (iv)

demonstrate that entities that receive a zero or *de minimis* rate in a CVD expedited

review are to be excluded from the underlying order, much as they would have been

had they received that rate during the original investigation.  Entities that receive an

above-*de minimis* rate, however, are not, at the time, assessed duties based on the

results of the expedited review but are assigned a new cash deposit rate based on

those results pending assessment pursuant to a subsequent administrative review.[24]

Exclusion from the order from the time of its issuance is further confirmed by the

reference to 19 C.F.R. § 351.204(e)(1) in 19 C.F.R. § 351.214(k)(3)(iv).  Section

351.204(e)(1) states that Commerce "will exclude from an affirmative final determination

. . . or an order . . . any exporter or producer for which the [agency] determines an

individual weighted-average dumping margin or individual net countervailable subsidy

rate of zero or *de minimis*."  19 C.F.R. § 351.204(e)(1).  As such, the exclusion

---

[23] The reference in 19 C.F.R. § 351.212(b)(2) to assessment based on new shipper reviews does not specify any particular subsection of 19 C.F.R. § 351.214; thus, the specific language of 19 C.F.R. § 351.214(k)(iii) makes plain that CVD expedited reviews are not covered by the assessment provision of 19 C.F.R. § 351.212(b)(2) applicable to new shipper reviews.

[24] The Coalition's assertion that "Commerce asked CBP *to conduct* the 'assessment of countervailing duties . . . on entries of this merchandise,'" Coal. Mem. at 33 (emphasis added), mischaracterizes Commerce's instructions.  The Liquidation Instructions and Cash Deposit Instructions merely observe that "[t]he assessment of countervailing duties by CBP on entries of this merchandise is subject to the provisions of Section 778 of the Tariff Act of 1930, as amended," and provide further instructions for CBP's treatment of interest for overpayments or underpayments of estimated duties, as the case may be.  Liquidation Instructions ¶ 6; *see also* Cash Deposit Instructions ¶ 4.  Commerce's inclusion of the term "assessment" in the instructions does not constitute a regulatory violation when the substantive aspects of Commerce's instructions are entirely consistent with the governing regulation.

referenced in section 351.214(k)(3)(iv) appears intended to function in the same way as an exclusion based on section 351.204(e)(1).  This interpretation is consistent with the coincident periods of investigation and review, *see id.* § 351.214(k)(3)(i), and the purpose of the CVD expedited review to provide an exporter with an individual rate before the first administrative review, *see Preamble*, 62 Fed. Reg. at 27,321.[25]

Commerce's instructions were therefore necessary to implement the results of the CVD expedited review with respect to the *de minimis* companies because the *CVD Order* no longer provided a basis for the suspension of liquidation of those companies' entries or the collection or retention of cash deposits.  Accordingly, the Coalition's challenge fails.

    **B.    Supplier Subsidies**

        **1.    Additional Background**

Information placed on the record of the CVD expedited review demonstrated that Rustique, D&G, and D&G's affiliate, Portbec, purchased subject merchandise from unaffiliated suppliers and either further processed the merchandise prior to exportation to the United States as subject merchandise or resold the merchandise without further processing.  Rustique reported that it "[o]ccasionally . . . buys sawn white cedar softwood from Canadian producers that is then further processed in Rustique's factory

---

[25] At oral argument, the Coalition argued that 19 C.F.R. § 351.214(k)(3)(iv) does not contemplate exclusion from a CVD order from the time of issuance but instead refers to prospective exclusion.  Oral Arg. 2:27:00–2:30:00 (time stamp from the recording), https://www.cit.uscourts.gov/sites/cit/files/20240214_19-00122_MAB.mp3.  For the reasons stated, the Coalition's argument lacks merit.

into finished merchandise for sale in Canada or in the United States."  [Rustique] Apr.

12 Questionnaire Resp. (Apr. 12, 2018) ("Rustique IQR") at 8, CR 114, PR 238, CJA

Tab 11.  Portbec reported that it "exported (and on those sales also served as an

importer of record) . . . a limited volume of subject merchandise produced by other

companies in Canada."  Resps. of [D&G] to the [CVD] Questionnaire (Apr. 12, 2018) at

ECF p. 58, CR 99, PR 223, CJA Tab 10a.  Portbec "also served in a limited capacity as

a remanufacturer whereby it purchased lumber in Canada and cut that lumber down to

thin widths for resale."  *Id.*

        In light of this information, the Coalition urged Commerce to attribute subsidies

received by unaffiliated suppliers of subject merchandise to Rustique and D&G/Portbec.

*See* [The Coal.'s] Case Br. (Mar. 11, 2019) ("Coal. Case Br.") at 19–34, CR 900, PR

717 1st Suppl. CJA Tab 47.  The Coalition argued that, for any respondents acting as

resellers, Commerce should establish combination rates pursuant to 19 C.F.R.

§ 351.107(b) or cumulate subsidies pursuant to Commerce's trading company

regulation, 19 C.F.R. § 351.525(c).  *Id.* at 24–29.  As for subject merchandise further

processed by Rustique or D&G/Portbec, the Coalition first averred that there is "no

question of 'upstream subsidies' or 'passthrough' . . . raised by the situation of the

'independent remanufacturer'" because the supplier subsidies are provided with respect

to the "manufacture [or] production" of subject merchandise, not inputs into "the

production or manufacture of subject merchandise."  *Id.* at 30 n.85 (alteration in

original).  The Coalition thus argued that Commerce should likewise calculate

combination rates that include the all-others rate from the investigation applied to the

producer and the subsidy rate specific to the expedited review respondent.  *Id.* at 29–

34.  For this latter scenario, the Coalition relied on an earlier softwood lumber

proceeding in which Commerce included sales of "remanufactured lumber" (i.e.,

"softwood lumber that undergoes some further processing") in the subsidy calculations.

*Id.* at 31 & n.87 (citing Issues and Decision Mem. for Certain Softwood Lumber Prods.

from Can., C-122-839 (Dec. 5, 2005) at 5, 20, 38;[26] Issues and Decision Mem. for

Certain Softwood Lumber Prods. From Can., C-122-839 (Mar. 21, 2002) at 25 ("Lumber

IV Mem.")).[27]

      Commerce disagreed on all points.  First, the agency, unlike Plaintiff,

characterized lumber that underwent further processing as "inputs to the respondents'

exports to the United States."  I&D Mem. at 38.[28]  Noting that the Coalition had not

submitted an upstream subsidy allegation, Commerce stated that it "did not investigate

upstream subsidies" and therefore "lacked a basis to attribute subsidies" provided to the

"unaffiliated suppliers."  *Id.*  Commerce did not address the Coalition's reliance on

*Lumber IV*.  *See id.*

---

[26] Commerce's decision memoranda are publicly available at https://access.trade.gov/
public/FRNoticesListLayout.aspx, with separate links for pre- and post-June 2021
memoranda.

