C-122-858
Remand
Slip Op. 24-50
POR: 1/1/2015 – 12/31/2015
**PUBLIC DOCUMENT**
E&C/OIII: EB/PZ

*Committee Overseeing Action for Lumber International Trade Investigations or Negotiations*
*v. United States*
**Consol. Court No. 19-00122, Slip Op. 24-50 (CIT April 22, 2024)**
**Certain Softwood Lumber Products from Canada**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.  SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (CIT) issued on April 22, 2024.[1]  These final results of redetermination concern Commerce's final results of the expedited review of the countervailing duty (CVD) order on certain softwood lumber products (softwood lumber) covering the period of review (POR) January 1, 2015, through December 31, 2015.[2]  The CIT remanded two issues concerning the expedited review.  Specifically, the CIT remanded for Commerce:  1) to reconsider or further explain its determination not to account for subsidies received by unaffiliated suppliers of lumber to certain expedited review respondents; and 2) to reconsider or further explain its determination to use Fontaine Inc.'s (Fontaine) fiscal year 2014 tax returns to perform the benefit calculations for certain tax programs during the POR.

---

[1] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 24-50 (CIT April 22, 2024) (*Remand Order*).
[2] *See Certain Softwood Lumber Products from Canada:  Final Results of Countervailing Duty Expedited Review*, 84 FR 32121 (July 5, 2019) (*Expedited Review Final*), and accompanying Issues and Decision Memorandum (IDM).

## II.  BACKGROUND

On January 3, 2018, Commerce published the CVD order on softwood lumber from
Canada.[3]  On March 8, 2018, in response to requests filed by certain Canadian producers and
exporters, Commerce initiated an expedited review of the *CVD Order* pursuant to 19 CFR
351.214(k).[4]  The companies subject to the expedited review were not selected as mandatory or
voluntary respondents in the CVD investigation and were subject to the all-others rate of 14.19
percent.[5]  The period of review for the expedited review was the same as for the CVD
investigation, *i.e.*, January 1, 2015, through December 31, 2015.[6]  On July 5, 2019, Commerce
published the *Expedited Review Final* covering eight companies and their cross-owned
affiliates.[7]

Relevant to this redetermination, in the expedited review, Commerce determined a *de
minimis* overall subsidy rate for Les Produits Forestiers D&G Ltée (D&G) and its cross-owned
affiliates, Le Groupe Gesco-Star Ltée, Les Produits Forestiers Portbec Ltée (Portbec), and Les
Produits Forestiers Startrees Ltée, and excluded these companies from the *CVD Order*.  In
addition, Commerce calculated an above *de minimis* overall subsidy rate for Mobilier Rustique
(Beauce) Inc. (Rustique) and its cross-owned affiliates, J.F.S.R. Inc., Gestion C.A. Rancourt Inc.,
Gestion J.F. Rancourt Inc., Gestion Suzie Rancourt Inc., Gestion P.H.Q. Inc., 9331–3419 Quebec
Inc., 9331–3468 Quebec Inc., and SPQ Inc.  Commerce also calculated an above *de minimis*
subsidy rate for Fontaine, and its cross-owned affiliates, Gestion Natanis Inc., Les Placements
Jean-Paul Fontaine Ltée, and Placements Nicolas Fontaine Inc.[8]

---

[3] *See Certain Softwood Lumber Products from Canada:  Amended Final Affirmative Countervailing Duty
Determination and Countervailing Duty Order*, 83 FR 347 (January 3, 2018) (*CVD Order*).
[4] *See Certain Softwood Lumber Products from Canada:  Initiation of Expedited Review of the Countervailing Duty
Order*, 83 FR 9833 (March 8, 2018) (*Initiation Notice*).
[5] *See CVD Order*, 83 FR at 348.
[6] *See Initiation Notice*, 83 FR at 9833.
[7] *See Expedited Review Final*.
[8] *See Expedited Review Final*, 84 FR at 32122.

Several of the expedited review companies, the Government of Canada, and the Government of Québec challenged certain Commerce determinations in the *Expedited Review Final,* and the Committee Overseeing Action for Lumber International Trade Investigations (COALITION) challenged Commerce's statutory authority to promulgate its expedited review regulations at 19 CFR 351.214(k) to determine individual subsidy rates for companies not individually examined in an investigation.[9]  On November 19, 2020, the CIT remanded Commerce's *Expedited Review Final* for reconsideration of the statutory basis upon which Commerce promulgated its CVD expedited review regulations at 19 CFR 351.214(k).[10]  On February 22, 2021, Commerce issued its Final Results of Redetermination,[11] in which Commerce found that it did not have the statutory authority to promulgate the CVD expedited review regulations at 19 CFR 351.214(k), and to conduct CVD expedited reviews.  On August 18, 2021, the CIT affirmed Commerce's remand and vacated the expedited review regulation at 19 CFR 351.214(k), as well as the *Expedited Review Final*.  Accordingly, the CIT declined to consider the remaining challenges to the *Expedited Review Final* raised by several of the expedited review companies.[12]  On April 25, 2023, the U.S. Court of Appeals for the Federal Circuit reversed and remanded the CIT's decision vacating Commerce's CVD expedited review regulation.[13]  Thus, the case returned to the CIT to decide the remaining substantive claims raised by several of the expedited review companies that the CIT had not previously considered due to vacating the

---

[9] *See* COALITION 56.2 Motion and accompanying brief, dated December 19, 2019, (ECF No. 101); Rustique 56.2 Motion and accompanying brief, dated December 19, 2019, (ECF No. 100); Fontaine 56.2 Motion and accompanying brief, dated December 19, 2019, (ECF No. 103, corrected in ECF No. 150); Government of Canada 56.2 Motion and accompanying brief, dated December 19, 2019, (ECF No. 105., corrected in ECF No. 156); and Government of Quebec 56.2 Motion and accompanying brief, dated December 19, 2019, (ECF No. 106, corrected in ECF No. 145).

