C-122-858
Remand
Slip Op. 25-158
POR:  1/1/2015 – 12/31/2015
**PUBLIC DOCUMENT**
E&C/OIII:  KJ

***Committee Overseeing Action for Lumber International Trade Investigations or Negotiations***
***v. United States***
**Consol. Court No. 19-00122, Slip Op. 25-158 (CIT December 18, 2025)**
**Certain Softwood Lumber Products from Canada**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (CIT) issued on December 18, 2025.[1]  These final results of redetermination concern

Commerce's final results of the expedited review of the countervailing duty (CVD) order on

certain softwood lumber products (lumber or softwood lumber) covering the period of review

(POR) January 1, 2015, through December 31, 2015, concerning Les Produits Forestiers D&G

Ltée (D&G) and its cross-owned company Les Produits Forestiers Portbec Ltée (Portbec).[2]  The

CIT remanded for Commerce's reconsideration the documentation that D&G/Portbec proffered

with regard to the lumber the companies claimed was purchased from importers of record after

importation into the United States during the POR.[3]

---

[1] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 25-158 (CIT December 18, 2025) (*Remand Order – December 2025*).
[2] *See Certain Softwood Lumber Products from Canada:  Final Results of Countervailing Duty Expedited Review*, 84 FR 32121 (July 5, 2019) (*Expedited Review Final*), and accompanying Issues and Decision Memorandum (IDM).
[3] Within the remand order, the CIT did not address whether a decision by Commerce to include in its subsidy calculation documented purchases of duty paid lumber in the United Staes would be in accordance with law.  *See Remand Order – December 2025* at 16.

II.    BACKGROUND

On January 3, 2018, Commerce published the CVD order on softwood lumber from Canada.[4]  On March 8, 2018, in response to requests filed by certain Canadian producers and exporters, Commerce initiated an expedited review of the *CVD Order* pursuant to 19 CFR 351.214(k).[5]  The companies subject to the expedited review were not selected as mandatory or voluntary respondents in the CVD investigation and were subject to the all-others rate of 14.19 percent.[6]  The review period for the expedited review was the same as for the CVD investigation, *i.e.*, January 1, 2015, through December 31, 2015.[7]  On July 5, 2019, Commerce published the *Expedited Review Final* covering eight companies and their cross-owned affiliates, which included D&G/Portbec.[8]

Several of the expedited review companies, the Government of Canada, and the Government of Québec challenged certain Commerce determinations in the *Expedited Review Final*, and the Committee Overseeing Action for Lumber International Trade Investigations (COALITION) challenged Commerce's statutory authority to promulgate its expedited review regulations at 19 CFR 351.214(k) to determine individual subsidy rates for companies not individually examined in an investigation.  On November 19, 2020, the CIT remanded Commerce's *Expedited Review Final* for reconsideration of the statutory basis upon which Commerce promulgated its CVD expedited review regulations at 19 CFR 351.214(k).[9]  On

---

[4] *See Certain Softwood Lumber Products from Canada:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 FR 347 (January 3, 2018) (*CVD Order*).
[5] *See Certain Softwood Lumber Products from Canada:  Initiation of Expedited Review of the Countervailing Duty Order*, 83 FR 9833 (March 8, 2018) (*Initiation Notice*).
[6] *See CVD Order*, 83 FR at 348.
[7] *See Initiation Notice*, 83 FR at 9833.
[8] *See Expedited Review Final*, 84 FR at 32122.
[9] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, et al. v. United States, et al.*, 483 F.Supp.3d 1253 (CIT 2020) at 34-35.

February 22, 2021, Commerce issued its *First Remand Redetermination,*[10] in which Commerce found that it did not have the statutory authority to promulgate the CVD expedited review regulations at 19 CFR 351.214(k), and to conduct CVD expedited reviews.  On August 18, 2021, the CIT affirmed Commerce's remand and vacated the expedited review regulation at 19 CFR 351.214(k), as well as the *Expedited Review Final.*  Accordingly, the CIT declined to consider the remaining challenges to the *Expedited Review Final* raised by several of the expedited review companies.[11]

On April 25, 2023, the U.S. Court of Appeals for the Federal Circuit reversed and remanded the CIT's decision vacating Commerce's CVD expedited review regulation.[12]  Thus, the case returned to the CIT to decide the remaining substantive claims raised by several of the expedited review companies that the CIT had not previously considered due to vacating the *Expedited Review Final.*  On April 24, 2024, the CIT sustained several of Commerce's determinations in the *Expedited Review Final*, but remanded certain issues to Commerce including its decision not to attribute subsidies to D&G/Portbec received by their unaffiliated lumber suppliers.[13]  On September 10, 2024, Commerce issued its remand redetermination in which Commerce recalculated the subsidy rate for D&G/Portbec by treating them as trading companies, pursuant to 19 CFR 351.525(c), with respect to the companies' purchases of lumber

---

[10] *See Final Results of Redetermination Pursuant to Court Remand, Committee Overseeing Action for Lumber International Trade Investigations or Negotiations, et al. v. United States, et al.*, Court No. 19-00122, Slip Op. 20-167 (CIT 2020), dated February 22, 2021 (*First Remand Redetermination*).