[27] The Lumber IV Memorandum is dated March 21, 2001, which appears to be a
typographical error given that the associated Federal Register notice is dated April 2,
2002.  *See Certain Softwood Lumber Prods. From Can.*, 67 Fed. Reg. 15,545 (Dep't
Commerce Apr. 2, 2002) (notice of final affirmative CVD determination and final neg.
critical circumstances determination).

[28] Commerce asserted that the Coalition failed to submit an upstream subsidy allegation
consistent with the requirements of 19 C.F.R. § 351.523(a).  I&D Mem. at 38.  That
regulation defines "input product" to "mean[] any product used in the production of the
subject merchandise."  19 C.F.R. § 351.523(b).

Next, Commerce rejected the Coalition's reliance on 19 C.F.R. § 351.107(b) and 19 C.F.R. § 351.525(c).  *Id.* 38–39.  Commerce found that "the record does not contain information pertaining to subsidies that each unaffiliated producer/supplier received" and the agency therefore was unable to apply 19 C.F.R. § 351.525(c).  *Id.* at 39.

With respect to combination rates pursuant to 19 C.F.R. § 351.107(b), Commerce further explained that the agency has "refrained from examining whether a producer of subject merchandise (whose merchandise is resold by the respondent) received subsidies when the amount of such resales is small relative to the respondent's overall sales."  *Id.* at 39 & n.247 (citing *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the People's Republic of China*, 75 Fed. Reg. 9,163, 9,170 (Dep't Commerce Mar. 1, 2010) (prelim. affirmative CVD determination, prelim. affirmative critical circumstances determination) ("*Pipe From China*")).  Commerce found that "only a relatively small proportion of D&G/Portbec's business involves sales of merchandise from Canada to the United States" and that "the vast majority of D&G/Portbec's transactions involve purchasing Canadian lumber on a duty paid basis in the United States and reselling the lumber to buyers in the United States."  *Id.* at 39.  Commerce also found that, "for Rustique, its purchases of rough-hewn lumber actually represent a very small percentage of its wood fiber inputs."  *Id.*

## 2.    Analysis

The Coalition challenges Commerce's interpretation of the upstream subsidy provision to preclude consideration of subsidies to suppliers of lumber purchased and further processed by the respondents absent an upstream subsidy allegation, and

Commerce's decision otherwise not to apply the combination rate or trading company

regulations.  Commerce must further explain or reconsider its decisions.

### a.    The Upstream Subsidy Provision

Consistent with the agency's analysis, the court addresses first Commerce's

decision, based on the absence of an upstream subsidy allegation, not to attribute

subsidies received by unaffiliated suppliers of lumber that Rustique and D&G/Portbec

purchased and further processed.  *See* I&D Mem. at 38.[29]  From Commerce's decision

to require an upstream subsidy allegation, the court discerns a corresponding

determination to treat the so-called respondent-remanufacturers as the producers and

exporters of this merchandise.  *See id.* (referring to "further manufacturing on lumber

acquired from unaffiliated suppliers").[30]

In reaching this decision, Commerce failed to engage with the Coalition's

arguments concerning remanufacturing and, in particular, the type of "minor" activities

that may constitute "remanufacturing."  *See* Coal. Case Br. at 29–30.  This omission is

material because suppliers of lumber that would otherwise be covered by the *CVD*

---

[29] While Commerce discusses certain respondents' manufacture of lumber from logs, I&D Mem. at 38, the Coalition's challenge is directed solely at respondents' purchases of lumber (subject merchandise) from unaffiliated suppliers, *see* Coal. Case Br. at 19; Coal. Mem. at 41.

[30] Part of the court's difficulty in discerning Commerce's position on this issue is based on Commerce's discussion of Rustique's purchases of rough-hewn lumber (that were further processed) in its discussion of the respondents' reselling activities.  *See* I&D Mem. at 39.  However, at oral argument, the Government confirmed Commerce's position that the respondent-remanufacturers are the producers of the subject merchandise while noting that further explanation for this decision could be provided on remand.  Oral Arg. 0:11:50–0:12:25.

*Order* and subject to a higher rate would appear to be able to escape duties by selling merchandise through a "remanufacturer" with a more favorable rate.  *See* Coal. Mem. at 40; Coal. Reply at 20.[31]

If, on remand, Commerce continues to find that the respondent-remanufacturers are the producers of the subject merchandise, Commerce must reconsider or further explain its determination to require an upstream subsidy allegation for purchases of lumber that is within the class or kind of covered merchandise.  Commerce explained its decision by way of reference to the agency's finding that "logs and lumber are inputs to the respondents' exports to the United States."  I&D Mem. at 38.  However, Commerce provided no discussion of the agency's reasons for interpreting section 1677-1(a)(1) to include subject merchandise in the statutory definition of an *upstream* product.

Section 1671 provides:

(e) Upstream subsidies

Whenever the administering authority has reasonable grounds to believe or suspect that an upstream subsidy, as defined in section 1677-1(a)(1) of this title, is being paid or bestowed, the administering authority shall investigate whether an upstream subsidy has in fact been paid or

---

[31] At the hearing, Rustique suggested that it would be impossible to separate the allegedly small volume of subject merchandise for which Rustique acted as a remanufacturer from the entries for which Rustique did not.  Oral Arg. 32:00–33:25.  Rustique also suggested that any adjustment to its rate to account for supplier subsidies would amount to a "rounding error."  *Id.* at 33:40–34:00.  The court is unable to discern whether such concerns formed the basis for Commerce's reference to Rustique's input purchases in its discussion of reselling activities.  *See* I&D Mem. at 39 ("Similarly, for Rustique, its purchases of rough-hewn lumber actually represent a very small percentage of its wood fiber inputs.").  If, in fact, Commerce's decision on this issue turns on considerations other than the agency's interpretation of the upstream subsidy provision, Commerce must explain that decision in the first instance with sufficient clarity to enable judicial review.

bestowed, and if so, shall include the amount of the upstream subsidy as provided in section 1677-1(a)(3) of this title.

19 U.S.C. § 1671(e) (footnotes omitted).[32]  Section 1677-1(a)(1), in turn, states that an "'upstream subsidy' means any countervailable subsidy, other than an export subsidy, that—(1) is paid or bestowed by an authority . . . with respect to a product (hereafter in this section referred to as an 'input product') that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding."  19 U.S.C. § 1677-1(a)(1).