[10] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, et al. v. United States, et al.*, 483 F. Supp. 3d 1253 (CIT 2020) (*COALITION III*) at 34-35.

[11] *See* Final Results of Redetermination Pursuant to Court Remand, *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, et al. v. United States, et al.*, Court No. 19-00122, Slip Op. 20-167 (CIT 2020), dated February 22, 2021.

[12] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 535 F.Supp.3d 1336 (CIT 2021) (*COALITION IV*).

[13] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 66 F.4th 968, 979 (Fed. Cir. 2023) (*COALITION V*).

*Expedited Review Final.* In its April 24, 2024, *Remand Order,* the CIT sustained several of Commerce's determinations in the *Expedited Review Final,* but remanded to Commerce its decision not to attribute subsidies to D&G, Portbec, and Rustique received by their unaffiliated lumber suppliers, and its determination to use Fontaine's fiscal year 2014 tax returns to perform the benefit calculations for certain tax programs during the POR.[14]

With respect to the first issue, during the POR, D&G, Portbec, and Rustique purchased lumber from unaffiliated Canadian suppliers and either further processed (or "remanufactured") the lumber, which they sold to the United States, or they resold the lumber without further processing to the United States. The COALITION argued in the underlying expedited review that Commerce should account for these purchases from unaffiliated suppliers, by establishing producer/exporter combination rates pursuant to 19 CFR 351.107(b) and by cumulating subsidies pursuant to 19 CFR 351.525(c), because "as section 701(a)(l) of the Act makes clear, {Commerce} is required to countervail all countervailable subsidies provided 'with respect to the manufacture, production, or export of a class or kind of merchandise imported ... into the United States.'"[15]

The COALITION argued that for pure resellers, Commerce should apply a combination rate based on the all-others rate of 14.19 percent applied to the unaffiliated Canadian supplier of lumber plus the subsidy rate of the expedited review respondent, following Commerce's determination in *Sinks from China*.[16] For remanufacturers, the COALITION argued that Commerce should capture all subsidies, including those provided to the suppliers of lumber, where the respondents remanufactured that lumber, also by establishing a producer/exporter combination rate.[17] In the *Expedited Review Final*, Commerce disagreed with the COALITION,

---

[14] *See Remand Order.*
[15] *See* COALITION's Letter, "Case Brief," dated March 11, 2019.
[16] *Id.* at 25-26 (citing *Drawn Stainless Steel Sinks From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 78 FR 13017 (February 26, 2013) (*Sinks from China*), and accompanying IDM at 18, 21, 24, and 26-29).
[17] *Id.* at 31-33.

and found that because logs and lumber are inputs to the respondents' exports to the United

States, Commerce may not "presume the pass through of benefits received by unaffiliated input

suppliers.  Rather, 19 CFR 351.523(a) sets out requirements that the petitioner must adequately

allege in order for Commerce to investigate upstream subsidies, *i.e.* subsidies received by

unaffiliated input suppliers."[18]  Because the COALITION did not submit an upstream subsidy

allegation, Commerce found that there was no basis to attribute subsidies to logs and lumber

provided by unaffiliated suppliers to the respondents.[19]  With respect to the COALITION's

argument concerning cumulating benefits under the trading company regulation (19 CFR

351.525(c)), Commerce stated that it was unable to conduct such an analysis because the record

did not contain information pertaining to the subsidies that the unaffiliated Canadian lumber

suppliers received.[20]  Commerce also stated that it declined to examine subsidies provided to

unaffiliated producers of lumber that was resold by the respondents due to resales accounting for

a small percentage of the respondent's overall sales.[21]  Commerce also declined to establish

producer/exporter combination rates for the respondents and unaffiliated suppliers of lumber,

finding that because Commerce intended to establish producer/exporter combination rates for

expedited review respondents excluded from the order because they obtained a *de minimis*

overall subsidy rate as a result of the expedited review, an unaffiliated supplier/producer of

lumber would not be able to circumvent the payment of duties by shipping subject merchandise

through an excluded company, as such lumber would be subject to the all-others rate.[22]

In the *Remand Order*, the CIT stated that, if Commerce continues to find that the

respondent-remanufacturers are the producers of the subject merchandise, "Commerce must

reconsider or further explain its determination to require an upstream subsidy allegation for

---

[18] *See Expedited Review Final* IDM at Comment 5.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

purchases of lumber that is within the class or kind of covered merchandise."[23]  Citing sections 701(e) and 771A(a)(1) of the Act, the CIT found that Commerce did not explain "whether inputs that otherwise are subject merchandise may be considered 'upstream' to the subject merchandise exported to the United States; in other words, whether the statutory language 'a product . . . that is used . . . in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding' should be interpreted broadly, as Commerce did, to include subject and nonsubject inputs, or narrowly, as the {COALITION} suggests, such that it captures only nonsubject inputs used to produce subject merchandise."[24]

Regarding Commerce's decision not to apply combination rates pursuant to 19 CFR 351.107(b) or the trading company regulations at 19 CFR 351.525(c) to the respondents' purchase of lumber from unaffiliated suppliers, the CIT found that Commerce has rates for every producer in Canada during the POR on the record, whether it is an individually-calculated rate or the all-others rate.[25]  Additionally, the CIT took issue with Commerce's determination to disregard supplier subsidies when the volumes of lumber at issue were small, explaining that such a determination could be "significant" (*i.e.*, the difference between an above *de minimis* subsidy rate and a below *de minimis* subsidy rate, which would result in exclusion from the *CVD Order*).[26]  Regarding combination rates, the CIT found that Commerce's instructions to U.S. Customs and Border Protection (CBP) for D&G/Portbec currently consist of a combination rate where merchandise exported by D&G/Portbec and produced by an unaffiliated lumber supplier would be subject to the all-others rate/or the producer's rate, as appropriate.  However, the CIT noted that since the subsidy rate for Rustique was above *de minimis*, it was not a pure reseller of subject merchandise, and Commerce appeared to treat Rustique as the "producer" of all its