[11] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 535 F.Supp.3d 1336 (CIT 2021).

[12] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 66 F.4th 968, 979 (Fed. Cir. 2023).

[13] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 24-50 (CIT April 22, 2024).

from unaffiliated Canadian suppliers that was either further processed (or "remanufactured") and sold to the United States, or resold without further processing to the United States.[14]

On January 21, 2025, the CIT sustained Commerce's determination to treat D&G/Portbec as trading companies in certain circumstances, as described above, but remanded the revised subsidy calculation for D&G/Portbec.[15] The CIT found that Commerce did not address the COALITION's arguments raised during the remand proceeding concerning D&G/Portbec's revised subsidy calculations, and that Commerce did not adequately explain how its revised calculation is better than the alternative methodologies proposed by the COALITION.[16]

D&G/Portbec argued that, in its remand analysis, Commerce should take into consideration comments the companies made on the *Second Remand Redetermination*, wherein they requested the opportunity to "provide a breakdown of purchases of lumber from unaffiliated Canadian suppliers separately for deliveries in Canada and in the United States," based on their view that Commerce's trading company regulation applies to "a trading company which exports subject merchandise" and does not apply "to a purchaser in the United States at arms' length from the importer of the subject merchandise."[17] D&G/Portbec stated that the record reflected that, with respect to Portbec, "{o}f the C\$11,509,555 in lumber purchased from unaffiliated Canadian suppliers in 2015, … C\$6,609,791 was resold in the United States."[18] D&G/Portbec,

---

[14] *See Final Results of Redetermination Pursuant to Court Remand*, *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 24-50 (CIT 2024), dated September 10, 2024 (*Second Remand Redetermination*).

[15] *See Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 25-8 (CIT January 21, 2025) (*Remand Order – January 2025*) at 15 and 20.

[16] *Id.*

[17] *See* D&G/Portbec's Letter, "Preliminary Comments for the Second Remand Redetermination in the Expedited Reviews of the Countervailing Duty Order on Softwood Lumber from Canada," dated February 19, 2025 at 2 (D&G/Portbec Letter).

[18] *Id.* at 4.

thus, "sought to document the share of C$6,609,791 in resales that was 'purchased from importers of record after importation into the United States.'"[19]

On April 21, 2025, Commerce issued its final results of redetermination disagreeing with D&G/Portbec's arguments that the subsidy calculation should not include lumber purchases Portbec made in the United States and that the record should be reopened to solicit the value of these purchases.[20]  Commerce's trading company methodology is based on section 701(a) of the Tariff Act of 1930, as amended, through which Congress directed Commerce to determine the extent of subsidization conferred upon the manufacture, production, or export of subject merchandise imported into the United States.  When a producer exports subject merchandise to the United States, that merchandise can be subsidized both at the production stage based on the subsidies received by the producer and, if exported through a trading company, by the subsidies received by the trading company.  Thus, we explained that:

> regardless of whether Portbec purchased the lumber in Canada from unaffiliated Canadian suppliers or purchased and resold the lumber in the United States, which was produced by unaffiliated Canadian suppliers, the situation is still appropriately considered in this instance to be a relationship between a producer and its trading company, under 19 CFR 351.525(c) because fundamentally the lumber was produced by an unaffiliated Canadian producer, which benefited from countervailable subsidies.[21]

Further, we explained that:

> … for Commerce to fully evaluate D&G/Portbec's arguments that 19 CFR 351.525(c) is inapplicable to the facts relating to their lumber purchases from unaffiliated Canadian suppliers, D&G/Portbec would have to have developed a record that demonstrates "D&G/Portbec purchased lumber on the open market {in the United States} from unaffiliated suppliers on a duty-paid basis."  However, they failed to do so.  Thus, their arguments are effectively assertions without a basis in the record or D&G/Portbec's responses.  As such, Commerce cannot rely on

---

[19] *Id.*

[20] *See Final Results of Redetermination Pursuant to Court Remand*, *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 25-8 (CIT 2025), dated April 21, 2025 (*Third Remand Redetermination*).

[21] *Id.* at 7.