The U.S. Government and CGP's respective arguments on this issue focus, as Commerce did, on whether the purchased lumber may be characterized as an input. *See* U.S. Resp. at 24; CGP Resp. at 35, 37.[33]  Those arguments, however, are

---

[32] The U.S. Code contains two footnotes concerning errors in the original such that the reference to section 1677-1(a)(1) "[p]robably should be 'section 1677-1(a)'" and the reference to section 1677-1(a)(3) "[p]robably should be section 1677-1(c).'"  19 U.S.C. § 1671(e) nn.1–2.

[33] The CGP also rely on *Canadian Meat Council v. United States*, 11 CIT 362, 661 F. Supp. 622 (1987), to argue that the court has rejected the premise of the Coalition's argument, namely, that inputs that otherwise are subject merchandise may not be considered "upstream" to the subject merchandise pursuant to section 1677-1(a)(1). CGP Resp. at 35–36.  *Canadian Meat Council* is largely inapposite.  The underlying agency determination involved live swine and fresh, chilled, and frozen pork products from Canada.  *Canadian Meat Council*, 11 CIT at 363, 661 F. Supp. 3d at 623. Commerce had concluded, without conducting an upstream subsidies investigation, that subsidies on live swine benefitted pork producers.  *Id.* at 363, 365, 661 F. Supp. 3d at 623, 624.  The disagreement centered, however, on Commerce's narrow interpretation of the term "input" that led the agency to determine that live swine was not an input into the subject pork products and, thus, disregard the upstream subsidy provision prior to finding a pass-through of benefits.  *Id.* at 364–72, 661 F. Supp. at 624–29.  The *Canadian Meat Council* court did not squarely address the meaning of the term "upstream" or whether the statute requires an upstream subsidy allegation when the input is within the class or kind of covered merchandise.  Furthermore, the court later

nonresponsive to the question whether inputs that otherwise are subject merchandise

may be considered "upstream" to the subject merchandise exported to the United

States; in other words, whether the statutory language "a product . . . that is used . . . in

the manufacture or production of merchandise which is the subject of a countervailing

duty proceeding" should be interpreted broadly, as Commerce did, to include subject

and nonsubject inputs, or narrowly, as the Coalition suggests, such that it captures only

nonsubject inputs used to produce subject merchandise.

In light of the sparsity of Commerce's explanation of its statutory interpretation

and the limited briefing on the salient issues, the court will remand this issue for

Commerce to provide its explanation, and for the parties to fully brief their respective

views.[34]  In providing this explanation, Commerce should reconcile its position with

seemingly inconsistent earlier agency statements.  *See Live Swine From Can.*, 59 Fed.

Reg. 12,243, 12,255 (Dep't Commerce Mar. 16, 1994) (final results of CVD admin.

---

vacated its opinion and dismissed the action when the U.S. International Trade
Commission's negative injury determination became final.  *See Canadian Meat Council
v. United States*, 12 CIT 108, 111–12, 680 F. Supp. 390, 393 (1988).

[34] At the hearing, the court directed the U.S. Government to the legislative history
accompanying the Trade and Tariff Act of 1984, which discussed upstream subsidies in
reference to "a product *subsequently used* to manufacture or produce in that country
merchandise *which itself becomes* the subject of either a CVD or [antidumping]
investigation[]."  H.R. REP. 98-1156, at 171 (1984) (Conf. Rep.), *as reprinted in* 1984
U.S.C.C.A.N. 5220, 5288 (emphases added); *see also id*. (comparing the "intermediate
product" to the "final merchandise").  Section 1677-1 was first enacted as part of the
Trade and Tariff Act of 1984, Pub. L. 98-573, Title VI, § 613(a), 98 Stat. 2948.  While
the above-quoted sentence was contained in the document in reference to the House
bill, the definition contained in the Senate bill was the same except for the omission of
the need to investigate or assess upstream subsidies in antidumping cases.  *See* H.R.
REP. 98-1156, at 171, *as reprinted in* 1984 U.S.C.C.A.N. at 5288.

review) (stating generally that "[a]n upstream subsidy analysis is concerned with determining the effect of benefits received by producers of a product which itself is *not subject* to a countervailing duty investigation or order, but which is an input into the subject merchandise") (emphasis added); *cf.* Lumber IV Mem. at 16 (declining to require an upstream subsidies allegation to investigate subsidies received by producers of dimension lumber and remanufactured products, since both are considered subject merchandise);[35] *Ball Bearings and Parts Thereof From Thai.*, 62 Fed. Reg. 728, 730 (Dep't Commerce Jan. 6, 1997) (final results of CVD admin. review) (stating that the statute "expressly excludes export subsidies from its coverage (based on the presumption that an export subsidy paid on a *nonsubject input product* benefits the exportation of that product, not the downstream product)" (emphasis added)).[36]

---

[35] The CGP argue that this determination is inapposite because Commerce conducted the investigation on an aggregate basis, not a company-specific basis. CGP Resp. at 37. While Commerce relied on the aggregate nature of the investigation to reject arguments that certain respondent-remanufacturers did not benefit from stumpage programs, Commerce rejected the argument that an upstream subsidy allegation was necessary because "[b]oth dimension lumber and the remanufactured products covered by the scope are of necessity the same class or kind of merchandise." Lumber IV Mem. at 16.

[36] In response to the Coalition's argument that 19 U.S.C. § 1671(a)(1) required Commerce to account for supplier subsidies, the CGP rely on *Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000), to argue that "Commerce may not presume that the purchaser benefitted from any subsidies previously bestowed on the seller of the asset." CGP Resp. at 34; *see also* Coal. Mem. at 33–34. *Delverde* involved the sale of assets, rather than subject merchandise, and the Federal Circuit's opinion relied on its interpretation of the "Change in Ownership" provision of the statute, 19 U.S.C. § 1677(5)(F), which is inapposite here.

### b.    Commerce's Regulations

The issue of upstream subsidies aside, the court next turns to Commerce's regulations.  The element common to Commerce's combination rate and trading company regulations is the presence of an exporter that is not the producer.

Section 351.107(b)(1)(i) provides:

(b) Cash deposit rates for nonproducing exporters—
(1) Use of combination rates—(i) In general.  In the case of subject merchandise that is exported to the United States by a company that is not the producer of the merchandise, the [agency] may establish a 'combination' cash deposit rate for each combination of the exporter and its supplying producer(s).

Section 351.525(c) provides:

(c) Trading companies.  Benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm which is producing subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated.