---

[23] *See Remand Order* at 25.
[24] *Id.* at 27.
[25] *Id.* at 29-31.
[26] *Id.* at 31.

exports, "there does not, at present, appear to be any basis for Commerce to apply the combination rate regulation to Rustique."[27]  However, as a result of the *Remand Order* directing Commerce to reconsider its determination that respondent-remanufacturers are the producers of subject merchandise, the CIT stated that Commerce may need to reconsider whether it is necessary to apply the combination rate regulation to Rustique.[28]

Commerce was also remanded by the CIT on the date of receipt of tax benefits for Fontaine during the expedited review period.  Fontaine argued that Commerce should utilize its fiscal year 2015 (FY 2015) tax return to calculate the benefit that Fontaine received under certain tax programs during the POR because it knew of its tax liabilities and paid these liabilities during the POR.  In the *Expedited Review Final*, Commerce disagreed and continued to find that Fontaine's tax return filed during the POR (FY 2014 tax return) was the appropriate tax return to use to calculate the benefit that Fontaine received under these tax programs.[29]  In its *Remand Order*, the CIT found that Commerce had not identified substantial evidence or provided a reasoned explanation to support its reliance on Fontaine's FY 2014 tax return merely because those returns were filed during the POR or for rejecting Fontaine's FY 2015 tax return, which was filed after the POR.[30]  The CIT remanded this issue to Commerce for reconsideration or further explanation.[31]

## III.    ANALYSIS

### D&G/Portbec and Rustique - Supplier Subsidies

Commerce has reconsidered its determination not to account for subsidies received by unaffiliated suppliers of lumber to certain expedited review respondents, consistent with the *Remand Order*.

---

[27] *Id.* at 32-33.
[28] *Id.* at 33.
[29] *See Expedited Review Final* IDM at Comment 23.
[30] *See Remand Order* at 49.
[31] *Id.*

During the POR, D&G, Portbec, and Rustique purchased "rough-hewn" lumber from unaffiliated Canadian suppliers, which was further processed by the companies, and sold to the United States.[32]  Portbec also purchased lumber from unaffiliated suppliers, which it subsequently resold to the United States during the POR (which was not further processed).[33]  The volume and value of the lumber purchased from unaffiliated Canadian suppliers was reported by Rustique in its questionnaire responses[34] and included in its verification exhibits,[35] but such information was missing from the record for D&G/Portbec.  On June 5, 2024, Commerce issued a questionnaire to D&G/Portbec seeking information regarding the volume and value of lumber sourced by the respondents from affiliated Canadian suppliers, unaffiliated Canadian suppliers, and U.S. suppliers.  Commerce also requested that D&G/Portbec report the volume and value of lumber sourced from unaffiliated Canadian suppliers that was remanufactured and that was resold.[36]  D&G/Portbec provided the requested information on June 18, 2024.[37]

In accordance with 19 CFR 351.525(b)(6)(i), Commerce normally attributes a subsidy to the products produced by the company that received the subsidy.  However, 19 CFR 351.525(b)(6)(ii)-(v) provides additional rules for the attribution of subsidies received by respondents with cross-owned affiliates.  Subsidies to the following types of cross-owned affiliates are covered in these additional attribution rules:  (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is

[32] See D&G's Letter, "Responses of Les Produits Forestiers D&G Ltee, Le Groupe Gesco-Star Ltee, Les Produits Forestiers Portbec Ltee and Les Produits Forestiers Startrees Ltee to Countervailing Duty Questionnaire," dated April 12, 2018 (D&G's April 12 Response), at Appendix DG-1; see also Portbec's Letter, "Response of Les Produits Forestiers Portbec Ltee to Countervailing Duty Questionnaire," dated April 12, 2018, at pdf page 3 (Portbec April 12 Response); and Rustique's Letter, "Mobilier Rustique (Beauce) Inc. April 12 Questionnaire Response," dated April 12, 2018 (Rustique's April 12 Response), at 8 and Exhibit B.
[33] See Portbec April 12 Response at pdf page 3.
[34] See Rustique's April 12 Response at 8 and Exhibit B.
[35] See Rustique's Letter, "Verification Exhibits of Mobilier Rustique Inc," dated October 17, 2018, at Exhibit 4.
[36] See Commerce's Letter, "Court Remand regarding Expedited Review of the Countervailing Duty Order on Certain Softwood Lumber Products from Canada: Questionnaire for D&G & Portbec," dated June 4, 2024.
[37] See D&G/Portbec's Letter, "Response of Les Produits Forestiers D&G Ltée and Les Produits Forestiers Portbec Ltée to Supplemental Questionnaire," dated June 18, 2024.

8

primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent.  Further, 19 CFR 351.525(c) provides that benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm producing the subject merchandise that is sold through the trading company, regardless of affiliation.