D&G/Portbec's claim that they "operated no differently from an American company" when lumber was purchased and resold in the United States. If, in fact, D&G/Portbec was not the importer of record and purchased lumber in the United States only after an unaffiliated supplier entered it and subsequently resold it in the United States, then D&G/Portbec should have notified Commerce of those transaction details when they submitted their response to the June 5, 2024 questionnaire, but they chose not to do so.[22]

With respect to the subsidy calculation for D&G/Portbec, we reconsidered the subsidy calculation from the *Second Remand Redetermination* and found that Commerce's original calculation inappropriately weighted D&G/Portbec's purchases and sales.[23] After reconsidering the subsidy rate calculation methodologies (*i.e.*, Approach A and Approach B), as instructed by the CIT,[24] we concluded that Approach A properly takes into account each company's relative share of purchases of lumber from unaffiliated Canadian suppliers and each company's relative share of total sales to calculate the subsidy rate attributable to D&G and Portbec, under the trading company regulation, 19 CFR 351.525(c).[25] Having applied Approach A, we calculated an overall subsidy rate of 1.75 percent, which is above *de minimis*, for D&G/Portbec.[26]

In its December 18, 2025, order and opinion, the CIT stated that, in the *Third Remand Redetermination*, Commerce "failed to grapple with the basis for D&G/Portbec's request to reopen the record within the context of the record as a whole."[27] Therefore, the CIT remanded for Commerce's reconsideration the documentation that D&G/Portbec proffered with regard to the lumber the companies claimed was purchased from importers of record after importation into the United States during the POR.[28]

---

[22] *Id.* at 13-14.
[23] *Id*. at 8.
[24] *See Remand Order – January 2025* at 12-17.
[25] *See Third Remand Redetermination* at 9-10.
[26] *Id.* at 9 and 15.
[27] *See Remand Order – December 2025* at 19.
[28] *Id*. at 19-20.

On January 14, 2026, Commerce issued a questionnaire to D&G/Portbec requesting information and documentation regarding lumber that was purchased from importers of record after importation into the United States, and on January 30, 2026, received D&G/Portbec's response.[29]  On February 9, 2026, the COALITION submitted comments on D&G/Portbec's First Response.[30]  On February 10, 2026, Commerce issued a supplemental questionnaire to D&G/Portbec, and on February 17, 2026, received D&G/Portbec's supplemental response.[31]  On February 23, 2026, the COALITION submitted comments on D&G/Portbec's Second Response.[32]

## III.    ANALYSIS

As an initial matter, in the *Remand Order – December 2025*, the CIT noted that "D&G/Portbec sought to document the share of the C$6,609,791 in resales that was 'purchased from importers of record after importation into the United States.'"[33]  The CIT thus remanded "this limited matter to the agency for reconsideration and, as appropriate, acceptance of D&G/Portbec's proffered documentation."[34]  However, within its First Response, Portbec proffered more than the lumber purchase documentation, asserting that, in addition to lumber, from unaffiliated lumber suppliers, that was purchased in the United States after it was imported

---

[29] *See* Commerce's Letter, "Questionnaire for D&G/Portbec," dated January 14, 2026 (First Questionnaire); *see also* D&G/Portbec's Letter, "Response to Questionnaire for D&G/Portbec in the Court Remand in the Expedited Review of the Countervailing Duty Order on Softwood Lumber from Canada," dated January 30, 2026 (First Response).
[30] *See* COALITION's Letter, "Comments on D&G/Portbec's Supplemental Questionnaire Response," dated February 9, 2026.
[31] *See* Commerce's Letter, "Supplemental Questionnaire for D&G/Portbec," dated February 10, 2026 (Second Questionnaire); *see also* D&G/Portbec's Letter, "Response to Supplemental Questionnaire for D&G/Portbec in the Court Remand in the Expedited Review of the Countervailing Duty Order on Softwood Lumber from Canada," dated February 17, 2026 (Second Response).
[32] *See* COALITION's Letter, "Comments on D&G/Portbec's Second Supplemental Questionnaire Response," dated February 23, 2026.
[33] *See Remand Order – December 2025* at 8.
[34] *Id*. at 20.

(*i.e.*, Resales), Commerce should net out of the 2015 lumber purchase data secondary processing costs (*i.e.*, Secondary Processing Costs) to arrive at an accurate subsidy rate calculation.[35]

This remand is the first instance in which D&G/Portbec has raised the argument that secondary processing costs should be deducted in the calculation.  Because D&G/Portbec did not raise this argument in either the expedited review or earlier proceedings before the CIT or Commerce, the company waived the opportunity to raise the issue here.  Courts have held that "{j}ust economy, fairness to the parties and the need to fulfill Congress's intent of prompt resolution of these matters requires that errors of methodology, data selection, calculation, *etc.* all be raised from the outset."[36]  Nonetheless, because the information was placed on the record, we have considered it for purposes of this redetermination.  Thus, we analyzed the information and documentation that D&G/Portbec submitted for both Resales and Secondary Processing Costs.

### *Resales*

During the prior remand proceeding, in its February 19, 2025, letter, D&G/Portbec stated that it requests to submit "the precise figure for the share of the previously reported imports totaling C$6,609,791 that was indeed purchased from importers of record after importation into the United States, but which is included in the figure for purchases of lumber from unaffiliated Canadian suppliers … .  D&G/Portbec also is prepared to submit any additional information that the Department might require to ensure a fair and accurate calculation."[37]

Thus, in this remand proceeding, to support the claim that Portbec purchased lumber in the United States after importation, we requested that D&G/Portbec provide the following

---

[35] *See* First Response at 1.  Specifically, D&G/Portbec assert that Commerce should subtract secondary processing costs from Portbec's "Lumber (Unaffiliated Canadian Suppliers) – Remanufactured" category of the subsidy calculation.