For subject merchandise potentially covered by these regulations, Commerce first relied on the absence of company-specific information for the producer/suppliers. I&D Mem. at 38–39.[37]  Contrary to Commerce's explanation, the administrative record

---

[37] Commerce appeared to rely on this rationale specifically in connection with the trading company regulation.  *See* I&D Mem. at 39 (stating that the agency "cannot apply 19 CFR 351.525(c)" because of the lack of record information regarding subsidies received by unaffiliated suppliers).  Later, in discussion of this analysis, Commerce states that "the petitioner's arguments regarding the combination rate and trading company provisions are unfounded," *id.*, suggesting that the rationale also applies to Commerce's analysis of its combination rate regulation.

contains company-specific information for one of the suppliers.[38]  *See* Coal. Case Br. at

20 & n.50.[39]

For the remaining suppliers, Commerce explained that it declines to examine

suppliers for receipt of subsidies when the "amount of such resales is small relative to

the respondent's overall sales."  I&D Mem. at 39 & n.247 (citing *Pipe From China*, 75

Fed. Reg. at 9,170).  The rationale for Commerce's approach appears to be the

administrative burden in conducting an analysis of the supplier akin to that of a

mandatory respondent.  *Id.* at 38–39 (explaining the steps involved to cumulate

benefits); *see also, e.g.*, Prelim. Decision Mem. for Cast Iron Soil Pipe Fittings From

China, C-570-063 (Dec. 11, 2017) at 26 (explaining the analysis necessary to apply the

trading company regulation).[40]

---

[38] The identity of the supplier is treated as business proprietary information by the
parties.  While this supplier sold lumber to Rustique, Coal. Case Br. at 20, which did not
act as a pure reseller of the subject merchandise but instead performed further
processing on all purchased lumber inputs, *see* Rustique IQR at 8, the court considers
this issue here in the event it is relevant to Commerce's redetermination on remand.
[39] The U.S. Government argues that "there would be no need for Commerce to capture
[the] subsidies" received by this individually examined producer because "that company
is already being assessed duties for exports of subject merchandise."  U.S. Resp. at 27.
While that may be the case for subject merchandise produced and exported by that
company, the U.S. Government's assertion was not part of the grounds advanced by
Commerce and may not account for lumber purchased from that company and exported
under Rustique's rate based on the finding that Rustique is the producer of
remanufactured merchandise.
[40] The CGP contend that the trading company regulation applies solely to companies
that do not produce any subject merchandise and is therefore inapplicable here.  CGP
Resp. at 39.  Commerce did not adopt that rationale in the decision memorandum
despite arguments advanced by the GOC, *see* I&D Mem. at 36 & n.231 (citing Rebuttal
Br. of the [GOC] (Mar. 18, 2019) at 24, CR 908, PR 733, 1st Suppl. CJA Tab 67),
perhaps because the agency has not limited its application of the trading company

There are two problems with this explanation.  First, Commerce's practice did not account for the unusual circumstances of CVD expedited reviews.  The POR for the *Final Results* is the same as the period of investigation for the original determination. *Initiation Notice*, 83 Fed. Reg. at 9,833.  Thus, for this POR, Commerce has subsidy rates for every producer in Canada—either an individually determined rate or the all-others rate.  *See CVD Order*, 83 Fed. Reg. at 348–49.  Commerce's reliance on its practice failed to account for the period-specific information the agency has at its disposal.

Second, in explaining its decision not to apply 19 C.F.R. § 351.525, Commerce did not address whether it was appropriate to disregard any subsidies to the respondents' suppliers based on asserted small volumes when accounting for such subsidies might otherwise be the difference between zero or *de minimis* subsidy rates and subsidy rates above *de minimis*.  Commerce has recognized that otherwise small changes may nevertheless be considered significant when they can cause such a change in the subsidy rate.  *See* 19 C.F.R. § 351.224(g)(2) (defining a "significant ministerial error" to include one that would make the difference between a *de minimis* rate and a non-*de minimis* rate, or vice versa).

---

regulation to "pure resellers," *see, e.g.*, Prelim. Decision Mem. for Steel Concrete Reinforcing Bar from the Republic of Turk., C-489-830 (Sept. 6, 2019) at 6 (stating the agency would cumulate any subsidies received by a producer and exporter with subsidies received by an unaffiliated subcontractor/toller "in a manner similar to the attribution of a trading company's subsidies to an unaffiliated producer" because "such a determination is consistent with the general understanding of attribution of subsidies") (unchanged for the final determination).  As such, the court need not further address the CGP's *post hoc* argument.

With respect to 19 C.F.R. § 351.107(b), Commerce exercised its discretion not to use combination rates because only subject merchandise that is produced and exported by the *de minimis* companies is excluded from the payment of duties.  I&D Mem. at 40. Commerce further stated that "the unaffiliated producers that elected to export subject merchandise produced by a respondent, such as D&G, and claim a zero cash deposit rate would be unable to circumvent the payment of duties, as the merchandise would nonetheless be subject to the all-others rate."  *Id.*

Commerce frames the issue backwards: the issue is not the unaffiliated producers exporting merchandise produced by the *de minimis* companies, but, rather, the issue lies in the respondents exporting merchandise produced by unaffiliated suppliers that would otherwise be subject to a higher rate.  To that end, Commerce's instructions to CBP require application of the all-others rate (or the producer's own rate, as appropriate) to subject merchandise produced by an unaffiliated supplier and exported by one of the *de minimis* companies.  Liquidation Instructions ¶ 3; *see also Final Results*, 84 Fed. Reg. at 32,122 ("Merchandise which [the *de minimis* companies] export[] but does not produce . . . remains subject to the CVD order.").  While Commerce's instructions therefore effectuate a combination rate with respect to merchandise produced by an unaffiliated supplier and exported by D&G/Portbec, the situation with Rustique is less clear.

Rustique obtained an above-*de minimis* rate pursuant to the *Final Results*.  84 Fed. Reg. at 32,122.  Rustique did not, however, act as a pure reseller for any subject merchandise.  *See* Rustique IQR at 8.  Accordingly, as discussed above, Commerce

presently appears to consider Rustique to be the "producer" for all of Rustique's exports to the United States.  Thus, there does not, at present, appear to be any basis for Commerce to apply the combination rate regulation to Rustique.  Because the court is instructing Commerce to reconsider its determination that respondent-remanufacturers constitute the producers of such merchandise, on remand, Commerce may also need to reconsider its position with respect to the application of the combination rate regulation to Rustique.

Commerce's determination not to attribute subsidies received by the unaffiliated suppliers of lumbers to the respondents lacks clear, affirmative statements regarding the agency's views on respondent-remanufacturers and respondent-resellers, as well as the agency's reasons for interpreting and applying the relevant legal principles in the chosen manner.  Commerce's determination will therefore be remanded for reconsideration or further explanation consistent with the foregoing.

### C.    New Brunswick Property Tax Assessment Program

#### 1.  Additional Background

Property owners in New Brunswick typically pay property taxes based on an assessment of the "real and true value" of the land."  I&D Mem. at 85.  However, "land classified as freehold timberland" is assessed property taxes at a rate of 100 Canadian dollars per hectare.  *Id.*  Commerce concluded that this tax program is countervailable. *Id.*

To calculate the benefit conferred on NAFP from this program, Commerce first had to construct a benchmark for the "real and true value" of the land owned by NAFP.