In accordance with the *Remand Order*, we have reconsidered the relationship between D&G/Portbec and Rustique with their unaffiliated Canadian suppliers of lumber and find it appropriate to account for the subsidy benefits provided to the unaffiliated Canadian suppliers of lumber during the POR utilizing 19 CFR 351.525(c).  Specifically, for the lumber purchased from unaffiliated Canadian suppliers that D&G/Portbec and Rustique either further processed or resold directly to the United States, we determine that the situations described are appropriately considered in this instance as a relationship between a producer and its trading company under 19 CFR 351.525(c) because the respondents either conducted minor processing on the purchased rough-hewn lumber,[38] which itself is subject merchandise, or in the case of Portbec, resold the lumber directly without further processing.  Accordingly, we are cumulating the benefits from subsidies provided to D&G/Portbec and Rustique with benefits from subsidies provided to their unaffiliated Canadian lumber suppliers.  While we do not have complete subsidy usage information from all unaffiliated Canadian lumber suppliers from whom D&G/Portbec and Rustique sourced lumber, the CIT noted in its decision that the record contains POR-specific subsidy rates for all producers in Canada, via either a company-specific rate or the all-others rate.[39]  As a result, to conduct the necessary cumulation calculation under the trading company

---

[38] *See* D&G's April 12 Response at pdf page 10 and Appendix DG-1; *see also* Portbec's April 12 Response at pdf page 3.  *See also* Rustique's April 12 Response at Exhibit A for a description of its production process, which is proprietary.
[39] *See Remand Order* at 31.

rule, we are utilizing the cash deposit rate applicable to those suppliers from the investigation in a manner similar to the attribution of a trading company's subsidies to an unaffiliated producer.[40]

Because we have determined that the trading company regulation is applicable to these circumstances, and are cumulating the benefits received by the expedited review respondents with those of their unaffiliated Canadian lumber suppliers, we determine that the CIT's order for Commerce to reconsider or further explain Commerce's prior determination to require an upstream subsidy allegation to be moot.

With respect to the CIT's discussion of the application of a combination rate, we find that D&G/Portbec continues to receive an overall *de minimis* subsidy rate,[41] and thus, it continues to be appropriate to apply a combination rate to D&G/Portbec, consistent with our practice.[42] However, we have not included their unaffiliated Canadian suppliers of lumber in such a combination rate because of the small relative volume/value of lumber purchased from these unaffiliated Canadian lumber suppliers by D&G/Portbec during the POR, as the overall subsidy rate for D&G/Portbec remains *de minimis* after accounting for the benefits received by these unaffiliated lumber suppliers.  Thus, any merchandise produced *and* exported by D&G/Portbec continues to be excluded from the *CVD Order*, and other producers or exporters may not take advantage of that exclusion.

For Rustique, because its overall subsidy rate remains above *de minimis* after cumulating the benefits with its unaffiliated Canadian lumber suppliers,[43] we continue to find it appropriate not to assign a combination rate.  In CVD proceedings, we assign cash deposit rates to

---

[40] *See* Memorandum, "Final Results of Redetermination Calculations for Les Produits Forestiers D&G Ltée and Les Produits Forestiers Portbec," dated concurrently with these final results of redetermination (D&G/Portbec Final Calculation Memorandum); *see also* Memorandum, "Draft Results of Redetermination Calculations for Mobilier Rustique (Beauce) Inc.," dated July 15, 2024.
.
[41] *See* D&G Draft Calculation Memorandum.
[42] *See, e.g., Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China:  Countervailing Duty Order*, 81 FR 48387 (July 25, 2016).
[43] *See* Rustique Draft Calculation Memorandum.

companies on a "producer and/or exporter" basis, and there is no current cash deposit hierarchy for CVD proceedings, like there is for antidumping duty cases.  Thus, the cash deposit rate assigned to Rustique can be used by an importer regardless of whether Rustique is considered the producer or the exporter of the merchandise.  Further, we find that the issue of whether to assign a combination rate to Rustique is moot because its cash deposit rate has been superseded in subsequent segments of this *CVD Order*, including in the most recent administrative review final.[44]

**Fontaine – Date of Receipt of Tax Benefits**

Consistent with the *Remand Order*, we have reconsidered our determination that Fontaine's FY 2014 Tax Return is the appropriate return on which to calculate the tax benefit that Fontaine received during the POR.  As Commerce explained in the *Expedited Review Final*, under 19 CFR 351.509(b)(1), Commerce will find benefits under income tax programs to have been received on the date on which the recipient firm would otherwise have had to pay the taxes associated with the exemption or remission.  The regulation further states that Commerce will normally interpret this date to be the date on which the recipient firm filed its income tax return.

Commerce has also explained that, as discussed in the *CVD Preamble*, in determining the timing of receipt of benefit for tax programs the "goal is to equate the timing of receipt of the benefit with the date the firm knew the amount of its tax liability, and thus the definitive amount of its tax savings under any particular tax-related subsidy program."[45]  In the vast majority of cases, Commerce has determined that the date on which the respondent files its tax return "is the date on which a firm knows, definitively, the amount of its tax liability."[46]  In the *Expedited Review Final*, Commerce determined that Fontaine did not have definitive knowledge of its

---

[44] *See Certain Softwood Lumber Products from Canada:  Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 FR 50103, 50106 (August 1, 2023).
[45] *See Expedited Review Final* IDM at 94.
[46] *Id.* (citing *Countervailing Duties; Final Rule*, 63 FR 65348, 65376 (November 25, 1998) (*CVD Preamble*)).

liabilities until it filed its tax return (FY 2014 return was filed during the POR in 2015 and the FY 2015 tax return was filed after the POR in 2016).[47]  The CIT stated that the relevant inquiry in determining the date of receipt of the tax benefit is not when a recipient has "definitive knowledge" of the amount of the benefit.  Rather, the date of receipt of the tax benefit is based on the date on which the recipient firm would otherwise have had to pay the taxes associated with the exemption or remission, which is usually the day it files its tax return.[48]

Pursuant to the CIT's remand order, Commerce has reconsidered the information on the record and has determined that there is sufficient evidence to find, based on the unique facts of this record, that Fontaine was required to pay, and did pay, its final tax liabilities for FY 2015 by the end of the 2015 calendar year.  Commerce's finding in the *Expedited Review Final* was that Fontaine made estimated payments in the form of identical monthly installments throughout the fiscal year and that Fontaine "does not know the full extent of its tax liability until it files its tax return" the following year.[49]  However, we have reexamined Fontaine's FY 2015 tax liabilities, partially in light of record evidence for the FY 2014 tax return, which indicates that the date on which Fontaine had to pay the taxes associated with the tax exemptions or remissions was the end of the 2014 calendar year.  First, Fontaine was required by law to remit any taxes due for its FY 2014 tax return two months after the close of its fiscal year (*i.e.*, by December 31, 2014).[50]  The record contains an email from Fontaine's accountants on December 22, 2014, detailing to Fontaine the amount of its final tax liabilities for its FY 2014 tax return.[51]  The record also