[36] *See IPSCO Inc. v. United States*, 965 F.2d 1056, 1062 (Fed. Cir. 1992).

[37] *See* D&G/Portbec Letter at 4.

information and documentation for each transaction within the month that had the largest

purchase value of lumber from unaffiliated lumber suppliers during 2015, in order to document

the movement of the Canadian lumber across the border:  (a) date the lumber was exported from

Canada to the United States; (b) exporter of record; (c) date the lumber was imported into the

United States; (d) importer of record; (e) date the Canadian lumber was purchased by

D&G/Portbec in the United States and from whom; (f) date the Canadian lumber was sold by

D&G/Portbec in the United States and to whom; (g) Canadian customs invoice/commercial

invoice; (h) bill of lading; (i) manifest; (j) shipper's export declaration; (k) U.S. Customs entry

documentation; (l) purchase order; (m) invoice, (n) payment receipt; and (o) title transfer.[38]  In its

response, for purchase transactions within October 2015 (the month with the largest purchase

value), D&G/Portbec was able to provide only some of the requested items, such as the date the

Canadian lumber was purchased by D&G/Portbec in the United States and from whom; the date

the Canadian lumber was sold by D&G/Portbec in the United States and to whom; purchase

orders; invoices; and proof of payment.[39]  With regard to the other requested information,

D&G/Portbec stated that "{b}ecause Portbec did not handle the importation, we have no

documentation supporting the movement of the lumber across the border."[40]  D&G/Portbec

added that all transactions were Free on Board (FOB) – Destination or Freight Terms: Delivered,

meaning that the supplier retains title to and risk of loss of the lumber until the goods are

delivered to, and made available at, Portbec's designated destination."[41]

    After examining the information that D&G/Portbec submitted, we requested additional

information from Portbec to demonstrate that the lumber presented as purchases of Canadian

---

[38] *See* First Questionnaire at 4-5.
[39] *See* First Response at 2-3 and Exhibits A and C.
[40] *Id*. at 3.
[41] *Id*. at 1.

lumber in the United States in October 2015, itemized in Exhibit A, was already located within the United States when Portbec purchased it.[42]  Specifically, we also asked Portbec to explain the invoices from Tolko Marketing and Sales Ltd. (Tolko), dated October 20 and October 30, 2015, which indicate Vernon, British Columbia as the shipping point of the lumber sold to Portbec and state Portbec prepaid the supplier.[43]  In response, D&G/Portbec stated that Portbec does not take legal title until after delivery and acceptance of the lumber in the United States.[44]  They added that payment terms are sometimes shorter than the time required for the lumber to reach the destination (*e.g.*, when shipped by rail).[45]  In such cases, Portbec explained that it must advance the funds in order to comply with the agreed terms, before the lumber is delivered.[46]  Portbec added that "given that the transactions are conducted on an 'FOB Destination' basis, any transfer of funds made prior to Portbec's acceptance of the goods in the United States must be considered as an advance to the supplier."[47]

Additionally, D&G/Portbec submitted an affidavit from a Tolko employee with knowledge of the transactions between Portbec and Tolko.[48]  The Tolko employee stated that "Portbec purchased the lumber and took title to the goods solely within the United States (FOB Destination), for the purpose of reselling the lumber to a customer located in the United States" and "Portbec did not act as the importer of record for any lumber products subject to the transactions listed in Exhibit 'A'.  The importer of record for the lumber products was the lumber producer or another Canadian party, as applicable, and not Portbec, nor the U.S. end customer."[49]

---

[42] *See* Second Questionnaire at 4.
[43] *Id*. at 4; *see also* First Response at Exhibit C (p. 33 and 68).
[44] *See* Second Response at 1.
[45] *Id*.
[46] *Id*.
[47] *Id*.
[48] *Id*. at Exhibit 1a.
[49] *Id*.

In detail, we examined the Tolko invoices that were submitted for lumber purchased in October 2015, as well as June 2015 (which were provided in the Second Response). We observed that the invoices which have a shipping point of Vernon, British Columbia indicate "Importer of Record: Supplier."[50] We also observed that three other Tolko invoices, which indicate a shipping point of Island Point, Vermont, have the notation "Stock Transfer."[51] We further observed that, attached to these invoices, is inventory documentation from R.C.P Transit Inc., a temporary transit and storage facility located in Vermont,[52] indicating a yard transfer of lumber from Tolko to Portbec.[53]

Despite the fact that D&G/Portbec did not provide all the information and documentation requested to support the claim that a certain amount of lumber was purchased from unaffiliated Canadian suppliers in the United States after importation during 2015, we find that the substantive documentation that Portbec submitted for its purchases of lumber from Tolko in the United States is sufficiently representative of Portbec's purchases of imported lumber into the United States from other unaffiliated Canadian suppliers, which were subsequently resold to U.S. customers.