*Id.* at 90.  For the preliminary results of the CVD expedited review, Commerce used "private sales of timberland in the province during the POR."  *Id.*  While Commerce continued to use private sales for the *Final Results*, Commerce agreed with NAFP and GNB that Commerce should adjust the benchmark to "remove the value of standing timber on this land."  *Id.*  Commerce explained that the relevant tax laws defined "real property" to exclude "growing or non-harvested crops in or on land" such that "the value of the trees" should not be included in the benchmark.  *Id.* at 90–91.

To determine the value of the land minus the standing timber, Commerce used a ratio derived from information contained in an opinion issued by the Court of Queen's Bench of New Brunswick, titled *Higgins and Tuddenham v. Province of N.B.*, which concerned compensation for appropriated land.  *Id.* at 91 & n.598 (citing Rebuttal Cmts. to NAFP's Sept. 6, 2018 Suppl. Questionnaire Resp. (Sept. 17, 2018), Ex. 5 ¶¶ 17, 45, PR 602, CJA Tab 31a).  While the Coalition had placed the *Higgins and Tuddenham* opinion on the record, *see id.*, NAFP subsequently relied on that opinion to advocate for the ratio referenced therein, *see* NAFP's Case Br. (Mar. 11, 2019) at 31, CR 903, PR 721, CJA Tab 51.  Commerce agreed and applied a ratio of approximately 22 percent to the total land value including stumpage to determine the land value without stumpage. Final Results Calculations for [NAFP] (June 28, 2019), Attach 2, CR 912, PR 755, CJA Tab 58; *see also* I&D Mem. at 91 & nn.596–98.

## 2.    Analysis

The Coalition seeks to challenge Commerce's reliance on *Higgins and Tuddenham* to determine the appropriate methodology for adjusting the benchmark to

remove the value of standing timber.  Coal. Mem. at 46.  The U.S. Government, NAFP, and GNB each contend that the Coalition failed to exhaust its administrative remedies with respect to this argument.  U.S. Resp. at 18–20; NAFP Resp. at 3, 15–16; GNB Resp. at 9–10.  The Coalition, replying primarily to the U.S. Government, argues that the United States has conflated the issues of benchmark selection with Commerce's adjustment to the benchmark, Coal. Reply at 20, and asserts that it was not required to exhaust arguments regarding any adjustment because Commerce did not decide to remove the value of standing timber until the agency issued the *Final Results*, *id.* at 22.  Thus, the Coalition contends, it "had no opportunity" to present arguments regarding any adjustment to the benchmark.  *Id.* at 23.

"[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).[41]  The statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  The doctrine of administrative exhaustion is well-settled and requires a party to raise issues with specificity and "at the time appropriate under [an agency's] practice."  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37 (1952).  Doing so both "protect[s]

---

[41] The Coalition does not dispute the applicability of the doctrine of administrative exhaustion given that this case is governed by the APA.  In any event, the court has recently addressed and rejected this contention, finding that the APA does not bar the court from applying prudential exhaustion pursuant to 28 U.S.C. § 2637(d).  *See Ninestar Corp. v. United States*, Slip Op. 24-24, 2024 WL 864369, at *9–11 (CIT Feb. 27, 2024).

administrative agency authority and promot[es] judicial efficiency." *Corus Staal BV*, 502

F.3d at 1379 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).

Here, administrative exhaustion required the Coalition to present relevant

arguments in its administrative case and rebuttal briefs before raising those issues

before this court. *Cf. Dorbest Ltd v. United States*, 604 F.3d 1363, 1375 (Fed. Cir.

2010).[42]  Contrary to the Coalition's suggestion, exhaustion in this case did not require

"clairvoyance."  Coal. Reply at 23.  Instead, exhaustion required the Coalition to

respond substantively to the issues NAFP explicitly raised in its administrative case

brief.  *See* NAFP's Case Br. at 31 (proposing various methods for Commerce to adjust

the benchmark, including by using the ratio from *Higgins and Tuddenham*).  While the

Coalition argued that Commerce should not remove the value of standing timber from

the land value, Plaintiff failed to address NAFP's specific proposals for doing so in the

event Commerce agreed that an adjustment was warranted.  *See* Rebuttal Br. (March.

19, 2019) at 40, CR 909, PR 734, CJA Tab 54 (asserting generally (and inaccurately)

that Commerce "would not have an objective or reasonable way to [adjust the

benchmark]" because "[t]he Canadian Parties *have not proposed any methodology* to

separate the value of standing timber from the bare land" (emphasis added)).[43]

---

[42] While *Dorbest* addressed a case arising under the court's jurisdiction pursuant to 28
U.S.C. § 1581(c) and involving 19 C.F.R. § 351.309(c)–(d), exhaustion is similarly
appropriate here given that the court reviews Commerce's decision on the record
developed before the agency, and that process included the opportunity to file case and
rebuttal briefs.  *Cf. L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 36–37.

[43] At oral argument, the Coalition attempted to characterize its assertion regarding the
lack of an "objective or reasonable way" method for performing the adjustment as

"[P]arties having notice of an issue may not withhold pertinent arguments at the administrative level, seeking a new 'bite at the apple' before the courts."  *Calgon Carbon Corp. v. United States*, 44 CIT __, __, 443 F. Supp. 3d 1334, 1353–54 (2020) (citation omitted).  The Coalition was on notice that Commerce might consider both benchmark selection and adjustments to the benchmark, including using the *Higgins and Tuddenham* data, prior to the *Final Results*, and the Coalition was required to exhaust relevant arguments accordingly.  Because the Coalition failed to exhaust its arguments before the agency, the court will not now consider them in the first instance.

## II.        Consolidated Plaintiffs' Claims

Rustique, joined by the GOC and the GOQ, contends that Commerce erred in countervailing certain federal and provincial tax credits.  Rustique Mem. at 4–13; Rustique Reply at 2–6; GOC Mem. at 11–18; GOC Reply at 2–10; GOQ Mem. at 4–11; GOQ Reply at 3–9.  Fontaine, also joined by the GOC and the GOQ, contends that Commerce erred in using its fiscal year ("FY") 2014 tax returns to determine the benefit

---

responsive to the NAFP's proposals and sufficient to exhaust the arguments it now seeks to assert.  Oral Arg. 42:35–43:30.  This argument fails because the Coalition's assertion, read together with the incorrect assertion regarding the absence of any proposed methodology, suggests instead that the Coalition overlooked the proposals.  *See id.* at 41:00–42:30 (referring to the number of pages of argument to digest).  Even if the proposals were not overlooked, the Coalition must do more than offer mere characterization of the proposals.  Instead, the Coalition was required to present arguments as to *why* Commerce should reach the same conclusion.  "[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978).

conferred by various tax programs during the 2015 POR.  Fontaine Mem. at 10–18;

Fontaine Reply at 2–12; GOC Int. Mem. at 3–4; GOQ Mem. at 11–13; GOQ Reply at 9–

11.  The U.S. Government and the Coalition responded in support of Commerce's

determinations.  U.S. Resp. at 31–46; Coal. Resp. at 4–8.