---

[47] *Id.* at 94-95.
[48] *See Remand Order* at 49, n. 48.
[49] *See Expedited Review Final* IDM at 94.
[50] *See* Fontaine's Letter, "Response to the Second Supplemental Questionnaire to Fontaine, Inc.," dated July 25, 2018 (Fontaine SQR2), at Exhibit A-4.  Because the record of the expedited review contains all of Fontaine's tax-related documentation in single exhibits in its filings, which do not have consistent numbering throughout the exhibits, Commerce has identified the barcodes of the BPI version of Fontaine's submissions on ACCESS and identified the pdf page within those submissions so that parties can more easily follow the documents that Commerce is referencing.  For the citation in this footnote, *see* ACCESS barcode 3735149-08 at .pdf pages 67-68 where the balance due date for corporations is defined as "the date that is two months on which the taxation year ends."
[51] *See* Fontaine's IQR at Exhibit 5 (*see* ACCESS barcode 3694492-17 at .pdf page 2).

contains records of Fontaine's payment of that liability in December 2014.[52]  While Fontaine did make identical monthly estimated payments throughout the fiscal year,[53] the record also demonstrates that this December 2014 payment was not an estimated payment, but a final payment that reflected Fontaine's final tax liabilities for its return that it would later file in 2015. Since the date on which Fontaine would have had to pay the taxes associated with the exemption or remissions for its FY 2014 tax return was prior to the POR, it is not appropriate for Commerce to use Fontaine's FY 2014 tax return to calculate Fontaine's POR benefits for the associated tax programs.

On the other hand, as noted above, based on Canadian income tax law Fontaine was legally obligated to make a final payment of its FY 2015 tax liabilities prior to the end of calendar year 2015 (*i.e.*, two months after the end of its fiscal year, or December 31, 2015). Thus, for all the reasons stated above, Commerce has determined for these final results of redetermination that it would be appropriate to use Fontaine's FY 2015 tax return to calculate Fontaine's benefits for the POR.

Because Commerce fully verified Fontaine's FY 2015 tax return during the underlying review, the agency has all the information it needs to calculate subsidy benefits based on the FY 2015 tax return for four programs:  (1) Accelerated Capital Cost Allowance for Class 29 Assists, (2) Federal Logging Tax Credit, (3) Provincial Logging Tax Credit, and (4) Tax Credits for Investments Relating to Manufacturing and Processing Equipment.[54]  As a result of these calculations, Commerce has determined that Fontaine's overall subsidy rate is now *de minimis* and, thus, Fontaine should be excluded from the *CVD Order*.

---

[52] *Id.* (*see* ACCESS barcode 3694492-16 at .pdf page 8).
[53] *Id.* (*see* ACCESS barcode 3694492-17 at .pdf page 3).
[54] *See* Memorandum, "Final Results of Redetermination Calculations for Fontaine Inc.," dated concurrently with this remand redetermination (Fontaine Calculation Memorandum).

## IV.    INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on July 16, 2024.[55]  We received

comments from the COALITION,[56] D&G/Portbec,[57] and Fontaine.[58]  We summarize and address

these arguments, in turn.

### Comment 1: Whether D&G Acted as a Trading Company

*D&G/Portbec's Comments*

The following is a verbatim summary of the comments submitted by D&G/Portbec (internal
citations omitted).  For further details, *see* D&G/Portbec Comments at 2-3.

> D&G takes issue with two unsubstantiated conclusions in the Draft Remand
> Redetermination:  first, that D&G acted as a trading company for its unaffiliated
> lumber suppliers…There is no evidence on the record that the remanufacturing
> done by D&G or Portbec was negligible or that D&G or Portbec's business with
> their unaffiliated lumber suppliers was structured as a trading company
> relationship.

**Commerce's Position:**  As explained above, 19 CFR 351.525(c) provides that benefits from

subsidies provided to a trading company which exports subject merchandise shall be cumulated

with benefits from subsidies provided to the firm producing the subject merchandise that is sold

through the trading company, regardless of affiliation.  While D&G/Portbec argue that D&G is

not a "non-producing exporter,"[59] we have only applied the trading company regulation where

D&G, Portbec, and Rustique sourced lumber, the subject merchandise, from unaffiliated

Canadian suppliers.  Though D&G, Portbec, and Rustique perform processing on the lumber,

there is no disagreement that the companies' input for a subset of their sales which they exported

to the United States is already subject merchandise.  Thus, we continue to find that these

---

[55] *See Draft Results of Redetermination Pursuant to Court Remand*, *Committee Overseeing Action for Lumber
International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 24-50,
dated July 16, 2024 (Draft Results).
[56] *See* COALITION's Letter, "Comments on Draft Results for Redetermination Pursuant to Remand in the
Countervailing Duty Expedited Review of Certain Softwood Lumber Products from Canada," dated July 25, 2024
(COALITION Comments).
[57] *See* D&G/Portbec's Letter, "Comments of Les Produits Forestiers D&G Ltée and Les Produits Forestiers Portbec
Ltée on Draft Remand Redetermination," dated July 23, 2024 (D&G/Portbec Comments).
[58] *See* Fontaine's Letter, "Comments on Draft Remand Redetermination," dated July 23, 2024 (Fontaine Comments).
[59] *See* D&G/Portbec Comments at 2.

situations are appropriately considered in this instance as a relationship between a producer and its trading company.