In the Second Response, Portbec reported that its purchases of lumber from unaffiliated Canadian suppliers in the United States that was resold in the United States totaled C$5,317,890 (discounted price paid).[54] Therefore, within the subsidy rate calculation, we netted out C$5,317,890 from the category "Lumber (Unaffiliated Canadian Suppliers) – Resold."[55]

---

[50] *See* First Response at Exhibit C (p. 33 and 68).
[51] *Id*. at Exhibit C (p. 36 and 59); *see also* Second Response at Exhibit 3.1 (pdf p. 39).
[52] *See* First Response at Exhibit B.
[53] *Id*. at Exhibit C (p. 37 and 60); *see also* Second Response at Exhibit 3.1 (pdf p. 40).
[54] *See* Second Response at 3 and Exhibit 3.1.
[55] *See* Memorandum, "Draft Results of Redetermination Calculations for Les Produits Forestiers D&G Ltée and Les Produits Forestiers Portbec Ltée," dated March 17, 2026 (Subsidy Rate Memorandum).

11

*Secondary Processing Costs*

As discussed above, within this remand, D&G/Portbec raised for the first time the argument that Portbec's secondary processing costs for lumber purchased from unaffiliated Canadian suppliers in Canada should be deducted in the subsidy rate calculation. Though this argument should have been presented in the context of the underlying expedited review, we nevertheless analyzed the information that D&G/Portbec submitted on the record of this remand.

Within the First Response, D&G/Portbec stated:

To reach the correct value of unaffiliated Canadian lumber purchases in the United States, and ultimately to determine the net value of countervailable purchases within Canada, the Department should also note that in the "Unaffiliated Canadian Suppliers" figure, *the total CAD $4,899,764 related to the secondary processing (reman) includes* (i) D&G as the Canadian source representing CAD $444,541.77,{[56]} and (ii) Portbec's production costs for secondary processing performed at a third-party facility with which Portbec had a contractual arrangement, amounting to CAD $949,964.17. These amounts totaling CAD $1,394,505.90 should be netted out to reach an accurate calculation of purchases within Canada from independent third-party sources.[57]

We, thus, requested D&G/Portbec to explain why transactions within the "Lumber (Unaffiliated Canadian Suppliers) – Remanufactured" category should now be excluded from the subsidy rate calculation and to provide a breakdown of all transactions that compose the C$4,899,764 figure which was first reported by Portbec in the June 18, 2024 Response.[58]

In response, D&G/Portbec stated that Commerce should exclude the transactions in order to calculate a rate "that accounts for Portbec's practice, uncommon in the industry, of subtracting

---

[56] D&G/Portbec subsequently corrected the record regarding the D&G secondary processing costs stating that "Portbec's transactions with D&G in fact were not included in the June 2024 questionnaire response data and the reference to same in the most recent questionnaire response was due to confusion on our part…." *See* Second Response at 2.

[57] *See* First Response at 1{emphasis added}.

[58] *See* Second Questionnaire at 5; *see also* D&G/Portbec's Letter, "Response to Supplemental Questionnaire," dated June 18, 2024 (June 18, 2024 Response), at Table 2. D&G/Portbec publicly disclosed the C$ value in its First Response.

certain secondary processing."[59]  D&G/Portbec also provided a list of transactions comprising the total remanufactured value amount of C$4,899,764, sourced from its accounting system.[60] We examined the transactions and observed that the listing contains only Portbec's lumber purchases from unaffiliated Canadian suppliers intended for secondary processing during 2015.[61] The listing does not include any transactions with Portbec's processing partner, Les Rabotage L'Islet Nord (RIN), with which Portbec had a subcontracting arrangement for secondary processing of lumber purchased from unaffiliated Canadian suppliers.[62]  Moreover, our examination of the transactions reports, which Portbec generated from its accounting system, shows that lumber purchased for remanufacturing and secondary processing costs are recorded in separate financial accounts.  Specifically, secondary processing costs that Portbec paid to RIN during 2015, were posted to accounts 414400 and 555006000.[63]  Whereas, Portbec's lumber purchases from unaffiliated Canadian suppliers intended for secondary processing during 2015, were recorded in accounts 411100 and 4150060000.[64]  We thus find that the evidence provided by D&G/Portbec does not support its request for a deduction in the subsidy rate calculation, but instead demonstrates that secondary processing costs are not in fact included in the C$4,899,764 remanufactured value reported in D&G/Portbec's June 18, 2024 Response.  Because the C$4,899,764 figure never included secondary processing costs for lumber that was purchased from unaffiliated Canadian suppliers, we conclude that there is no basis to subtract such costs from the value reported for Lumber (Unaffiliated Canadian Suppliers) – Remanufactured."