      The court will sustain Commerce's determination as to Rustique's challenge but

remands Commerce's benefit determination with respect to Fontaine.

### A. The Federal Logging Tax Credit ("FLTC") and Provincial Logging Tax Credit ("PLTC")

#### 1.    Additional Background

      Corporations in Québec that conduct logging operations must pay a ten percent

tax on logging income in addition to federal and provincial income taxes.  *See* I&D Mem.

at 45–46.  The GOC provides a tax credit equal to two thirds of the logging tax (the

FLTC) and the GOQ provides a tax credit equal to one third of the logging tax (the

PLTC), credits that logging companies claim on their federal and provincial tax returns,

respectively.  *See id.* at 45, 48; Resp. of the [GOQ] to the Dep't's Apr. 13, 2018 Suppl.

Questionnaire Vol. II at QC-TAX-10–11, CR 288, PR 341, CJA Tab 18a.

      Commerce found that the FLTC and the PLTC 1) each constitute a financial

contribution in the form of revenue forgone that was otherwise due to the federal and

provincial governments; 2) are *de jure* specific; and 3) confer a benefit.  I&D Mem. at

45–46.  Commerce disagreed with the argument that a Canadian policy against double

taxation means that revenue is not forgone.  *Id.* at 46.  Commerce also addressed and

rejected the argument that the FLTC and the PLTC do not confer a net benefit, *id.* at

47–48, or that the credits "act as a transfer of funds from the federal to the provincial government," *id.* at 48. According to Commerce, "[a]ny arrangement" between the federal and provincial governments, and "the purpose of such an arrangement, is beyond the purview of what Commerce is able to consider under the [statute] and its regulations." *Id.* at 48–49. Lastly, Commerce concluded that the logging tax could not be construed as an application fee or deposit paid to qualify for the FLTC and the PLTC. *Id.* at 46–47 (discussing 19 U.S.C. § 1677(6)(A)).

### 2.    Analysis

A countervailable subsidy "exists when . . . a foreign government provides a financial contribution . . . to a specific industry" that confers "a benefit" to "a recipient within the industry." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)). Section 1677(5) defines a financial contribution to include, *inter alia*, "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." 19 U.S.C. § 1677(5)(D)(ii). "A benefit shall normally be treated as conferred where there is a benefit to the recipient." *Id.* § 1677(5)(E).

Rustique and the GOQ each contend that Commerce erred in finding that revenue was forgone by the federal and provincial governments. Rustique asserts that Commerce must consider "the prevailing domestic standard and the normative benchmark of the tax system in question," which in this case, Rustique contends, constitutes the 26.9 percent total tax rate (federal plus provincial) applicable to all corporations. Rustique Mem. at 4–5; Rustique Reply at 3. According to Rustique, the

ten percent logging tax is simply "a mechanism for annual inter-governmental wealth shifts," Rustique Mem. at 6,[44] and the FLTC and the PLTC together prevent double taxation of logging income, *id.* at 6–7.  The GOQ similarly asserts that "[t]he logging tax *would not exist* if the offsetting tax credits were not available."  GOQ Mem. at 8 (emphasis added).  These arguments are dependent on the relationship between the ten percent logging tax and the FLTC and the PLTC.

Commerce was within its discretion to reject such arguments because the record does not support the claim that the logging tax would not exist but for the credits forgiving the tax.  Documents submitted by the GOC and the GOQ do support that a "policy rationale" behind the FLTC and the PLTC is to avoid double taxation.  Resp. of the [GOC] to the Dep't's Apr. 13, 2018 Suppl. Questionnaire (May 7, 2018) ("GOC SQR") at GOC-ER-20, CR, 231, PR 324, CJA Tab 17.  The existence of a general policy against double taxation does not, however, substantiate the assertion that the logging tax and the tax credits must stand or fall together.  Contrary to the GOQ's assertion that Commerce failed to consider the policy rationale for the tax credits, GOQ Reply at 5–7, Commerce considered the rationale and concluded that a policy against double taxation does not outweigh the evidence demonstrating that the FLTC and PLTC are otherwise countervailable as programs by which the federal and provincial governments, respectively, forgo revenue, I&D Mem. at 46.  Commerce acknowledged

---

[44] With respect to the FLTC, Rustique contends that although the GOC "does forego some revenue," that shortfall ends up with the GOQ such that there is no financial contribution to the company.  Rustique Mem. at 8; *see also* Rustique Reply at 4–5.

that the GOQ has never received the full ten percent logging tax but explained that was

because the provincial government elected to provide a tax credit in the form of the

PLTC and that such decision, even if intended to offset double taxation, remains

countervailable.  *Id.*  Mere disagreement with Commerce's conclusions is not a

sufficient basis for a remand.

A corollary to this argument is the proposition that Commerce should have

considered the logging tax and the tax credits to constitute a single subsidy program.

*See* GOC Mem. at 12; Rustique Mem. at 11–13 (arguing there was no benefit because

the logging tax and the tax credits effectively cancel each other out); Rustique Reply at

7 (asserting that the logging tax and tax credits "legally must be" considered a single

program).  However, the parties identify no factual evidence calling into question

Commerce's decision not to treat tax credits enacted by different government entities as

a single program, or any examples of Commerce doing so.[45]  To that end, the GOC errs

in relying on *Government of Sri Lanka v. United States*, 42 CIT __, 308 F. Supp. 3d

1373 (2018) ("*GOSL*"), and *Inland Steel Indus., Inc. v. United States*, 21 CIT 553, 967 F.

---

[45] The record suggests that the FLTC predates the enactment of the logging tax in Québec and the enactment of the PLTC but does not indicate the temporal relationship between the tax and the PLTC.  *See* GOC SQR, Ex. FLTC-1, CR 233, PR 326, CJA Tab 17a (documenting statements concerning the enactment of the FLTC and supporting similar action at the provincial level to fully offset the logging tax then enacted in the provinces of British Columbia and Ontario).

Supp. 1338 (1997), *aff'd*, 188 F.3d 1349 (Fed. Cir. 1999).  GOC Mem. at 13–15; GOC

Reply at 3–5.  As Commerce found, these cases are distinguishable.[46]  I&D Mem. at 48.