D&G/Portbec also argue that "there is no evidence on the record that D&G or Portbec conducted only 'minor processing on the purchased rough-hewn lumber.'"[60] However, in this instance, regardless of the level of processing, there is still no question that the product purchased by D&G/Portbec is lumber, which is subject merchandise. Thus, for this subset of their sales, they exported subject merchandise produced by unaffiliated Canadian suppliers.

Finally, D&G/Portbec argue that there was no "commercial, agency or sales relationship between the unrelated lumber producers and D&G/Portbec"[61] and that there is no evidence that their lumber input suppliers knew that the lumber purchased by D&G/Portbec was destined for export to the United States, arguing that their situation is unlike *Sinks from China*.[62] We note that there is no requirement in 19 CFR 351.525(c) to find a "commercial, agency, or sales relationship," and there is no knowledge test in CVD proceedings. With respect to D&G/Portbec's citation to *Sinks from China*, the only relevant discussion in that final determination is that Commerce cumulated the benefits received by an unaffiliated trading company with those of the respondent producer, in accordance with 19 CFR 351.525(c).[63] Here, we find that D&G, Portbec, and Rustique's relationships with their unaffiliated suppliers of lumber are appropriately treated as one between a trading company and a producer, and have similarly cumulated the benefits, in accordance with 19 CFR 351.525(c).

**Comment 2:  Whether Subsidies Were Passed Through to D&G**

*D&G/Portbec's Comments*

The following is a verbatim summary of the comments submitted by D&G/Portbec (internal citations omitted). For further details, *see* D&G/Portbec Comments at 3-5.

---

[60] *Id.* at 3.
[61] *Id.* at 2-3.
[62] *Id.* at 2 (citing *Sinks from China*).
[63] *See Sinks from China* IDM at 4.

D&G takes issue with two unsubstantiated conclusions in the Draft Remand Redetermination… second, that any subsidies received by those suppliers were passed through in the prices they charged to D&G…  Similarly, there is no showing – or logic to support – the assertion that unaffiliated lumber suppliers passed through their subsidy benefits to D&G or to Portbec.  In fact, {Commerce} seems to have created out of thin air the "factual" predicate for its conclusion at pages 9-10 of the Draft Remand Redetermination:

'In accordance with the *Remand Order*, we have reconsidered the relationship between D&G/Portbec and Rustique with their unaffiliated Canadian suppliers of lumber and find it appropriate to account for the subsidy benefits provided to the unaffiliated Canadian suppliers of lumber during the POR utilizing 19 CFR 351.525(c). Specifically, for the lumber purchased from unaffiliated Canadian suppliers that D&G/Portbec and Rustique either further processed or resold directly to the United States, we determine that the situations described are appropriately considered in this instance as a relationship between a producer and its trading company under 19 CFR 351.525(c) because the respondents either conducted minor processing on the purchased rough-hewn lumber, which itself is subject merchandise, or in the case of Portbec, resold the lumber directly without further processing.'

**Commerce's Position:**  D&G/Portbec argue that there is no evidence that D&G or Portbec benefitted from subsidies received by unaffiliated lumber suppliers.  D&G/Portbec cite to the provisions covering upstream subsidies under sections 701(e) and 771A of the Act, arguing that the lumber D&G/Portbec purchased for purposes of remanufacturing constitutes an "input product,"[64] and that "{t}here is no record evidence suggesting that any lumber inputs were purchased at less than arm's-length prices."[65]  However, Commerce noted that the upstream subsidy provisions under sections 701(e) and 771A of the Act are not applicable in this case.  First, we do not have an upstream subsidy allegation before us.  More importantly, however, is that section 771A(a) of the Act defines an upstream subsidy as one that is bestowed on an input product.  As explained above, for purposes of these final results of redetermination, the lumber that D&G, Portbec, and Rustique sourced from unaffiliated suppliers is subject merchandise (rather than an input into subject merchandise).  Thus, we find D&G/Portbec's reference to *OCTG from Argentina* inapposite, not only because the case occurred prior to the enactment of

---

[64] *See* D&G/Portbec Comments at 4.
[65] *Id.*

the URAA, but because the provision of the case D&G/Portbec cites involves whether benefits are passed from the supplier to a purchaser of an input product.[66]

Further, as explained above, we are treating D&G, Portbec, and Rustique as trading companies with respect to the subset of sales where they purchased lumber from unaffiliated Canadian suppliers, and thus, there is no statutory provision to determine whether subsidy benefits "passed through" from the unaffiliated suppliers to D&G, Portbec, and Rustique. Rather, the trading company regulation at 19 CFR 351.525(c) directs Commerce simply to cumulate benefits provided to a trading company exporting subject merchandise with subsidies provided to the producer of subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated. That is what we have done in these final results of redetermination.

Additionally, we disagree with D&G/Portbec's contention that *Delverde*[67] is relevant to the instant situation. *Delverde* concerned a change in ownership and whether Delverde received subsidies as a result of a purchase of assets from a party that previously received subsidies.[68] Similarly, *Allegheny Ludlum* concerned the sale of a company, and whether subsidies were extinguished upon the privatization of the company.[69] These situations are distinct from this case, where D&G, Portbec, and Rustique purchased subject merchandise from unaffiliated suppliers, which they further processed and exported to the United States, and did not concern the purchase of assets or the sale of a company.