---

[59] *See* Second Response at 2 and Exhibit 2a.

[60] *Id.* at 3 and Exhibit 2d.  We note that the remanufactured value of C$4,899,764 is the summation of the full prices and not the summation of the actual discounted prices paid by Portbec, which totaled C$4,874,828.  *Id*. at Exhibit 3.2(ii).

[61] *Id*. at Exhibits 2d and 3.2(ii).

[62] *Id*. at 2 and Exhibits 2c(ii), 2d and 3.2(ii).

[63] *Id*. at Exhibit 2c(ii).

[64] *Id*. at Exhibits 2d and 3.2(ii).

**Revised Subsidy Rate**

As a result of our analysis, we made one modification to D&G/Portbec's subsidy rate calculation, based on Approach A as noted above.  We deducted the C$5,317,890 of lumber purchased from unaffiliated Canadian suppliers in the United States after importation from the category "Lumber (Unaffiliated Canadian Suppliers) – Resold."[65]  After accounting for that deduction, D&G/Portbec's revised subsidy rate is 1.05 percent, which is above *de minimis*.[66]

## IV.    INTERESTED PARTY COMMENTS

We released the Draft Remand to interested parties on March 17, 2026.[67]  On March 24, 2026, we received comments from the COALITION and D&G/Portbec.[68]  The arguments submitted are summarized and addressed below.

**Comment 1:    Whether There Is Sufficient Evidence to Find All Reported Imported Lumber Was Located in the United States at the Time of Purchase**

*COALITION's Comments*

The following is a verbatim summary of an argument submitted by the COALITION (internal citations omitted).  For further details, *see* the COALITION's Comments at 4-9.

> *Resales*: {Commerce} requested {D&G/Portbec} to provide certain documentation to support D&G/Portbec's claim that Portbec purchased lumber produced by unaffiliated Canadian producers in the United States after importation. D&G/Portbec failed to do so for most of the transactions the company claimed to have occurred in the United States.  {Commerce} stated that it found the documentation D&G/Portbec provided with respect to Portbec's purchases from {Tolko} "sufficiently representative of Portbec's purchases of imported lumber into the United States from other unaffiliated Canadian suppliers."  However, {Commerce} did not provide any citation or explanation on how Portbec's transactions with Tolko were "representative" of all other transactions Portbec had with other companies.  Given that D&G/Portbec has not been able to substantiate

[65] *See* Subsidy Rate Memorandum.

[66] *Id*.

[67] *See Draft Results of Redetermination Pursuant to Court Remand*, *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court No. 19-00122, Slip Op. 25-158 (CIT December 18, 2025), released March 17, 2026 (Draft Remand).

[68] *See* COALITION's Letter, "Comments on Draft Remand Redetermination," dated March 24, 2026 (COALITION's Comments); *see also* D&G/Portbec's Letter, "Comments on the Draft Remand Redetermination," dated March 24, 2026 (D&G/Portbec's Comments).

its claim for the majority of the transactions, {Commerce} should find that the record does not support an adjustment to the subsidy calculation for most of the transactions and correct its {Draft Remand} to net out only the transactions for which there is sufficient proof that they were indeed purchases Portbec made after importation to the United States.

*Secondary Processing Costs*: {Commerce} correctly noted that D&G/Portbec waived this argument by not raising it in earlier proceedings.  {Commerce} also correctly found that D&G/Portbec's argument lacks merit substantively. D&G/Portbec's documentation shows that the C$4,899,764.38 figure reported by D&G/Portbec for "Unaffiliated Canadian Suppliers – Remanufactured" in its June 2024 questionnaire response never included any costs Portbec incurred for secondary processing.  Accordingly, {Commerce} reasonably found that no further deduction is necessary because "the evidence provided by D&G/Portbec . . . demonstrates that secondary processing costs are not in fact included in the C$4,899,764 remanufactured value reported in D&G/Portbec's June 18, 2024 Response."   To the extent that D&G/Portbec's request for deduction is based on the belief that the supplier benefit should be calculated in a way that takes into account Portbec's secondary processing costs, this argument is meritless. {Commerce's} goal is to determine the subsidy benefit amount bestowed upon the lumber produced by other Canadian producers before Portbec purchased the lumber.  To what extent and expense Portbec wishes to further process such lumber after the purchase is entirely irrelevant to {Commerce's} inquiry here.  As such, {Commerce} correctly rejected D&G/Portbec's request.

*D&G/Portbec's Comments*

The following is a verbatim summary of an argument submitted by D&G/Portbec.  For further details, *see* the D&G/Portbec's Comments at 3-4.