In *GOSL*, the court remanded Commerce's benefit determination when the

agency countervailed payments made by the Government of Sri Lanka ("GSL")

reimbursing tire manufacturers/rubber buyers for payments made to rubber

smallholders.  *GOSL*, 308 F. Supp. 3d at 1379–84.  The program examined in that case

involved an above-market "guaranteed price" to smallholders that rubber buyers were

required to pay, subject to reimbursement by the GSL for any difference between the

"market price" and the "guaranteed price," i.e., the value of the guarantee to the

smallholders.  *Id.* at 1379–80.  The court concluded that Commerce erred in ignoring

evidence that the rubber buyers had effectively extended "interest-free loans" to the

GSL such that the "reimbursement payments" at issue were not properly considered a

benefit.  *Id.* at 1382.

---

[46] Rustique cites *Hynix Semiconductor Inc. v. United States*, 29 CIT 995, 1003, 391 F.
Supp. 2d 1337, 1345 (2005), for the proposition that the phrase "subsidy program" is
broadly interpreted to include various elements supporting a single governmental
purpose.  Rustique Reply at 7.  Rustique stretches the reasoning of *Hynix* too far.  *Hynix*
addressed 19 U.S.C. § 1677(5)(B)(iii), which describes a subsidy whereby the authority
was "entrust[ing] or direct[ing] a private entity to make a financial contribution."  29 CIT
at 998 n.3, 391 F. Supp. 2d at 1341 n.3 (citation omitted).  Noting Commerce's "case-
by-case discretion" to decide when the statute applies and congressional intent to "close
any loopholes which might enable governments to provide indirect subsidies," the court
sustained Commerce's decision to treat "a series of loans and equity infusions made by
multiple financial institutions" as "a single government program of direction."  *Id.* at
1003–04, 391 F. Supp. 2d at 1345–46.  *Hynix* does not, as Rustique contends, require
Commerce "to consider the logging tax and the credits canceling it as component parts
of a single program."  Rustique Reply at 7.

In *Inland Steel*, the Government of France ("GOF") and Usinor Sacilor entered into an agreement pursuant to which each would provide funds to regional development companies and that "the GOF would transmit its share of the funds through Usinor Sacilor, with Usinor Sacilor receiving the funds from the GOF as shareholders' advances and then funneling those same funds to the [regional development companies]." 21 CIT at 560, 967 F. Supp. at 1349. Commerce concluded that the "agreement between Usinor Sacilor and the GOF did not relieve Usinor Sacilor of any obligations it [previously] had" so Usinor Sacilor received no benefit from the contributions that it "merely channeled" to the regional development companies. *Id.* The court sustained this determination. *See id.* at 586, 967 F. Supp. at 1368.

In each of these cases, record evidence documented the nature and purpose of the program that effectively placed the respondent in the position of an intermediary in order to effectuate the program's purpose. In contrast, here, Commerce reasonably concluded that "the logging tax credits are not flowing through an intermediary" to effectuate a transfer of funds to the GOQ but are instead tax credits provided by the federal and provincial governments to the respective companies. I&D Mem. at 48; *see also* GOC SQR at GOC-ER-20 (explaining that the FLTC is intended to avoid double taxation of the logging companies).

Rustique's argument that the FLTC and PLTC confer no benefit because together they result in Rustique paying the same tax rate as non-logging corporations is also misplaced. *See* Rustique Mem. at 10; Rustique Reply at 4. Commerce's benefit regulation, 19 C.F.R. § 351.509(a), directs the agency to determine whether "a benefit

exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."  Each of the two programs at issue here, the FLTC and the PLTC, lower Rustique's tax burden.  *See* I&D Mem. at 46.  Commerce was not required to compare Rustique's tax rate to non-logging companies that are not subject to the logging tax and are ineligible for both the FLTC and PLTC.

Lastly, Commerce correctly rejected the GOC's argument that Commerce should treat the logging tax as a payment used to qualify for the FLTC and the PLTC such that the amount of the tax should be deducted from any subsidy.  *See* GOC Mem. at 17; GOC Reply at 8–9; I&D Mem. at 47.  Section 1677(6)(A) permits Commerce to "subtract from the gross countervailable subsidy the amount of--(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy."  19 U.S.C. § 1677(6)(A).  In its construction of the statute, the GOC reads out the word "similar" preceding "payment."  GOC Mem. at 17 (stating that "the tax was a 'payment paid in order to qualify for, or to receive, the benefit' of the FLTC and PLTC" (quoting 19 U.S.C. § 1677(6)(A))).  If this were true, then any tax for which a government provides a corresponding credit could be deducted from the final subsidy rate.  While the GOC faults Commerce for failing to explain why the logging tax does not fall within the category of "similar payment," GOC Mem. at 18, nowhere does the GOC explain why the logging tax should be considered a payment "similar" to an "application fee" or "deposit" or why its interpretation of the term would not substantially weaken the statute.  *See id.*

Because Commerce's determinations regarding the FLTC and PLTC are supported by substantial evidence, and in the absence of any detracting record evidence that Commerce overlooked, the court will sustain Commerce's determinations.

## B.    Date of Receipt of Tax Benefits

### 1.    Additional Background

As previously noted, the POR for the CVD expedited review was January 1, 2015, through December 31, 2015.  I&D Mem. at 27.  Fontaine's FY 2015 ended on October 31, 2015.  *Id.* at 94.

Fontaine "is required by law to pay its federal and provincial taxes within sixty days of the end of its fiscal year," i.e., by December 31.  *Id.*;[47] *see also* Verification of the Questionnaire Resps. of Fontaine Inc. (Oct. 23, 2018) at 5–6, CR 844, PR 657, CJA Tab 36 (verifying Fontaine's payments of FY 2015 taxes within the POR).  Consistent therewith, the record shows that Fontaine's FY 2014 federal tax return reflects payments made during the 2014 calendar year with no balance owing in 2015. Fontaine's Resp. to Initial Questionnaire (Apr. 13, 2018) ("Fontaine IQR"), Ex. 5 at ECF pp. 310, 317, CR 131–38, 144–50, 152, 154, 156, PR 254, CJA Tab 13a).  For the provincial tax return, Fontaine made payments in 2014 that exceeded the amount of

---

[47] Corporations, such as Fontaine, must make periodic federal tax payments throughout the year and any remaining federal taxes "on or before the balance-due day for the year."  Resp. to the Second Suppl. Questionnaire to [Fontaine] (July 25, 2018) ("Fontaine's 2SQR"), Ex. A-4, [Federal] Income Tax Act ¶ 157 (ECF pp. 211–12), CR 701, PR 545, CJA Tab 25.  The balance-due day "is two months after the day on which the taxation year ends," *id.* ¶ 248 (subpart (d)(ii)) (ECF pp. 227–29).  Similar rules apply to provincial tax payments.  *Id.*, Ex. A-4, [Provincial] Taxation Act ¶ 1 (ECF p. 231) (defining "balance-due day" for a corporation).

total income tax payable and obtained a refund.  *Id.* at ECF pp. 129, 829.  For 2015, the record likewise shows that December 31, 2015, represented Fontaine's balance-due date for federal and provincial taxes.  *See* Fontaine's 2SQR, Ex. A-4 at ECF pp. 227–29, 231 (explaining balance-due dates).  Fontaine's FY 2015 federal and provincial tax returns reflected the sum of installments made during the fiscal year and refunds owing upon filing.  *See* Fontaine IQR, Ex. 5 at ECF pp. 762, 829.