D&G/Portbec also refers to the Appellate Body Report in AB-2003-6, *United States, Final Countervailing Duty Determination with Respect to Certain Softwood Lumber from Canada* in support of its arguments. However, WTO panel and Appellate Body conclusions are

---

[66] *See* D&G/Portbec Comments at 4-5 (citing *Oil Country Tubular Goods from Argentina*: *Initiation of a Countervailing Duty Investigation*, 49 FR 28289, 28900 (July 11, 1984) (*OCTG from Argentina*)).
[67] *Id.* (citing *Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000) (*Delverde*)).
[68] *See Delverde*.
[69] *See* D&G/Portbec Comments at 5 (citing *Allegheny Ludlum Corp. v. United States*, 358 F. Supp. 2d 1334, 1339 (Ct. Int'l Trade 2005) (*Allegheny Ludlum*)).

without effect under U.S. law "unless and until such a {report} has been adopted pursuant to the

specified statutory scheme" established in the URAA.[70]  Congress was very clear in the URAA

and its legislative history that WTO reports have no application to U.S. law absent the United

States agreeing to such application.  In no case do WTO panel or Appellate Body dispute

settlement reports limit automatically Commerce's discretion in applying the statute in an AD or

CVD proceeding.[71]  Put simply, WTO reports "do not have any power to change U.S. law or to

order such a change."[72]

**Comment 3:  Whether Commerce Correctly Calculated the Supplier Subsidies**

*COALITION's Comments*

The following is a verbatim summary of the comments submitted by the COALITION (internal
citations omitted).  For further details, *see* COALITION Comments at 3-9.

> In its Draft Remand Redetermination, {Commerce} correctly determined that it
> should account for subsidies bestowed upon lumber produced by unaffiliated
> suppliers that the respondents purchased and resold to the United States.  However,
> {Commerce} must correct certain ministerial errors contained in the agency's
> subsidy rate calculation with respect to {D&G} and {Portbec}.
>
> First, {Commerce's} calculation "double-weighted" the value of Portbec and
> D&G's purchases of unaffiliated suppliers' lumber. To correct the error, the
> Department should calculate Portbec's (and D&G's) "Unaffiliated Lumber
> Purchases % of Total Sales" by dividing Portbec's (and D&G's) purchase of
> unaffiliated lumber over Portbec and D&G's total sales.  This calculation captures
> the correct percentage of Portbec's unaffiliated lumber purchases with relation to
> the combined total sales of Portbec and D&G.
>
> Second, the "total sales" figures {Commerce} used in its subsidy rate calculation
> are inconsistent with those relied on in {the *Expedited Review Final*}.  The supplier
> subsidy issue does not impact the denominator for Portbec and D&G.  As such,
> {Commerce} should correct these numbers to align with the numbers used in the
> {the *Expedited Review Final*}.

**Commerce's Position:**  We disagree with the COALITION that Commerce's calculation in the

draft results of redetermination is incorrect.  The record shows that D&G and Portbec purchased

---

[70] *See Corus Staal BV v. U.S.*, 395 F. 3d 1347-49, *accord Corus Staal BV v. U.S.*, 502 F. 3d 1375; and *NSK Ltd. v. U.S.*, 510 F. 3d 1379-80.
[71] *See* 19 USC § 3538(b)(4) (implementation of WTO reports is discretionary) (Section 129(b)(4) of the URAA).
[72] *See* SAA at 659.

meaningfully different volumes of lumber from unaffiliated producers and had notably different
sales levels for 2015.  We therefore find it necessary to take into account the individual business
activities (purchases and sales) of D&G and Portbec to properly attribute the supplier subsidies.

The applied methodology determines the percentage of each company's unaffiliated
lumber purchases in relation to their portion of combined sales and then multiplies those shares
by the all-others rate to derive a subsidy rate for the unaffiliated lumber producers that is
attributable to D&G and Portbec.  We find that this calculation best reflects that portion of the
unaffiliated lumber producers' subsidies that D&G and Portbec each received based on their own
particular quantity of lumber purchased and sales made during 2015.  As shown in the draft
remand calculations, the subsidy rate calculated for the unaffiliated producers is then added to
D&G/Portbec's subsidy rate determined in the *Expedited Review Final*.[73]

However, we agree with the COALITION that the total sales amounts for D&G and
Portbec used in the draft results of redetermination subsidy rate calculation are not consistent
with those total sales amounts relied on in the *Expedited Review Final*.  Therefore, for these final
results of redetermination, we have used, in the subsidy rate calculation, D&G's and Portbec's
total sales values net of inter-company sales and freight that were used in the *Expedited Review
Final*.  We continue to find that the overall subsidy rate for D&G/Portbec remains *de minimis*
after correcting the total sales figures.[74]

## Comment 4:  Whether Commerce Should Reconsider Its Determination of Timing of Fontaine's Receipt of Tax Benefits

*COALITION's Comments*

The following is a verbatim summary of the comments submitted by the COALITION (internal
citations omitted).  For further details, *see* COALITION Comments at 9-11.

Contrary to {Commerce's} Draft Remand Redetermination, record evidence
demonstrates that 2015 was the date Fontaine "would otherwise have had to pay

---

[73] *See* Memorandum, "Draft Results of Redetermination Calculations for Les Produits Forestiers D&G Ltée and Les Produits Forestiers Portbec Ltée Draft Remand Subsidy Calculations for Rustique," dated July 15, 2024.
[74] *See* D&G/Portbec Final Calculation Memorandum.

the taxes associated with the exemption or remission" for income tax payable for FY 2014. Accordingly, the benefits Fontaine received from various tax subsidy programs during the POR were numbers contained in the company's FY 2014 tax returns. As such, in the final remand redetermination, {Commerce} should use Fontaine's FY 2014 tax returns to calculate the benefits Fontaine received from various tax subsidy programs during the {POR}.

**Commerce's Position:** We disagree with the COALITION's argument that record evidence demonstrates that 2015 was when Fontaine knew the amount of its tax liability relating to its FY2014 tax return. As Commerce explained above, our general practice is that the date on which the respondent files its tax return "is the date on which a firm knows, definitively, the amount of its tax liability."[75] Although that is Commerce's normal practice, there may be limited exceptions, including in this remand redetermination, when record evidence demonstrates that the firm's liabilities were finalized and paid prior to the date on which the firm filed it tax return.