D&G/Portbec supports {Commerce's} Draft Remand to the extent that they netted out C$5,317,890 from the category "Lumber (Unaffiliated Canadian Suppliers) – Resold."   D&G/Portbec previously requested the opportunity to provide information regarding lumber purchases from unaffiliated Canadian suppliers where D&G/Portbec both purchased and resold the lumber in the United States. When given that opportunity, D&G/Portbec cooperated with {Commerce} to the best of its ability and provided documentation on  supporting these purchases. {Commerce} correctly concluded that this documentation sufficiently supported D&G/Portbec's purchases in the United States and correctly netted out C$5,317,890 from the category "Lumber (Unaffiliated Canadian Suppliers) – Resold."

**Commerce's Position:**  We do not find the COALITION's arguments to be persuasive and, therefore, are not modifying our analysis for these final results of redetermination.

In the *Expedited Review*, we stated that "D&G/Portbec is a border mill that was verified to have sourced their wood from private sources, mostly in the United States."[69]  Commerce elaborated that "only a relatively small proportion of D&G/Portbec's business involves sales of merchandise from Canada to the United States."[70]

The statute does not require that Commerce examine all transactions of the respondents selected for investigation.  While the statute does proscribe that Commerce "shall determine an individual countervailable subsidy rate for each known exporter or producer of subject merchandise," the statute also provides an exception if "the administering authority determines that it is not practicable" to do so.[71]  In practice, where Commerce determines in that it does not have the resources necessary to examine each known producer or exporter, the agency has limited its examination to a reasonable number of exporters or producers.[72]

Commerce also has a practice of limiting its examination in other respects where the burden exceeds the available resources or where parties request a modification to certain reporting requirements.  In the preamble to Commerce's recently codified regulations, the agency further elaborated on its practice of limiting the amount information that it will examine in a segment of a proceeding when it is not practicable to examine all information and documentation at issue.[73]

---

[69] *See Expedited Review Final* IDM at 39.

[70] *Id*.

[71] *See* section 777A(e)(2) of the Act

[72] *See* 19 CFR 351.109(c).

[73] *See Regulations Enhancing the Administrative of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 FR 101694, 101747 (December 16, 2024) ("Commerce is tasked by Congress to be the administrator of the CVD law.  Commerce disagrees with certain commenters that because the Act expressly allows Commerce to select respondents when the number of potential respondents is too large to examine, the Act does not also permit Commerce to limit examination of certain transactions or entities when resource constraints and the record supported such a limitation.  Indeed, it is common for Commerce to limit the number of transactions or affiliated parties reviewed in a case when the facts on the record warrant such limitation.  This should not be surprising to anyone who practices before Commerce—it is the normal authority given to a Federal agency in charge of administering an administrative proceeding.").

16

For example, in *Ferrosilicon from Russia*, Commerce requested, in the initial questionnaire, only sample documents and sample agreements, used as support for a respondent's reported sales practice, procedure, or process that it employs in its ordinary course of business, stating that "{it} routinely makes determinations based on sample sets of documents."[74]  Other case examples include *4th Tier Cigarettes from Korea*, where Commerce limited home market sales reporting requirements to two sales channels;[75] *Shrimp from Vietnam*, where Commerce selected for examination the largest unaffiliated farmer who supplied raw shrimp to a mandatory respondent,[76] and *CRS from Russia,* where, given a large number of cross-owned affiliated input suppliers of scrap, Commerce limited its examination to the two largest suppliers.[77]  Citing resource constraints or parties' requests, Commerce has also limited its review of information by

---

[74] *See Ferrosilicon from the Russian Federation:  Final Determination of Sales at Not Less Than Fair Value*, 79 FR 44393 (July 31, 2024), and accompanying IDM at Comment 2.

[75] *See 4th Tier Cigarettes from the Republic of Korea:  Preliminary Affirmative Determination of Sales at Less Than Fair Value and Preliminary Negative Determination of Critical Circumstances*, 85 FR 44281 (July 22, 2020), and accompanying Preliminary Decision Memorandum (PDM) at 3 and 13, unchanged in *4th Tier Cigarettes from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 FR 79994 (December 11, 2020) (collectively, *4th Tier Cigarettes from Korea*).

[76] *See Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 FR 22374 (April 1, 2024), and accompanying PDM at 2-3, unchanged in *Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination*, 89 FR 85500 (October 28, 2024) (collectively, *Shrimp from Vietnam*).

[77] *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Determination*, 80 FR 79564 (December 22, 2015), and accompanying PDM at 2, unchanged in *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative Countervailing Duty Determination and Final  Negative Critical Circumstances Determination*, 81 FR 49935 (July 29, 2016) (collectively, *CRS from Russia*).

modifying the period of review;[78] and limiting its request of certain sales information;[79] supporting documentation;[80] verification reporting; among others.