For the preliminary results of the CVD expedited review, Commerce used Fontaine's FY 2014 tax return to calculate the benefit received for certain tax programs because Fontaine filed that tax return in 2015.  I&D Mem. at 93.  Fontaine challenged this decision before the agency, urging Commerce to use Fontaine's FY 2015 tax returns because Fontaine paid the taxes associated with those returns during the POR even though Fontaine filed the FY 2015 tax returns in 2016.  *Id.* at 93–94.  Commerce disagreed.  *Id.* at 94.

The relevant regulation states:

(b) Time of receipt of benefit—(1) Exemption or remission of taxes.  In the case of a full or partial exemption or remission of a direct tax, the Secretary normally will consider the benefit as having been received on the date on which the recipient firm would otherwise have had to pay the taxes associated with the exemption or remission.  Normally, this date will be the date on which the firm filed its tax return.

19 C.F.R. § 351.509(b)(1).

Commerce explained that its "goal is to equate the timing of receipt of the benefit with the date the firm knew the amount of its tax liability, and thus the definitive amount of its tax savings under any particular tax-related subsidy program."  I&D Mem. at 94.

Commerce stated that, "[b]ased on our experience, the date on which [a firm] files its tax return is the date on which a firm knows, definitively, the amount of its tax liability, and thus any attendant savings realized under tax-related subsidy programs." *Id.* at 94 & n.626 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,376 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*")).

Applying this "definitive knowledge" standard, Commerce concluded that "Fontaine makes estimated tax payments throughout the year prior to filing its tax return, but it does not know the full extent of its tax liability until it files its tax return." *Id.* at 94. To support this finding, Commerce noted that Fontaine identified periodic payments as "installments made" on its federal tax return and that Fontaine made identical monthly installments throughout the year. *Id.* at 94 & nn.633–34 (citing Fontaine IQR, Ex. 5).

### 2.    Analysis

Fontaine challenges Commerce's reliance on the company's FY 2014 tax returns because those returns reflect pre-POR liabilities. Fontaine Mem. at 10. Fontaine contends that when the date of payment and date of filing differ, the date of payment is the operative date. *Id.* at 12. Here, Fontaine argues, the date of payment fell in 2015 and Commerce therefore should have used its FY 2015 tax returns. *Id.* at 11. Fontaine asserts that Commerce's regulation does not impose a knowledge requirement and that even if it did, Fontaine knew its tax liability when it made its final payment. Fontaine Reply at 8–9. The GOQ and GOC advance similar arguments. GOQ Mem. at 11–13; GOC Int. Mem. at 3–4; GOQ Reply at 9–11.

The United States argues that "Commerce's focus on the date on which a firm knew of its tax liability" reflects the agency's "longstanding practice."  U.S. Resp. at 43. The Coalition supports Commerce's use of a "definitive knowledge" standard and Fontaine's FY 2014 tax returns.  *See* Coal. Resp. at 8.

A remand is required when an agency's "decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors."  *Star Fruits*, 393 F.3d at 1281.  Commerce must reconsider or further explain its decision to use Fontaine's FY 2014 tax returns to determine the POR benefits.

Ascertaining the appropriate date for calculating any benefit is a factual matter specific to each case, and Commerce's experience must yield to those facts.  *See* I&D Mem. at 94 (stating that, "[b]ased on our experience, the date on which it files its tax return is the date on which a firm knows, definitively, the amount of its tax liability").  As discussed above, the record shows that Fontaine made FY 2014 payments in 2014 and FY 2015 payments in 2015.  Thus, this case appears to be one in which the date of payment (December 31, two months after the end of the fiscal year) and date of filing (the following calendar year) do not align.

Commerce's focus on "definitive knowledge of the amount of or benefit from the tax credits," *id.*, resulted in the agency's failure to grapple with record evidence that

undermined its decision.[48]  The outcome might be different if Fontaine's FY 2015 tax

returns were not available for Commerce to use in ascertaining the relevant tax credits

received during the POR.  However, those tax returns were available, and Commerce

has not explained why they do not contain the information the agency needs to

determine Fontaine's benefit for the subsidy programs notwithstanding the aggregate

refunds reflected in the returns.  Commerce has not identified substantial evidence or

provided a reasoned explanation to support its reliance on Fontaine's FY 2014 tax

returns merely because those returns were filed in 2015 or the agency's rejection of the

FY 2015 tax returns.  Accordingly, this issue will be remanded for reconsideration or

further explanation.

---

[48] Commerce's reliance on the *CVD Preamble* fails to persuade the court to adopt the agency's interpretation.  *See* I&D Mem. at 94 & n.624 (citing *CVD Preamble*, 63 Fed. Reg. at 65,376).  The *CVD Preamble* refers to a set of regulations proposed in 1997 and characterized those regulations as "propos[ing] to consider the benefit as having been received on the date the firm knew the amount of its tax liability."  65 Fed. Reg. at 65,376.  The regulations proposed in 1997 did not explicitly evince a standard based on knowledge (definitive or otherwise).  Instead, Commerce proposed a standard based on when "the recipient firm became capable of calculating the amount of the benefit" and equated that date, "[n]ormally," with "the date on which the firm filed its tax return." *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,852 (Dep't Commerce Feb. 26, 1997) (notice of proposed rulemaking and request for public comments).  Regardless, as the *CVD Preamble* acknowledges, Commerce has adopted a standard based "on the date on which the recipient firm would otherwise have had to pay the taxes associated with the exemption or remission, which is usually the date it files its tax return."  65 Fed. Reg. at 65,376.  It is that standard Commerce must apply.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are remanded in part and sustained in part; it is further

**ORDERED** that, on remand, Commerce shall reconsider or further explain its determination not to account for subsidies received by suppliers of lumber to the CVD expedited review respondents; it is further

**ORDERED** that, on remand, Commerce shall reconsider or further explain its determination to use Fontaine's FY 2014 tax returns to perform benefit calculations for the 2015 POR; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before July 22, 2024; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: April 22, 2024
        New York, New York