The record evidence that the COALITION points to as support is a notification of assessment from the Government of Quebec relating to an adjustment for a tax credit that was claimed in Fontaine's FY2014 tax return.[76] This notification was issued by the GOQ in December 2015,[77] approximately ten months after Fontaine submitted its tax return and approximately a year after it was required by law to submit its final payment relating to the FY2014 tax return. According to the COALITION, this supports the contention that Fontaine did not, in fact, know its tax liability until after the completion of the calendar year.

However, the CIT ruled that the relevant inquiry in determining the date of receipt of the tax benefit is not when a recipient has "definitive knowledge" of the amount of the benefit. Rather, the date of receipt of the tax benefit is based on the date on which the recipient firm would otherwise have had to pay the taxes associated with the exemption or remission, which is

---

[75] *See CVD Preamble* at 65376.
[76] *See* Fontaine's Letter, "Fontaine's Response to Initial Questionnaire," dated April 13, 2018 (Fontaine IQR) at Exhibit 5 (As explained in the Draft Remand Results, Fontaine filed all of its tax related documents in one exhibit in its IQR without consistent internal numbering, to make it easier for parties to pinpoint the document we are referencing we are including the ACCCESS barcode and page of the pdf for relevant citations. For this document, see ACCESS Barcode 3694492-17 at pdf page 14).
[77] *Id.*

usually the day it files its tax return.  In this instance, the GOQ issuing a notification of assessment months after Fontaine was required to pay its taxes (or even file its tax return) does not change the date on which Fontaine was legally required to, had knowledge of its final liabilities, and paid its liabilities associated with its FY2014 tax return.  This is the date in which it had to otherwise pay taxes associated with the exemptions or remissions pursuant to that return, which was before the POR.  Accordingly, we find that the record does not support that 2015 was the year in which Fontaine was required to pay its taxes in relation to the FY2014 tax return.

**Comment 5:  Whether to Revise the Calculation of Fontaine's Subsidy Rate**

*Fontaine's Comments*

The following is a verbatim summary of the comments submitted by Fontaine (internal citations omitted).  For further details, *see* Fontaine Comments at 2.

> Commerce used incorrect sales figures reported in Fontaine's initial questionnaire response instead of the verified sales figures from verification. Commerce should use the corrected and verified sales figures in its final results of redetermination.

**Commerce's Position:**  We agree with Fontaine that it is appropriate to utilize the revised sales figures that were submitted as part of Fontaine's verification exhibits for these remand results. We used the revised sales figures in the *Expedited Review Final*.  Accordingly, we have revised the calculations from the draft redetermination to utilize the sales figures submitted during the verification.[78]  The resulting changes to the subsidy rate calculations did not result in a change to the rounded *ad valorem* subsidy rates for any program.[79]

**Comment 6:  Whether Commerce Should Instruct U.S. Customs and Border Protection (CBP) to Refund Fontaine's CVD Cash Deposits**

*Fontaine's Comments*

The following is a verbatim summary of the comments submitted by Fontaine (internal citations omitted).  For further details, *see* Fontaine Comments at 3.

---

[78] *See* Fontaine Calculation Memorandum.
[79] *Id.*

Commerce on remand found Fontaine's *ad valorem* subsidy rate to be *de minimis* and thus that Fontaine should be excluded from the CVD Order.  Because this finding means that Fontaine has definitively overpaid CVD duty deposits, Commerce should instruct {CBP} to refund immediately Fontaine's CVD duty deposits.

**Commerce's Position:**  If the CIT upholds Commerce's remand redetermination, Commerce intends to instruct CBP to exclude from the *Order* subject merchandise produced and exported by Fontaine, once there is a final and conclusive decision from the CIT.  In such a case, we intend to instruct CBP to discontinue the suspension of liquidation and the collection of cash deposits of estimated countervailing duties on all shipments of softwood lumber produced and exported by Fontaine, entered, or withdrawn from warehouse, for consumption on or after April 28, 2017.  In addition, we intend to instruct CBP to liquidate, without regard to countervailing duties, all suspended entries of shipments of softwood lumber produced and exported by Fontaine, and to refund all cash deposits of estimated countervailing duties collected on all such shipments.  Subject merchandise that Fontaine exports but do not produce, as well as merchandise Fontaine produces but is exported by another company remains subject to the *Order*.

## V.    FINAL RESULTS OF REDETERMINATION

Based on the analysis above, we have reconsidered our determination with respect to D&G, Portbec, and Rustique, and accounted for subsidies received by unaffiliated suppliers of lumber, and we have reconsidered our use of Fontaine fiscal year 2014 tax returns, and instead used Fontaine's fiscal year 2015 tax returns to perform the benefit calculations for certain tax programs during the POR.  As a result, we determine the countervailable subsidy rates to be:

| Producer/Exporter | Subsidy Rate (percent) |
|---|---|
| Fontaine Inc. and its cross-owned affiliates[80] | 0.88 (*de minimis*) |
| Les Produits Forestiers D&G Ltée and its cross-owned affiliates[81] | 0.70 (*de minimis*) |
| Mobilier Rustique (Beauce) Inc. and its cross-owned affiliates[82] | 2.07 |

9/10/2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[80] Commerce finds the following companies to be cross-owned with Fontaine Inc.: Gestion Natanis Inc., Les Placements Jean-Paul Fontaine Ltee, and Placements Nicolas Fontaine Inc.

[81] Commerce finds the following companies to be cross-owned with Les Produits Forestiers D&G Ltée: Le Groupe Gesco-Star Ltée, Les Produits Forestiers Portbec Ltée, and Les Produits Forestiers Startrees Ltée.

[82] Commerce finds the following companies to be cross-owned with Mobilier Rustique (Beauce) Inc.: J.F.S.R. Inc., Gestion C.A. Rancourt Inc., Gestion J.F. Rancourt Inc., Gestion Suzie Rancourt Inc., Gestion P.H.Q. Inc., 9331-3419 Quebec Inc., 9331-3468 Quebec Inc., and SPQ Inc.