Given the time and resource constraints necessary to complete this remand, it was not practicable for Commerce to examine all lumber purchases from unaffiliated Canadian suppliers that Portbec stated occurred in the United States after importation (*i.e.*, resales) during 2015.[81] Consequently, when we re-opened the record, we decided to conduct a spot-check of the information and limited an examination to those transactions that took place in the month with the largest value of resales during 2015, to serve as a proxy for the year.[82]

Our analysis was of the month in which Portbec had the largest value of resales during 2015. Such an analysis is not unlike a verification procedure that Commerce routinely undertakes where a subset of a large amount of documentation is selected for examination. We note that the CIT has upheld the principle that "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe."[83]

---

[78] *See, e.g., Finished Carbon Steel Flanges from India:  Final Results of Countervailing Duty Administrative Review, 2016-2017*, 85 FR 18193 (April 1, 2020), and accompanying IDM at 4.

[79] *See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 1204, 1213 (U.S. 2005) ("The respondent in that case had reached an agreement with Commerce to provide limited reporting of downstream sales."); and *Silicon Metal from Brazil:  Affirmative Final Determination of Sales at Less Than Fair Value*, 83 FR 9835 (March 8, 2018), and accompanying IDM at 18 (stating "This limited reporting of its sales and cost data is a result of Dow Corning's own request that it be excused from reporting all of its sales and costs for all of its downstream products.  Commerce consented to Dow Corning's request.").

[80] *See Polyethylene Terephthalate Film, Sheet, and Strip from India:  Final Results of Countervailing Duty Administrative Review; 2013*, 81 FR 7753 (February 16, 2016), and accompanying IDM at fn. 28 (stating "To alleviate the burden of reporting for Jindal, the Department granted Jindal limited reporting of the license documentation.  Thus, the analysis of the EPCGS license documentation is based on a sample of license documents.").

[81] The *Remand Order – December 2025*, issued on December 18, 2025, initially had a deadline of March 18, 2026, which was subsequently extended by 30 days to April 17, 2026.

[82] *See* First Questionnaire at 4-5.

[83] *See, e.g., Geneva Steel v. United States*, 914 F. Supp. 563, 590 (CIT 1996) ("Commerce's decision to employ a spot check of the information submitted was a reasonable method of verification as there is no obligation on Commerce to conduct a comprehensive examination of all information submitted."); *see also Micron Technology v. United States*, 535 F. Supp. 2d 1336 (CIT 2007) ("It is not required that Commerce trace through every number of

As discussed in the Draft Remand, Portbec did not provide all the information and documentation that was requested regarding the resales, but it did submit important information for our examination, such as purchase orders, invoices, inventory sheets, proof of payment, and an affidavit from a Tolko employee.[84] After a review of Portbec's responses, we found that substantive documentation was submitted regarding Portbec's purchases of lumber from Tolko in the United States after importation.[85] We also found that those purchases from Tolko are representative of the experience Portbec had with other unaffiliated Canadian lumber suppliers during 2015.[86]

The basis for finding Tolko as a proxy for Portbec's other unaffiliated Canadian lumber suppliers is that Tolko was Portbec's largest supplier during October 2015. Out of the 20 transactions in October 2015, involving seven unaffiliated Canadian suppliers, Portbec had the most transactions with Tolko (six purchases) accounting for 40.02 percent of the month's purchases, thus making Tolko the largest supplier to Portbec.[87] According to Portbec's purchase ledger, Tolko was a main supplier throughout 2015.[88] Based on these facts, we continue to find that Portbec's purchases of lumber from Tolko in the United States after importation are representative of the purchase transactions that Portbec had with other unaffiliated Canadian lumber suppliers in the United States during 2015. Therefore, contrary to the COALITION's arguments, we need not revise the subsidy calculation by netting out, on a case-by-case basis,

---

the response – a representative sample is sufficient. We further note that it would be unrealistic to require a full-scale audit of the foreign entity … . Finally, in concluding that Commerce was not required to conduct full-scale audits of …{respondents}, we are mindful of the statutory time constraints imposed on Commerce.").
[84] *See* Draft Remand at 9-11.
[85] *Id*.
[86] *Id*. at 11.
[87] *See* Second Response at Exhibit 3.1.
[88] *Id*.

only those transactions where support that the purchases were made after importation in the United States is on the record.

Regarding the issue of secondary processing costs, as no party has argued against our decision in the Draft Remand, we have not changed our finding that there is no basis to subtract such costs from the value reported for Lumber (Unaffiliated Canadian Suppliers) – Remanufactured" in the subsidy rate calculation.[89]

## V.    FINAL RESULTS OF REDETERMINATION

We continue to deduct the C$5,317,890 of lumber purchased from unaffiliated Canadian suppliers in the United States after importation from the category "Lumber (Unaffiliated Canadian Suppliers) – Resold."[90]  After accounting for the resales deduction, D&G/Portbec's revised subsidy rate is 1.05 percent, which is above *de minimis*.[91]

4/17/2026

X _Chris Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[89] *See* Draft Remand at 12-14.
[90] *See* Subsidy Rate Memorandum.
[91] *Id.*

20